UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUSIANA

| | | |
|---|---|---|
| PAMELA BROOKS | * | CIVIL ACTION |
| | * | |
| | * | CASE NO. 2:18 – cv- 07736 |
| VERSUS | * | |
| | * | SECTION: E |
| | * | |
| CHRISTINE N. WATLER, UNITED STATES | * | |
| POSTAL SERVICE AND UNITED STATES | * | JUDGE:  SUSIE MORGAN |
| OF AMERICA | * | MAGISTRATE:  JOSEPH C. |
| | * | WILKINSON, JR. |

*********************************************************************************************

## MEMORANDUM IN SUPPORT OF DAUBERT MOTION AND MOTION IN LIMINE  TO EXCLUDE THE TESTIMONY, REPORT AND OPINIONS  OF DR. KEVIN WATSON

**MAY IT PLEASE THE COURT:**

Plaintiff, PAMELA BROOKS, files this Memorandum in Support of *Daubert* Motion and Motion in Limine to Exclude the Testimony, Report and Opinions of Dr. Kevin Watson.

### I.    FACTUAL BACKGROUND:

The present lawsuit was filed by Pamela Brooks as the result of injuries that she sustained on October 31, 2016 as the result of a rear end crash.  Ms. Brooks was operating her 2010 Nissan Altima and was travelling in an easterly direction on Veterans Memorial Boulevard at its intersection with southbound Pontchartrain Boulevard, which eastbound Veterans Memorial Boulevard traffic was controlled by a yield sign, when Ms.

1

Brooks brought her vehicle to a gradual, safe and complete stop in order to yield to southbound Pontchartrain Boulevard traffic in New Orleans, Louisiana.

Christine Watler was acting in the course and scope of her employment with the United States Postal Service (USPS), operating a 2005 Dodge Caravan United States Postal Service vehicle, and was travelling directly behind Ms. Brooks' vehicle, when suddenly and without warning, Ms. Watler collided into the rear of Ms. Brooks' vehicle.

The investigating New Orleans police officer concluded that Ms. Watler was in violation of following too closely.

As a result of this crash, Ms. Brooks sustained injuries to her neck, back, shoulders and both knees for which she has been under active medical treatment with Dr. Marco Rodriguez, a board certified orthopedic spine surgeon, Dr. Douglas Bostick, a board certified orthopedic extremity surgeon, and Dr. Fred DeFrancesch, a spine interventionalist with board certification in physical medicine and rehabilitation with additional board certifications in pain medicine and spinal cord injuries.

## II. DEFENDANT RETAINED DR. KEVIN WATSON TO PROVIDE AN ADDITIONAL MEDICAL OPINION OUTSIDE THE AREA OF HIS EXPERTISE

In its effort to refute medical causation and the recommended future treatment by all of Plaintiff's treating physicians, Defendant hired Dr. Kevin Watson to evaluate Ms. Brooks and provide a medical causation opinion. Dr. Watson is an orthopedist with a general orthopedic practice that does not include the following:

1.  Dr. Watson is not a biomechanical engineer. (Exhibit 1, p. 25-26; Exhibit 2)

2.  Dr. Watson is not an accident reconstruction expert. (Exhibit 1, p. 25-26; Exhibit 2).

3.  Dr. Watson is not a spine specialist. (Exhibit 1, p. 16).

4.  Dr. Watson is not a spine interventionalist. (Exhibit 1, p. 21).

(Exhibit 1, Exhibit 2 - CV).

III.  **APPLICATION OF FEDERAL RULE OF EVIDENCE 702 AND DAUBERT PRINCIPLES MANDATE THAT AN EXPERT BE QUALIFIED TO TESTIFY IN THE AREA OF EXPERTISE IN WHICH HE IS BEING OFFERED.**

A.  **Federal Rule of Evidence Article 702 and Daubert.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. The Rule states:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. "

*Oaks v. Westfield Ins. Co., et al,* **2014 WL 198161 (E.D. 2014) citing Fed. Rules of Evidence Rule 702.**

Rule 702 is in effect a codification of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals,* **509 U.S. 579, 589 112 S.Ct. 2786 (1993).** *Daubert* provides the analytical framework for determining whether expert testimony is admissible under Rule 702. *Wright v. Selective Insurance, et al,* **2016 WL 11083337 (E.D. La. 2016).**

In *Daubert*, the Supreme Court held that trial courts should serve as gatekeepers for expert testimony and should not admit such testimony without first determining that

the testimony is both "reliable" and "relevant." ***Wright, supra***. In satisfying its "gatekeeper" duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions. ***Wright, supra***.

Both scientific and non-scientific testimony are subject to the ***Daubert*** framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant." ***Oaks*** citing ***Burleson v. Tex. Dep't of Criminal Justice*, 393 F. 3d 577, 584 (5th Cir. 2004);** see also ***Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137,147 (1999).**

When expert testimony is challenged under ***Daubert***, the party offering the expert's testimony bears the burden of proving its reliability and relevance by a preponderance of the evidence. ***Oak, supra,*** citing ***Moore v. Ashland Chem. Co., Inc.*, 151 F. 3d 269, 276 (5th Cir. 1988)** *cert. denied*, **526 U.S. 1064 (1999**).

**Rule 702 requires that the expert be qualified and that his testimony assist the trier of fact**. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, **158 F. 3d 548 (11th Cir. 1999)** citing ***Joiner v. General Electric, Co.*, 78 F. 3d at 529-30,** *rev'd on other grounds*, **522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 508 (1997).** (Emphasis added).

The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *Id* at 590. The overall goal is to make certain that an expert, whether basing his testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1156 (1999).

The United States Supreme Court in *Daubert, supra,* set forth several non-exclusive factors for the courts to consider in making a determination as to whether an expert's testimony is relevant and reliable. Those factors include but are not limited to:

1. The testability of the technique or scientific inquiry;

2. Whether the theory or technique has been subjected to peer review and publication;

3. The known or potential rate of error; and

4. Whether the technique had gained general acceptance.

*Daubert*, 509 U.S. at 589, 593-94.

Pursuant to Federal Rule of Evidence Article 702, the holding in Daubert and the evidence, Dr. Watson's testimony, report and opinions must be stricken.

**B.** **The Courts In Employing Their Gatekeeping Function Have Refused to Allow an Expert to Testify Outside of his Area of Expertise Pursuant to Rule 702 and Daubert.**

1. **The Courts Have Stringent Requirements for the Qualification of an Expert in Accident Reconstruction.**

**Accident Reconstructionists**

Accident reconstructionists testify about facts from which they claim to be able to give an accurate picture of the sequence of events immediately preceding an accident. These facts include: "Vehicle mass; direction of skid marks; dimensions of vehicles involved; dents, brakes and paint transfers of vehicles; road surface textures; and physics principles of mechanics such as inertia, velocity, coefficients of friction, and operating characteristics of vehicles." *Tuato vs. Brown,* 85 Fed.Appx. 674, 10th Cir. 2003).

The accident reconstructionist, scientifically, based upon principles and theories of physics determines the forces generated in a crash in order to scientifically determine the forces subjected to an occupant in a vehicle.

In *Wilson vs. Woods,* 163 F.3d 935 (5th Cir. 1999), defendants retained A.K. Rosenhan, whom they offered at trial as an expert in accident reconstruction. Rosenhan had a bachelor of science degree and a master of science degree in mechanical engineering, taught courses in mechanical engineering and industrial engineering at various colleges and vocational schools, did consulting work for 25 years in fire reconstruction and investigation and at the time of trial, had shifted his professional emphasis to automobile accident reconstruction. *Wilson at 937.* During voir dire Rosenhan testified that although he taught college level courses, he never held a professional rank, he never taught an accident reconstruction course or any other course that involved accident reconstruction, he had no degree or certification in accident reconstruction but was enrolled in a correspondence course from the Northwestern Traffic Institute, he had not completed the requirements for certification by the Association of Accident Reconstructionists, and although he testified in various cases, one court had refused to qualify him as an expert in vehicle accident reconstruction based on his lack of qualifications. *Wilson at 937.* The court also questioned Rosenhan and ascertained that he had never conducted any studies or experiments in the field of accident reconstruction, he did not take any measurements or collect any data from the accident scene, and that he was unable to show that his training or experience as a mechanical engineer gave him expertise in the field of accident reconstruction that was

distinguishable from training received by other mechanical engineers. Based on all of these facts, the court refused to qualify Rosenhan as an expert witness. ***Wilson at 937.***

## 2. The Courts Have Stringent Requirements for the Qualification of an Expert in Biomechanical Engineering.

### Biomechanical Engineering

Biomechanics apply the principles in mechanics to the facts of a specific accident and provide information about the forces generated in that accident, explain how the body moves in response to those forces, and thus determine what type of injuries would result from the forces generated. Biomechanics are qualified to determine what injury causation forces are in general and can tell how a hypothetical person's body will respond to those forces, but are not qualified to render medical opinions regarding the precise cause of a specific injury. Each individual person has his own tolerance level, and therefore a biomechanical engineer can testify only in general terms concerning what forces can lead to what injuries. *Smelser vs. Norfolk Southern Railroad Company,* 105 F.3d 299 (6th Cir. 1997).

Likewise in ***Oaks v. Westfield Ins. Co., 2014 WL 198161 (E.D. La. 2014)***, defendants attempted to introduce the testimony of Dr. Richard Harding, an expert in biomechanical engineering, impact kinematics, and injury causation analysis to prove that Plaintiff's injuries were not caused by the accident at issue. Judge Barbier held that Dr. Hardings' testimony was unreliable, beyond the witnesses' expertise, and unhelpful to the trier of fact because although the defendants were presenting Dr. Harding as a biomechanical expert, his biomechanical qualifications were only partially relevant

because his report did not present solely a biomechanical analysis. ***Oak, supra.*** Judge Barbier stated further that Dr. Harding provided both biomechanical and medical causation opinions when he opined that the force of impact could not have caused Plaintiff's injuries. The court elaborated further that Dr. Harding was not qualified to testify about Plaintiff's medical condition because he was not board certified or qualified in any medical specialty, he had not practiced clinical medicine in over a decade, and he had never been licensed to practice in the United States. Judge Barbier elaborated further that Dr. Harding's accident reconstruction certification was irrelevant because his report did not reconstruct the exact accident at issue. Rather, Dr. Harding re-created a loosely similar accident or relied on prior testing that presented an allegedly similar scenario. ***Oak, supra***. Judge Barbier ultimately concluded that Dr. Harding's opinion would not assist the trier of fact in any way, but would confuse the jury or cloud its common sense fact-finding role and granted Plaintiff's motion in limine. ***Oak, supra***.

## IV.  DR. WATSON IS NOT A BIOMECHANICAL ENGINEER NOR IS HE AN ACCIDENT RECONSTRUCTION EXPERT.

1.  **Dr. Watson has no knowledge, skill, experience, training or eduction in Biomechanical Engineering or Accident Reconstruction**.

Dr. Watson testified that he is an orthopedist with a general orthopedic practice. (Exhibit 1, p. 16).   Dr. Watson is not an accident reconstructionist and is not a biomechanical engineer.

A review of Dr. Watson's expert report and his deposition testimony shows that Dr. Watson attempts to provide biomechanical engineering and accident reconstruction testimony by applying biomechanical engineering and accident reconstruction theories

and principles regarding the causation of Ms. Brooks' injuries and her need for future treatment. **(Exhibits 1 and 2).**   Dr. Watson strays beyond his expertise as a general orthopedist.

When questioned regarding his qualifications and expertise, Dr. Watson testified as follows:

"Q: ... When you testified in court on those two occasions, were you offered and accepted as an expert in any other field other than general orthopedic surgery?

**A: No**.

Q: Have you ever offered an opinion as a biomechanical engineer?

**A: No**.

Q: Do you have any training in accident reconstruction?

**A: No**.

Q: Do you have any training in biomechanical engineering?

**A: No.**

Q: Do you have any experience in accident reconstruction?

**A:  I don't know what that means.**
**I have gone to some courses put on by the America Academy of Orthopedic Surgeons where they do talk about the biomechanics of motor vehicle collisions and the passenger mechanics**.

Q: I'm going to get into that in just a minute. But right now I'm asking you, do you have any expertise in accident reconstruction?

**A: No**.

Q:  Do you have any experience in biomechanical engineering?

**A: No.**

Q: Do you have any expertise in accident reconstruction.

A: **Again besides how I answered your other question**.

Q: Why don't you answer it again so we have it on the record.

A: **Again, what I said was, I've been to courses put on by the American Academy of Orthopedic Surgeons, which talks about the biomechanics of passengers and the response involving motor vehicle collisions**.

Q:  I don't know if that answers that question, I'm going to ask this: Do you have any experience in biomechanical engineering:

A: **Other than what I just answered. If you consider that biomechanical engineering, then yes.  If you don't, then no**.

Q:  Have you ever used or applied any biomechanical engineering protocol in evaluating and rendering opinions in orthopedics?

A: **No**.

Q: Have you ever been tendered or accepted as an expert in accident reconstruction?

A: **No**.

Q: Have you ever been tendered or accepted as an expert in biomechanical engineering?

A: **No**.
Q:  Are you an accident reconstructionist?

A: **No.**

Q: Are you a biomechanical engineer?

A: **No**. "

**(Exhibit 1, p. 25-28).**

Dr. Watson by his own admission is not a biomechanical engineer and is not an accident reconstructionist. Despite his lack of qualifications in biomechanical engineering and accident reconstruction, Dr. Watson's report and deposition testimony are based upon the unqualified use of accident reconstruction and biomechanical engineering theories and principles.  The fact that Dr. Watson is an orthopedist should not give him complete rein to provide "expert opinions" when his opinions are undisputedly outside the realm of his orthopedic practice. To do so, would completely subvert what Federal Rule of Evidence Article 702 and *Daubert* were enacted to do.

2. **Dr. Watson's Report is Fraught With the Application of Biomechanical Engineering and Accident Reconstruction Principles, Theories and Conclusions Masked as Medical Opinions.**

- **Cervical and Lumbar Injuries**:

Dr. Watson provided the following opinions in his report with regard to the cervical and lumbar injuries sustained by Ms. Brooks:

> "The accident photos and traffic crash report denote a low speed rear-end MVC with minimal damage to either vehicle."  (Exhibit 2; p. 8).   …

> "The AMA Guides Newsletter November/December 2018 report that vehicles that sustain little or no damage are typical of minor/low-speed collisions, generally with delta-Vs (change in velocity) less than 10 mph." (Exhibit 2; p. 8).   …

> "**As for a mechanism of injury (Step 2 and 3), low change in velocity rear end impacts have not been shown to generate cervical injury. Cormier et al in Spine 2018 report that the risk of injury beyond neck strain in low change in velocity rear end collisions is essentially zero. There is general acceptance that volunteers can be safely exposed to rear impacts of less than 18 km per hour (11 mph) without a meaningful risk of injury**." **(Exhibit 2, p. 9). (Emphasis added).   …**

11

"There is no objective evidence of trauma to the cervical spine. **The low change in velocity mechanism of injury has not been shown to generate cervical disc injury or generate forces that cause neck injury beyond a strain.** There is no objective justification for a causation claim that the incident generated the changes seen on Ms. Baker's (sic) cervical MRI or ongoing neck complaints. "

**(Exhibit  2; p. 10). (Emphasis added).   ...**

Here, Dr. Watson is relying on a 1976 study authored by Joseph M. Cormier, who has a Ph.D. in Biomedical Engineering and who is employed by Biodynamic Research Corporation (BRC). Dr. Watson's deposition testimony cited above confirms that he is not a biomedical engineer.  Nevertheless, Dr. Watson is referencing, and attempting to apply relying on biomechanical engineering principles and theories when he admittedly has absolutely no education, experience, or expertise in the field of biomedical engineering. Despite his complete lack of qualifications in this area, Dr. Watson attempts to apply principles and theories of biomechanical engineering in order to arrive at his opinion that Ms. Brooks' injuries were not caused by this crash. Dr. Watson's report and testimony is unreliable and outside the area of his expertise.  Dr. Watson's report goes on to apply other theories and principles of accident reconstruction and biomechanical engineering as follows:

"Furthermore, in this accident, it is unclear how a cervical or lumbar injury would occur. Disc injury is typically a combination of flexion and compression with force. Facet injury could occur with hyperflexion or extension. **These forces would not be expected to have occurred in this case, especially at a low change in velocity. Wood. et. al. in the <u>AMA Guides Newsletter</u> November/December 2018, specifically report that "the motions, forces, and accelerations generated in low-speed (low change in velocity) collisions are less than those encountered in activities**

**of daily living.** The scientific process of injury causation analysis leads to the conclusion that disc degeneration and disc herniations are pre-existing and not caused by low-speed vehicle collisions.

**(Exhibit 2, p. 11) (Emphasis Added) …**

"Lee et. al. in Annals of Orthopedics & Rheumatology **report that low change in velocity rear end vehicular collisions produce limited impact forces, limited lumbar range of motion, and a general lack of injury mechanism…"**

**(Exhibit 2, p. 11) (Emphasis Added) …**

"…There is no objective evidence of trauma to the lumbar spine. **The low-speed change in velocity mechanism of injury has not been shown to generate disc injury or serious back issues.** There is no objective justification for a causation claim that the incident generated the changes seen on Ms. Brooks' lumbar MRI or ongoing back complaints…"

**(Exhibit 2; p. 12). (Emphasis added). …**

- **Bilateral Knee Injuries:**

With regard to Ms. Brooks' bilateral knee injuries, Dr. Watson's report provides as follows:

"**As for causation and mechanism of injury, there is no clear mechanism by which a low speed rear-end collision would generate arthritis in the knee. Furthermore, there is no clear mechanism by which a low speed rear-end collision would exacerbate or aggravate a pre-existing condition to any significant degree. Orthopedic literature (and other publications) has shown that in a rear-end collision, the driver would move rearward in the seat. The seat would absorb energy from the impact and then the driver would rebound forward. However, the rebound would be dissipated and also restrained by the shoulder and lap belt. This type of motion would not be consistent with the generation of a meniscus tear, ligament tear, arthritis, or an aggravation of a pre-existing condition. "**

**(Exhibit 2, p. 12). (Emphasis added) …**

- **Bilateral Shoulder Injuries:**

    Dr. Watson's report provides as follows with regard to Ms. Brooks' bilateral shoulder injuries:

> "Brooks et. al. in the AMA Guides Newsletter January/February 2014 report that MRIs identify a high prevalence of rotator cuff tears in asymptomatic individuals. **They also report that the "biomechanical literature contains no reports of human volunteers sustaining cuff tears or other shoulder injury in staged rear-end collisions despite the fact that several hundred such tests have been conducted." In the conclusion they state that there is "insufficient evidence in the medical literature to conclude that rear-end MVCs cause rotator cuff tears and compelling evidence in the biomechanical literature that low-speed rear-end collisions do not." "They also note that the forces in a low-speed rear impact are insufficient to even propagate a pre-existing partial tear, much less cause a new tear."**

> **(Exhibit 2, p. 13). (Emphasis added).**

- **Right Shoulder Injury:**

    With regard to the right shoulder, Dr. Watson concluded the following:

> "The presence of partial tearing does not signify trauma or an acute traumatic origin. **The mechanism of injury is not consistent with the generation of a rotator cuff tear according to the medical and biomechanical literature cited by the AMA".**

> (Exhibit 2, p. 13). (Emphasis added)

    The above verbiage including "motions, forces, and accelerations generated in low-speed accidents and changes in velocity" are derived directly from biomechanical engineering and accident reconstruction studies, principles and theories. Clearly, Dr. Watson is inserting these principles and theories into his report and attempting to apply these principles and theories without the required knowledge, skill, experience, training

or education in either of these specialized areas.  Further, there is no evidence of the context in which these articles were written since the articles were not attached to Dr. Watson's report. When questioned about the authors of the articles, whether the authors were medical doctors or biomechanical engineers, and specific questions concerning the groups studied, Dr. Watson was unable to provide the information to any degree of certainty. (Exhibit 1, p. 38, 42, 44, 45, 46, 49, 51, 54, 57, 62, 65).

The law does not allow Dr. Watson to provide a biomechanical engineering and/or accident reconstruction analysis cloaked as a medical opinion. Irrefutably, Dr. Watson has no knowledge, skill, experience, training or education in biomechanical engineering or accident reconstruction and according to the governing law and jurisprudence Dr. Watson cannot provide an expert opinion that is not only outside his area of expertise, but in an area where he has absolutely no experience or training.

**3. If Dr. Watson Did Not Rely On Biomechanical Engineering and Accident Reconstruction Principles and Theories, and Relied Solely on His Medical Expertise, He Would Conclude that Ms. Brooks' Injuries Were Caused by this Automobile Crash.**

Dr. Watson testified that his opinions regarding causation were based on the articles cited in his report which include both biomechanical engineering and accident reconstruction principles and theories as follows:

Q: …I'm going to talk about your ultimate opinion in just a bit. **But is it a fair statement that your ultimate opinion relies, at least in part, on all of the articles that you've cited on page 14 and 15 of your report?**

A: **Yes.**

**(Exhibit 1, p. 50).  (Exhibit 2, p. 14 and 15) (Emphasis added)**

Q: Do you, independent of all of these articles, know the force required in an automobile crash to cause injury?

**Ms. Chickering:**

Object to the form.

**The Witness**:

**No, I couldn't quote you an exact Newton force, no**.

**By Mr. Favret**:

Q:  That's not within your knowledge or expertise. Is that fair to say?

A**:  Yes.**

**(Exhibit 1, p. 86).**

Conversely, if Dr. Watson based his medical causation opinion on his experience as a general orthopedic physician, and not on the biomechanical engineering and accident reconstruction theories and principles cited in his report, his ultimate medical opinion would be that Ms. Brooks' injuries were caused by this automobile crash as evidenced by the following testimony:

Q: Now, hypothetically if Ms. Brooks experienced pain as a result of this crash in her neck, her low back, her shoulders, and her knees within 24 hours of the crash, and hypothetically, if she reported all those symptoms to the first doctor she saw three days later, based upon that, would you relate those symptoms to the crash of October 31, 2016? I know this is hypothetical.

**A:  Yeah. I think, yes**.

**(Exhibit 1, p. 109)**.

If Dr. Watson based his medical causation opinion on his experience as a general orthopedic physician and not biomechanical engineering and accident reconstruction

principles and theories, Dr. Watson also relates Ms. Brooks' medical treatment to the automobile crash as evidenced by the following:

> Q: By history, do you relate all of the medical treatment Ms. Brooks has undergone that you're aware of, from all of her treating physicians, to the October 31, 2016 crash.
>
> **A: Yes.**
>
> **(Exhibit 1, p. 127)**.

4. **Dr. Watson's Report and Opinions Are So Intertwined With Biomechanical Engineering and Accident Reconstruction Principles and Theories That it is Impossible to Separate His Unqualified Use of Accident Reconstruction and Biomechanical Principles and Theories From That of Any Medical Opinions He may Have.**

It is well settled that District Courts must be assured that the proffered witness is qualified to testify by virtue of his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. ***Wilson v. Woods*, 163 F. 3d 935 (5th Cir. 1999)**. The district court makes preliminary determinations whether the proposed expert witness is qualified … under Rule 702. ***Wilson, supra, citing Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F. 3d 777, 781 (3d Cir. 1996).**

The expert's assurances that he has used generally accepted methodology is insufficient. *Moore v. Ashland Chemical*, 151 F.3d 269 (9th Cir. 1995). Moreover, nothing in either ***Daubert*** or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ***ipse dixit*** of the expert. A court

may conclude that there is simply too great an analytical gap between the data and the opinion offered. ***General Electric Co. v. Joiner, supra.***

Here, Dr. Watson's report and opinions are so intertwined and tainted with biomechanical engineering and accident reconstruction principles and theories that it is impossible to separate any qualified general orthopedic testimony about which Dr. Watson could be qualified to provide. In fact, it would be impossible for Dr. Watson to testify as per his report considering his strong unqualified reliance on biomechanical engineering and accident reconstruction theories and principles which he relied upon in order to reach his opinions as evidenced by both his testimony and report. (Exhibits 1 and 2). Based on the facts, governing law, and jurisprudence, Dr. Watson's testimony and his report must be completely stricken based on his lack of qualifications in these areas and the fact that his testimony will not assist the trier of fact.

**V.    DR. WATSON IS NOT A SPINE SPECIALIST OR A SPINAL INTERVENTIONALIST.**

**A. Ms. Brooks is Under Active Medical Treatment with a Board Certified Orthopedic Spine Surgeon and a Spine Interventionalist Who is Board Certified in Physical Medicine and Rehabilitation, Pain Medicine and Spinal Cord Injuries.**

Ms. Brooks is under active medical treatment with Dr. Marco Rodriguez, a board certified orthopedic spine surgeon and Dr. Fred DeFrancesch, a spine interventionalist who is board certified in physical medicine and rehabilitation with additional board certifications in pain medicine and spinal cord injuries.

Pursuant to the recommendations of both Dr. Rodriguez and Dr. DeFrancesch, Ms. Brooks has undergone a cervical facet joint injection on the right at C4-5 and C5-6 and medial branch block on the right at C4, C5, and C6, a confirmatory medial branch blockade on the right at C4, C5, and C6, and a radiofrequency neurotomy/nerve burn surgery at those levels. Ms. Brooks has also undergone a lumbar medial branch block on the right at L3-4 and L4-5. Ms. Brooks has obtained relief from the interventional procedures.

Dr. Rodriguez has recommended the following future medical treatment:

1. Cervical Radiofrequency Ablation/Nerve Burn Surgery on the right at C4-5 and C5-6 every 12 to 18 months; and
2. Lumbar Facet Injections one to two times per year for the remainder of her lifetime; or
3. Lumbar Percutaneous Radiofrequency Ablation/Nerve Burn Surgery every 12 to 18 months for the remainder of her lifetime.

Dr. DeFrancesch has recommended the following future medical treatment:

1. Cervical Radiofrequency Ablation/Nerve Burn Surgery on the right at C4-5 and C5-6 every 6-18 months for the remainder of her lifetime; and

(Exhibit 3, Brooks Plaintiff Exhibit  000703 - 000730, 000722).

a. **Dr. Watson by his Own Admission is Not a Spine Specialist and is Not Qualified to Provide an Opinion Regarding Ms. Brooks Past and Future Spine Treatment for her Cervical and Lumbar Spine.**

1. **Dr. Watson is Not a Spine Specialist**:

- Dr. Watson has a general orthopedic practice. (Exhibit 1, p. 12).

- Dr. Watson does not perform spine surgery. (Exhibit 1, p. 12).

- Dr. Watson's only exposure to spine surgery was a 6 month rotation during residency between 2002 and 2007 as an assistant. (Exhibit 1, p. 13).

- Dr. Watson does not perform cervical laminectomies. (Exhibit 1, p. 12).

- Dr. Watson does not perform cervical fusions. (Exhibit 1, p. 12).

- Dr. Watson does not perform any cervical surgeries. (Exhibit 1, p. 12).

- Dr. Watson does not perform lumbar laminectomies. (Exhibit 1, p. 12).

- Dr. Watson does not perform lumbar fusions. (Exhibit 1, p. 12).

- Dr. Watson does not perform any lumbar surgeries. (Exhibit 1, p. 12).

- Dr. Watson did not undergo any type of fellowship. (Exhibit 1, p. 13).

- Dr. Watson did not do a spine fellowship. (Exhibit 1, p. 13).

- Dr. Watson does not have a spine surgery board certification. (Exhibit 1, p. 14).

- Dr. Watson has never authored a publication on spine surgery. (Exhibit 1, p. 14).

- Dr. Watson has never given a presentation to other physicians about spine surgery. (Exhibit 1, p. 14).

- Dr. Watson has never taught spine surgery. (Exhibit 1, p. 14).

- Dr. Watson is not a member of any professional organization dealing specifically with spine surgery.  (Exhibit 1, p. 15).

- Dr. Watson has a spine specialist in his practice, Dr. Felipe Ramirez who is Board Certified in Spine Surgery but defendants did not hire Dr. Ramirez. (Exhibit 1, p. 15).

- **<u>Dr. Watson does not consider himself a spine specialist</u>**. (Exhibit 1, p. 16).

2. **<u>Dr. Watson is Not a Spine Interventionalist</u>**.

- Dr. Watson is not a spine interventionalist. (Exhibit 1, p. 21).

20

- Dr. Watson has never performed a spinal intra-articular facet injection. (Exhibit 1, p. 15).

- Dr. Watson has never performed a spinal medial branch block. (Exhibit 1, p. 15).

- Dr. Watson has never performed a spinal radiofrequency ablation, rhizotomy, neurotomy or a nerve burn.  (Exhibit 1, p. 15).

- Dr. Watson has never performed any type of spinal injection or spinal procedure. (Exhibit 1, p.  21).

- Dr. Watson does not consider himself a spine specialist. (Exhibit 1, p. 16).

- Dr. Watson has testified in court on two (2) occasions and on both occasions was qualified as an expert in general orthopedic surgery. (Exhibit 1, p. 21).

Dr. Watson admittedly is not a spine specialist, is not a spine interventionalist, and has **never** performed a spinal injection, but has both testified and concluded in his report that Ms. Brooks' cervical  injections and medial branch blocks were given in a non-diagnostic manner, that any past or future cervical facet injections or radiofrequency ablation would not be related to the accident, that there is no efficacy in repeating radiofrequency ablation beyond seven to ten years, and that there is little support for lumbar facet injections and radiofrequency ablation. (Exhibits 1 and 2).  Dr. Watson concludes further that there is insufficient evidence to support the use of injection therapy for subacute and chronic low back pain. (Exhibit 2). These opinions stray well beyond Dr. Watson's experience, training and expertise as a general orthopedist.

Defendant retained Dr. Watson to provide expert testimony as a spine specialist and spine interventionalist although he is not qualified to provide expert medical testimony and opinions regarding Ms. Brooks' spinal injuries and the treatment for those

injuries. Defendant had an opportunity to retain a spine interventionalist, a board certified physical medicine and rehabilitation specialist, with additional board certifications in pain medicine and spinal cord injuries such as Ms. Brook's treating physician, Dr. DeFrancesch. Defendant chose not to. Defendant could have retained Dr. Felipe Rameriz, Dr. Watson's partner who is a spine specialist. Instead, Defendant retained Dr. Watson, who has a general orthopedic practice with no experience, training or expertise in the interventional treatment of the spine. In fact, a review of Dr. Watson's report confirms that his opinions regarding interventional treatment for Ms. Brooks' spine is merely a series of randomly extrapolated quotes from the medical literature in areas that he has no expertise.

Federal Rule of Evidence Article 702 and Daubert do not support the use of Dr. Watson's report or testimony regarding Ms. Brooks' medical treatment for her spine when he clearly lacks the required training, experience and expertise. The fact that Dr. Watson is a general orthopedist does not qualify him to testify in areas in which he was not trained and has no specialized knowledge or education. This court, as the gatekeeper, should exclude testimony based merely on subjective belief or unsupported speculation. *City of Tuscaloosa, supra*. Dr. Watson's testimony would be highly prejudicial and would not assist the trier of fact. Based on the evidence here, Dr. Watson's report and opinion testimony regarding the treatment of Ms. Brooks' spine must be stricken.

VI.    **THE COURT MUST CONCLUDE THAT DEFENDANT CANNOT SUSTAIN ITS BURDEN OF SHOWING THAT DR. WATSON IS QUALIFIED TO TESTIFY AND THAT HIS REPORT AND TESTIMONY MUST BE STRICKEN**.

The above cited law, facts and evidence mandate a finding that Dr. Watson's reliance on theories and principles of accident reconstruction and biomechanical engineering render his testimony and opinions unqualified. First, Dr. Watson's opinions regarding causation are so embedded with biomechanical engineering and accident reconstruction theories and principles that they are completely tainted and must be stricken. Second, Dr. Watson by his own admission is not a spine specialist and not a spine interventionalist.  Dr. Watson is a general orthopedist and cannot be allowed to testify as an expert spinal interventionalist or as a spine specialist when he has no knowledge, skill, experience, training or education in that area of practice. Simply put, Dr. Watson's report and testimony in the areas in which defendant will offer his testimony at trial will be unreliable and will not assist this court in reaching a just conclusion.

Defendant bears the burden of proving that Dr. Watson has the necessary knowledge, skill, experience, training and education in this matter, which is a burden that it cannot carry. ***Daubert, supra***, and **Federal Rule of Evidence 702**. For all of the reasons set forth above, Plaintiff prays that this Daubert Motion and Motion in Limine to Exclude the Testimony, Report and Opinions of Dr. Kevin Watson be granted.

Respectfully submitted,

FAVRET, DEMAREST, RUSSO,
LUTKEWITTE & SCHAUMBURG
A Professional Law Corporation

*/s/ Dean J. Favret*

_____

DEAN J. FAVRET, Bar #20186
ANTHONY J. RUSSO, Bar #8806
SETH H. SCHAUMBURG, Bar #24636
ANGELA C. IMBORNONE, Bar #19631
LAUREN A. FAVRET, Bar #33826
Attorneys for Plaintiff
1515 Poydras Street, Suite 1400
New Orleans, Louisiana 70112
Telephone: (504) 561-1006
Facsimile: (504) 523-0699

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2019, I electronically filed the Memorandum in Support of Daubert Motion and Motion in Limine to Exclude the Testimony and Opinions of Dr. Kevin Watson with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all parties in this matter.

*/s/ Dean J. Favret*

_____

DEAN J. FAVRET