EXHIBIT "1"

Dr. Kevin Watson

---

DEPOSITION TRANSCRIPT OF:

**Dr. Kevin Watson**

DATE TAKEN:

**8/15/2019**

CASE:

**Pamela Brooks vs United States of America**

Affiliated Reporting
650 Poydras Street, Suite 2610
New Orleans, LA 70130
Phone: 504-568-9111
Fax: 504-568-9110
Email: pages@affiliatedreporting.com
Website: www.affiliatedreporting.com

**Attached to the back cover is a CD with the transcript files.**

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION CASE NO. 18-7736     DIVISION "E" 2

JUDGE: SUSIE MORGAN

MAGISTRATE:   JOSEPH C. WILKINSON, JR.

PAMELA BROOKS

VERSUS

UNITED STATES OF AMERICA

Deposition of DR. KEVIN WATSON, 3434
Prytania Street, Suite 430, New Orleans,
Louisiana 70112, taken in the offices of
ORTHOPAEDIC ASSOCIATES OF NEW ORLEANS on
Thursday, August 15, 2019.

APPEARANCES:

FAVRET, DEMAREST, RUSSO, LUTKEWITTE &
SCHAUMBURG
Attorneys at Law
BY:   DEAN FAVRET, ESQUIRE
1515 Poydras Street, Suite 1400
New Orleans, Louisiana  70112
    ATTORNEYS FOR PLAINTIFF

U.S. DEPARTMENT OF JUSTICE
Attorneys at Law
BY:  ELIZABETH A. CHICKERING, ESQUIRE
650 Poydras Street, Suite 650
New Orleans, Louisiana  70130
    ATTORNEYS FOR DEFENDANT

REPORTED BY:

THERESA (TERRI) MATHERNE
Certified Court Reporter

---

Dr. Kevin Watson

1    PAMELA BROOKS VS. UNITED STATES OF AMERICA
2
3        Deposition of DR. KEVIN WATSON
4          Taken on August 15, 2019
5
6
7              EXHIBIT INDEX
8  1.  Curriculum vitae.
9  2.  Fee schedule.
10 3.  Articles.
11 4.  July 18, 2019, report.
12
13     (Exhibits 2 and 3 were not provided to the
14     court reporter.)
15
16
17
18
19
20
21
22
23
24
25

---

Dr. Kevin Watson

1                    INDEX
2
3                          Page    Line
4   EXHIBIT # 1              5       17
5   EXHIBIT # 2              7        9
6   EXHIBIT # 3             29        3
7   EXHIBIT # 4             29       14
8
9
10  EXAMINATION BY MR. FAVRET     5        5
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Dr. Kevin Watson

```
 1            S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and between
 4  counsel for the parties hereto that the deposition
 5  of the aforementioned witness is hereby being
 6  taken under the Federal Rules of Civil Procedure,
 7  for all purposes, in accordance with law;
 8       That the formalities of reading and signing
 9  are specifically waived;
10       That the formalities of sealing,
11  certification, and filing are specifically waived;
12       That all objections, save those as to the form
13  of the question and the responsiveness of the
14  answer, are hereby reserved until such time as
15  this deposition, or any part thereof, may be used
16  or sought to be used in evidence.
17              *      *      *      *
18       THERESA (TERRI) MATHERNE, Certified Court
19  Reporter, in and for the Parish of Jefferson,
20  State of Louisiana, officiated in administering
21  the oath to the witness.
22
23
24
25
```

Affiliated Reporting                                    Page: 4

Dr. Kevin Watson

```
 1            DR. KEVIN WATSON,
 2  after having been first duly sworn by the
 3  above-mentioned court reporter, did testify  as
 4  follows:
 5  EXAMINATION BY MR. FAVRET:
 6  Q.  Doc, my name is Dean Favret.  I represent
 7      Ms. Brooks in this matter.  And I know some
 8      information about you, so I may not go through
 9      everything.
10      I tend to talk fast, so stop me if I'm too
11      fast for you.  Okay?
12  A.  Yes, sir.
13  Q.  Doc, this is your CV?
14  A.  Yes, sir.
15  Q.  I'm going to mark that as Watson No. 1.  This
16      is up-to-date, Doc?
17              (Exhibit 1, curriculum vitae, was
18              marked for identification.)
19  A.  Yes.
20  Q.  You are an orthopedist?
21  A.  Yes.  Orthopedic surgeon.
22  Q.  In this particular case involving Ms. Brooks,
23      you were hired by the defendant in this case?
24  A.  Yes.
25  Q.  You were hired by Ms. Chickering, and she
```

Affiliated Reporting                                    Page: 5

Dr. Kevin Watson

```
 1      represents the United State of America?
 2  A.  Yes.
 3  Q.  You're not Ms. Brooks' treating physician?
 4  A.  No.
 5  Q.  You were hired by the United States of
 6      America, or the defendant in this case, to
 7      testify on their behalf?
 8  A.  I don't know about testifying on their behalf.
 9      They asked me to evaluate Ms. Brooks, evaluate
10      the record, and offer opinions.
11  Q.  You were not hired to treat Ms. Brooks?
12  A.  No.
13  Q.  Or make any treatment recommendations?
14  A.  No.
15  Q.  You saw Ms. Brooks one time, one time only,
16      and that was July 18, 2019?
17  A.  Yes.
18  Q.  That was two years, nine months after the
19      October 31, 2016, crash?
20  A.  Yes.
21  Q.  The defendants in this litigation paid you for
22      the evaluation?
23  A.  Yes.
24  Q.  How much did they pay you?
25  A.  I don't know offhand.  I can get you a fee
```

Affiliated Reporting                                    Page: 6

Dr. Kevin Watson

```
 1      schedule of what we charge.  But I don't know.
 2  Q.  Can you do that for me?
 3  A.  Yes.
 4  Q.  I'll mark the fee schedule as Exhibit No. 2.
 5      I will attach that to the deposition.
 6      What is your usual charge for evaluating
 7      individuals on behalf of defendants or
 8      insurance companies?
 9              (Exhibit 2, fee schedule, was
10              marked for identification.)
11  A.  It doesn't matter who asked us to do the
12      evaluation, whether it be plaintiff,
13      defendant, or insurance company.  It's usually
14      $2,500 for an independent medical exam, which
15      includes the record review and generation of
16      the reports.
17  Q.  How long did it take you for this evaluation?
18      I'm talking about reading all the documents,
19      physically examining, putting your hands on
20      Ms. Brooks, and everything that took you from
21      beginning till the time your report was typed
22      up?
23  A.  Hours.  I don't know.
24  Q.  What is your best estimate?
25  A.  Three or four hours.
```

Affiliated Reporting                                    Page: 7

Dr. Kevin Watson

1  Q.  How did you arrive -- how do you arrive at
2       $2,500 for these evaluations?
3  A.  It's with the office fee schedule.  It's been
4       based off of -- we were previously a part of a
5       larger medical group.  That was their fee, so
6       we just kind of carried it out.
7  Q.  Does the amount that you charge the defendants
8       in this case to evaluate Ms. Brooks, does that
9       have anything to do with what you would earn
10      if you were not doing this evaluation and
11      doing your work?
12 A.  Yes.  So I mean, it's a significant time chunk
13      to perform these evaluations and reports.
14 Q.  Okay.
15 A.  So part of it is taking time away from
16      otherwise potential clinically duties and
17      seeing other patients.
18 Q.  And when you are evaluating -- strike that.
19      If the examination from beginning to end
20      took three or four hours, that would, roughly,
21      be charging $800 -- I'm sorry, $625 to $833 an
22      hour.  Is that generally what you earn when
23      you are doing duties as a part of your
24      orthopedic practice?
25 A.  I would say, for example, like a knee

Dr. Kevin Watson

1       replacement, we get paid $1,400, which takes
2       about an hour to do.
3  Q.  Okay.  So my question is --
4  A.  Similar to the hourly rate, yes.
5  Q.  So you generally earn between $633 -- I'm
6       sorry, $625 an hour to $833 an hour to perform
7       your duties as an orthopedist?
8  A.  I think that would be -- again, it depends on
9       the patients.
10      If you're in clinic, sometimes the rate
11      might be less if it's all established
12      patients.  If it's new patients, then it can
13      be easily that much and more.  Surgery,
14      obviously, much more than that rate.
15 Q.  How many of these evaluations on behalf of
16      defendants or insurance companies do you do
17      per week?
18 A.  Maybe two.
19 Q.  And how many weeks of the year do you do them?
20 A.  I don't know.  It's certainly not every week.
21      I would tell you last year I did 50.
22 Q.  So this year, you are on an average of two a
23      week?
24 A.  Probably so.
25 Q.  And so how many weeks do you anticipate having

Dr. Kevin Watson

1       to do defense examinations for the year?
2  A.  I don't know.  It's not something I schedule
3       personally, so I don't know when they come in
4       or why they come in.
5  Q.  Okay.
6  A.  It just seems to be the average of when they
7       come in.
8       I could go two or three weeks without
9       getting one.  I could go a week where I do two
10      or three or four instead of two.
11      I think two is about an average.  I work
12      basically every week of the year.  I do take a
13      couple of vacations a year.
14 Q.  You should.
15 A.  Yeah.
16 Q.  So last year at 50 examinations on behalf of
17      defendants or insurance companies at $2,500
18      per examination, I know that's an average.
19      Right?
20 A.  Yes.
21 Q.  That would be $125,000 earned for performing
22      these examinations last year; is that true?
23 A.  Yes.
24 Q.  Do you consider that you earn a substantial
25      amount of money performing these examinations

Dr. Kevin Watson

1       on behalf of defendants and insurance
2       companies?
3           MS. CHICKERING:
4               Object to the form.
5           THE WITNESS:
6               I don't know what "substantial"
7       means.  I make money from doing -- for my
8       time.
9               Again, as I said, if I were doing
10      clinical duties, I could certainly
11      probably equal that amount without the
12      time involved in the exam.  I think you
13      have to clarify to me what "substantial"
14      means.
15 BY MR. FAVRET:
16 Q.  Sure.
17      Do you consider earning $125,000 performing
18      50 examinations on behalf of defendants or
19      insurance companies in a year a substantial
20      amount?
21 A.  Again, I don't know what you mean by
22      "substantial."  It is money.  It is income.
23      If I wasn't doing it, I would do something
24      else to earn that income.
25 Q.  Now, tell me a little bit about your practice.

1    Would you consider your practice a general
2    orthopedic practice?
3  A. Yes.
4  Q. And you do not do spine surgery, do you?
5  A. Correct.
6  Q. You don't perform cervical surgeries?
7  A. Correct.
8  Q. You don't perform cervical laminectomies?
9  A. Correct.
10 Q. You don't perform cervical fusions?
11 A. Correct.
12 Q. Do you perform lumbar surgery?
13 A. No.
14 Q. Do you perform lumbar laminectomies?
15 A. No.
16 Q. Do you perform lumbar fusions?
17 A. No.
18 Q. Where were you doing your residency?
19 A. I did my residency at the University of
20    Alabama at Birmingham from 2002 to 2007.
21 Q. The only spine surgeries that you participated
22    in was as an assistant during your six-month
23    rotation in residency in 2002.  Do I have that
24    right?
25 A. Well, from 2002 to 2007, during that period of

1    time.  I don't exactly remember the exact
2    years I did the spine rotation.  But during
3    that period of time, six months of that time
4    is spent -- it wasn't necessarily in 2002.
5  Q. I got you.
6  A. During that period of time from 2002 to 2007,
7    six months of spine surgery rotation.
8  Q. When you are in residency, you're learning
9    from attending physicians about various
10    practices in terms of orthopedics?
11 A. Yes.  Correct.
12 Q. So your exposure to spine surgery was as a
13    resident assisting in spine surgery, cervical
14    and lumbar, for a six-month stint during
15    residency.  Do I have that right?
16 A. Right.  It's not just surgery, but also
17    evaluating patients in the clinic and forming
18    treatment plans.
19 Q. Did you undergo any kind of fellowship?
20 A. No.
21 Q. You did not do a spine fellowship, did you?
22 A. No.
23 Q. Now, you're board certified in orthopedic
24    surgery?
25 A. Yes.

1  Q. Are there -- who recognizes the -- who issued
2    the board certification to you in orthopedic
3    surgery?
4  A. The American Board or Orthopedic Surgery.
5  Q. Does the American Board of Orthopedic Surgery
6    have any type of sub-board certification in
7    spine surgery?
8  A. Yes.
9  Q. What is that called?
10 A. I believe it's called spine surgery.
11 Q. That's clever.
12 A. Yeah.
13 Q. Do you have a board certification in spine
14    surgery?
15 A. No.
16 Q. Have you ever authored any publications on
17    spine surgery?
18 A. No.
19 Q. Have you ever taught spine surgery?
20 A. No.
21 Q. Have you ever given presentations to spine
22    surgeons about spine surgery?
23 A. No.
24 Q. Are you a member of any professional
25    organization involving spine surgery?

1  A. Well, I'm a member of the American Academy of
2    Orthopedic Surgeons, which does have spine
3    surgeons in it.
4  Q. Do you have membership in any professional
5    organization dealing specifically with spine
6    surgery?
7  A. No.
8  Q. Have you ever performed a spinal injection?
9  A. No.
10 Q. Have you ever performed intra-articular facet
11    injection?
12 A. No.
13 Q. Have you ever performed a medial branch block?
14 A. No.
15 Q. Are you familiar with the procedure
16    radiofrequency ablation, rhizotomy, or
17    neurotomy?  You're familiar with those
18    procedures?
19 A. Yes.
20 Q. That's, essentially, the thermal burning of a
21    medial branch nerve?
22 A. Yes.
23 Q. And the design of that is to interrupt that
24    nerve transmitting pain to the brain that a
25    facet is injured or hurting?

Dr. Kevin Watson

1  A.  Yes.
2  Q.  Is it all right if I refer to that procedure
3      as a nerve burn procedure or a nerve burn
4      surgery?
5  A.  If that's what you want to call it, that's
6      fine.  I'll understand it.
7  Q.  That's what I mean.  Can you and I have the
8      understanding that if I talk about whether
9      it's a rhizotomy or an RFA or neurotomy or
10     nerve burn, when you and I are communicating
11     today, that we're all talking about the same
12     thing?
13 A.  Yes.
14 Q.  Have you ever performed a nerve burn
15     procedure?
16 A.  No.
17 Q.  Do you consider yourself a spine specialist?
18 A.  No.
19 Q.  What specialization do you have in terms of
20     orthopedics?  Would you say it's expert in
21     extremities?
22 A.  General orthopedics, which is spine, knees,
23     hips, foot, ankles.
24 Q.  You treat patients with spine pain?
25 A.  Yes.

Dr. Kevin Watson

1  Q.  What's your protocol for treatment of
2      individuals with spine pain?
3  A.  Well, so we evaluate them, we see them,
4      perform a history and physical exam.  If
5      necessary, get radiographs looking for
6      pathology, often prescribe anti-inflammatory
7      medicines.  If needed, physical therapy.
8          If they have radicular symptoms that are
9      not responding to conservative treatment,
10     often get MRIs of the spine, whatever spine
11     happens to be involved.
12         If the MRI shows objective evidence of
13     problems that matched the subjective
14     complaints of the patient, then often times
15     I'll order epidural steroid injections to
16     treat the pain and the radicular symptoms.
17         If the MRI shows significant cord
18     compression or nerve compression, then if I
19     think they are surgical candidates, we'll
20     refer them to my partner who can perform spine
21     surgery.
22 Q.  How would you treat -- you're familiar with
23     the cervical and lumbar MRIs of Ms. Brooks?
24 A.  Yes.
25 Q.  How would you treat someone like Ms. Brooks

Dr. Kevin Watson

1      who presented to you with neck and back pain
2      with the same cervical and lumbar MRI
3      findings?  What would you do as your course of
4      treatment?
5  A.  So I would see her, and I would give her, I
6      would offer her anti-inflammatory medicine and
7      physical therapy.
8          Her complaints are what's called axial
9      pain.  So pain that stays in the cervical and
10     lumbar spine, no radicular symptoms, no
11     evidence of any nerve problems that she
12     complains about or on her physical exam.
13         So I would not be looking to treat discs or
14     nerve impingement.  I'd mostly be treating --
15 Q.  The neck and back pain?
16 A.  Neck and back pain.
17 Q.  If the physical therapy and prescriptions did
18     not help reduce her pain, what would you do
19     after that?
20 A.  So for her, I would recommend probably weight
21     loss and continued activity to strengthen up
22     her core in her neck and back.
23 Q.  And if that doesn't work, what would your next
24     protocol be?
25 A.  At that point I would say that I don't really

Dr. Kevin Watson

1      have -- I cannot explain the source of her
2      neck or back pain.
3  Q.  And would you offer any type of other
4      therapeutic modality?  Or would you just say,
5      "You're going to be stuck with pain?"
6  A.  I would tell her if she continues to lose
7      weight, strengthen her core, that her pain
8      should dramatically improve.
9  Q.  If that doesn't, what is your next treatment
10     recommendation?
11 A.  So if she lost weight and still had cervical
12     and lumbar pain, again, I would tell her she
13     has arthritic changes in her neck and back.
14     But there's no proven treatment that we can do
15     to alleviate her pain.
16 Q.  So that would be the end of the line for her
17     in terms of treatment you would offer her?
18 A.  Yes.
19 Q.  In your practice, are you the one that
20     determines when you have a patient with neck
21     or back pain whether they're a surgical
22     candidate or not?  Or do you refer them to the
23     spinal specialist within your practice to make
24     that determination?
25 A.  So, obviously, it's our spine surgeons'

Dr. Kevin Watson

1  ultimate determination whether or not they
2  perform surgery or not.
3      But if I look at the objective studies,
4  again, if they match with the subjective
5  complaints of the patient and I think they're
6  a surgical candidate, then that's when I refer
7  them.
8      If I don't think their MRIs and objective
9  studies and subjective complaints match or are
10  responsible for their symptoms, then I won't
11  refer them.
12      The spine surgeon, obviously, I can't tell
13  the spine surgeon to operate or not to
14  operate.
15  Q.  Who is the spinal specialist in your office?
16  A.  Felipe Ramirez.
17  Q.  Is he board certified in spine surgery?
18  A.  Yes.
19  Q.  If you ever had questions about whether one of
20  your patients is a candidate for spine
21  surgery, that would be something where you
22  would refer your patient to Dr. Ramirez for
23  him to make that conclusion?
24  A.  Again, if I think the patient is a candidate
25  for spine surgery, then I'll send it to him.

Dr. Kevin Watson

1      If I don't, then I won't send it to him.
2      I suppose if it's a borderline case, then I
3  could send it to him and he could give his
4  opinion as well.
5  Q.  Are you a spine interventionalist?
6  A.  No.
7  Q.  Do you have expertise in spinal injections and
8  spinal procedures?
9  A.  I think I have expertise in the knowledge of
10  their indications and performance, but I don't
11  do them.
12  Q.  You never have performed any type of spinal
13  injection or spinal procedure.  Right?
14  A.  Correct.
15  Q.  How many times have you testified in court?
16  A.  I think twice.
17  Q.  Where were those two times?
18  A.  I think once was in Orleans Parish, and I
19  think one was in St. Tammany Parish.
20  Q.  And in both of those cases -- how long ago
21  were those?
22  A.  I would be guessing.  Two years ago, perhaps.
23  Maybe one was two years, maybe one was four
24  years ago.
25  Q.  And in both of those cases, were those cases

Dr. Kevin Watson

1  where you performed an evaluation on behalf of
2  a defendant or insurance company like in our
3  case?
4  A.  No.
5  Q.  Were they as treating physicians?
6  A.  One was a treating physician, one was a
7  medical malpractice case, defense.
8  Q.  So you were providing testimony on behalf of
9  the defendant doctor that was being sued for
10  medical malpractice?
11  A.  Yes.
12  Q.  In this particular case, I'm talking about
13  Ms. Brooks, you prepared a 14-page report.
14  And then in that report, you evaluate all the
15  treatment that Ms. Brooks has undergone.  And
16  you performed a physical examination.  You
17  examined all the records.
18      And then you went through, on pages eight,
19  nine, ten, 11, 12, 13, and 14, seven pages
20  where you refer to various publications and
21  articles dealing primarily with making a
22  determination of causation.  You'd agree with
23  that?
24  A.  Yes.
25  Q.  When you were testifying on behalf of the

Dr. Kevin Watson

1  person that you were the treating physician
2  of, did you go through that same type of
3  nine-page evaluation of causation?
4  A.  No.
5      I think in that case the gentleman had a
6  rotator cuff tear and I performed surgery.  So
7  I don't think the issue of causation was ever
8  asked.  It was more -- the issue was recovery
9  time and what his long-term disabilities would
10  be.
11  Q.  Are you telling me that attorney representing
12  that patient didn't ask you about causation at
13  trial in that case?
14  A.  I don't even remember.  I don't remember how
15  it even happened.  We can always look back,
16  but I don't remember.
17  Q.  Back to the question.  Did you perform, as you
18  did in Ms. Brooks' case, a nine-page
19  evaluation of causation on that particular
20  case where you testified in court on behalf of
21  the individual that you treated?
22  A.  I don't think it would have been nine pages
23  even if it would have been because it was one
24  body part.  Ms. Brooks had multiple body parts
25  involved.

Dr. Kevin Watson

1          If I done it, then it would have been
2     written.  But I don't think it would have been
3     nine pages.
4   Q.  That's not quite my question.
5          My question is, did you perform a nine-page
6     evaluation of causation on that case where you
7     were testifying as the treating physician on
8     behalf of the plaintiff that was injured in
9     that case?
10  A.  I think I answered your question.
11         I don't remember was my first answer.
12    Secondly, if I would have, it wouldn't have
13    been nine pages because it wouldn't have been
14    quite as extensive as what Ms. Brooks had
15    because of the multiple body parts involved.
16  Q.  When you treat patients, do you go through
17    with every patient a nine-page evaluation of
18    what caused their injuries like you did with
19    Ms. Brooks?
20  A.  Again, I don't think it's necessary when we're
21    the treating physician to go through a
22    nine-page evaluation of causation.
23         Now, if the patient asked me what caused
24    this, I will explain what I think caused their
25    injury or their problem.  If they want me to

Dr. Kevin Watson

1     write -- if the patient wants me to write the
2     explanation down, I'm happy to write the
3     explanation.
4          I often quote studies to my patients.  We
5     have patients who come in and they say,
6     "What's going on?  What's the best treatment?"
7     I will often cite articles to give them a
8     better opinion of what could have caused this,
9     and what is the best evidence of treating
10    their problem.  It's not always written down,
11    but sometimes it is in discussion form.
12  Q.  When you testified in court on those two
13    occasions, did you testify -- strike that.
14         When you testified in court on those two
15    occasions, were you offered and accepted as an
16    expert in any other field other than general
17    orthopedic surgery?
18  A.  No.
19  Q.  Have you ever been offered -- strike that.
20         Have you ever offered an opinion as an
21    accident reconstructionist?
22  A.  No.
23  Q.  Have you ever offered an opinion as a
24    biomechanical engineer?
25  A.  No.

Dr. Kevin Watson

1   Q.  Do you have any training in accident
2     reconstruction?
3   A.  No.
4   Q.  Do you have any training in biomechanical
5     engineering?
6   A.  No.
7   Q.  Do you have any experience in accident
8     reconstruction?
9   A.  I don't know what that means.
10         I have gone to some courses put on by the
11    America Academy of Orthopedic Surgeons where
12    they do talk about the biomechanics of motor
13    vehicle collisions and the passenger
14    mechanics.
15  Q.  I'm going to get into that in just a minute.
16    But right now I'm asking you, do you have any
17    expertise in accident reconstruction?
18  A.  No.
19  Q.  Do you have any experience in biomechanical
20    engineering?
21  A.  No.
22  Q.  Do you have any expertise in accident
23    reconstruction?
24  A.  Again, besides how I answered your other
25    question.

Dr. Kevin Watson

1   Q.  Why don't you answer it again so we have it on
2     the record.
3   A.  Again, what I said was, I've been to courses
4     put on by the American Academy of Orthopedic
5     Surgeons, which talks about the biomechanics
6     of passengers and the response involving motor
7     vehicle collisions.
8   Q.  I don't know if that answers that question.
9     I'm going to ask this:  Do you have any
10    experience in biomechanical engineering?
11  A.  Other than what I just answered.  If you
12    consider that biomechanical engineering, then
13    yes.  If you don't, then no.
14  Q.  Have you ever used or applied any
15    biomechanical engineering protocol in
16    evaluating and rendering opinions in
17    orthopedics?
18  A.  No.
19  Q.  Have you ever been tendered or accepted as an
20    expert in accident reconstruction?
21  A.  No.
22  Q.  Have you ever been tendered or accepted as an
23    expert in biomechanical engineering?
24  A.  No.
25  Q.  Are you an accident reconstructionist?

Dr. Kevin Watson

1   A.   No.
2   Q.   Are you a biomechanical engineer?
3   A.   No.
4   Q.   Are you offering any opinions with regard to
5        Ms. Brooks in the field of accident
6        reconstruction?
7   A.   No.
8   Q.   Are you offering any opinions related to
9        Ms. Brooks as a biomechanical engineer?
10  A.   No, not as a biomechanical engineer.
11  Q.   Have you ever been -- strike that.
12          In the two times that you were tendered as
13        an expert in general orthopedic surgery, have
14        you ever been limited in your testimony by the
15        court?
16  A.   No.
17  Q.   Doctor, I was asking you before we started
18        about the articles that you have listed in the
19        back of your 15-page report that you issued on
20        July 18, 2019.
21          Can I have you provide copies of those
22        articles to the court reporter, so we can
23        attach that, within the next two or three
24        days?
25  A.   Yes.

Dr. Kevin Watson

1   Q.   Thank you.  So I will attach those as, in
2        globo, number three.  Thank you, Doctor.
3             (Exhibit 3, articles, was marked
4                for identification.)
5   A.   Okay.
6   Q.   So you're familiar with the articles that you
7        have referenced in the back of your 15-page
8        report?
9   A.   I'm familiar with them.  I can't say that I
10        have a photographic memory, but yeah.
11  Q.   I'm going to attach as Watson No. 4 a copy
12        Doctor, of your July 18, 2019, report.  That
13        is your report that you prepared?
14             (Exhibit 4, July 18, 2019, report,
15                was marked for identification.)
16  A.   Yes.
17  Q.   And have you prepared any other report
18        relative to your evaluation and your opinions
19        related to Ms. Brooks?
20  A.   No.
21  Q.   Doctor, you have the July 18, 2019, report in
22        front of you?
23  A.   Yes.
24  Q.   If you would, Doc, flip to the 14th page.
25  A.   Okay.

Dr. Kevin Watson

1   Q.   What I'm going to do is go through these
2        various -- what do you call these, your
3        bibliography, footnotes?
4   A.   References.
5   Q.   I'm going to through the various references
6        and ask you some questions about it.  Okay?
7   A.   Okay.
8   Q.   The first one that I see here, Barth.  Do you
9        see that publication?
10  A.   Uh-huh.
11  Q.   Yes?
12  A.   Yes.
13  Q.   Is Barth a biomechanical engineer?
14  A.   No.
15  Q.   Is Barth a physician?
16  A.   He is a Ph.D.
17  Q.   He's not an M.D?
18  A.   No.
19  Q.   What is his Ph.D. in?
20  A.   I lie.  He might be an M.D.  He's an
21        M.D./Ph.D. or just a Ph.D.  I have to look.
22  Q.   What is his field of specialty?
23  A.   Psychology.
24  Q.   Do you have any expertise in psychology?
25  A.   No.

Dr. Kevin Watson

1   Q.   What was -- just a brief summary of that
2        study.
3   A.   So this was looking at, again, basically what
4        the title says, trying to -- a causation
5        method, an objective method for determining
6        whether symptoms are related to an injury,
7        whether it's work-related or some type of
8        other personal injury claim.
9          It kind of describes in a more objective
10        method of trying to evaluate these patients.
11  Q.   Is that the first time that that type of
12        causation evaluation, that you're aware of,
13        was ever set forth in an article such as this?
14  A.   There's a whole book, the AMA Guides to Injury
15        and Disease Causation.  I don't know when it
16        was published.
17  Q.   Were you trained about injury causation in
18        medical school?
19  A.   Well, we're trained about injuries.  So
20        especially in orthopedics, we do classes in
21        orthopedics and what types of injuries
22        generated certain types of fractures, ligament
23        tears, things like that like.
24  Q.   Did this Barth study deal with any
25        participants that he studied?

Dr. Kevin Watson

1  A.  It cites different articles. It wasn't like a
2     study that he performed. It's mostly
3     referencing other articles.
4  Q.  Do you have any knowledge of the studies that
5     he performed?
6  A.  Again, I'd have to go back and kind of go
7     through the exact article to tell you exactly
8     everything that he referenced.
9  Q.  Do you know the number of participants in any
10    of his studies?
11 A.  No.
12 Q.  Do you know if the participants were screened
13    for preexisting conditions? We'll start with
14    that.
15 A.  So I think -- so, again, he quotes these
16    different articles that cite what these other
17    articles have screened for.
18       So, again, it's a general overview of
19    what's mentioned in my discussion as far as
20    the AMA Guides newsletter to causation
21    methods. So he's basically describing the
22    method of how to performed rather than quoting
23    studies and doing studies on patients.
24 Q.  Understood.
25       The studies that he relied upon, that is

Dr. Kevin Watson

1     Barth relied upon in writing this, are you
2     familiar with how many participants in those
3     studies?
4  A.  Again, I'd have to read all of them.
5  Q.  Do you know as you sit here today?
6  A.  No, I don't. I don't remember as I sit here
7     today.
8  Q.  The studies that Barth relied upon, did you
9     read those studies or just Barth study?
10 A.  Again, I'd have to look through all of his
11    bibliography. I'm sure I read many of his
12    studies in there. But I'd have to look at
13    each reference.
14 Q.  The studies Barth relied upon, were the
15    participants in those studies screened for
16    preexisting condition?
17 A.  Yes. A lot of those are talking about what
18    preexisting conditions and how they affect,
19    the effect of injury-relatedness and
20    claim-relatedness.
21 Q.  What preexisting conditions were those various
22    participants screened for in the studies that
23    Barth cited?
24 A.  Very numerous.
25 Q.  Can you list them?

Dr. Kevin Watson

1  A.  So, again, you can pretty much come up -- we
2     talk about anxiety, depression, smoking,
3     obesity, previous claims. All these are --
4     arthritis. All these things are cited
5     throughout these studies are quoted by Barth.
6  Q.  What were the age of those participants in the
7     studies Barth cited?
8  A.  It varied. I don't know offhand.
9  Q.  What were the gender of the participants?
10 A.  Both female and male.
11 Q.  What were the body habitus of those various
12    participants?
13 A.  Again, so they looked at all types.
14 Q.  Was the selection in those studies random or
15    specific?
16 A.  I'm sure each study is different. How each
17    study is quoted, as far as whether or not they
18    were randomized or specific, that's hard to
19    say in particular.
20 Q.  Were there always controlled groups in those
21    studies that Barth cited?
22 A.  I don't know if they were all controlled
23    groups.
24 Q.  Is control group important in studies?
25 A.  I guess it depends on what you're studying.

Dr. Kevin Watson

1  Q.  The articles that Barth cited, were those peer
2     reviewed?
3  A.  Yes.
4  Q.  What peers reviewed?
5  A.  I guess it depends on what article and what
6     journal it was published.
7  Q.  Is Barth's study peer reviewed?
8  A.  Yes. The AMA Guides is peer reviewed by the
9     American Medical Association.
10 Q.  So what area of specialty reviewed Barth's
11    study?
12 A.  I guess the editorial board of the American
13    Medical Association, which includes, I guess,
14    every medical specialty.
15 Q.  All medical specialties?
16 A.  I would say I don't know specific of the
17    editorial board. But I know there are
18    orthopedic surgeons on there.
19 Q.  Is that Barth study generally accepted in the
20    scientific community?
21 A.  Yes.
22 Q.  How do you know that?
23 A.  It's been published and peer reviewed by the
24    AMA.
25       Again, this study isn't trying to -- it's

Dr. Kevin Watson

1    more of a review of the causation method than
2    actually making a claim of, I don't know, ACLs
3    are from running up a tree.  It's a review of
4    the causation method and how the causation
5    method has been validated.
6    Q.   Are there studies that disagree with Barth,
7         peer-reviewed studies that disagree with
8         Barth's study?
9    A.   Not that I know of.
10   Q.   Do you know if there is a camp, I call it
11        camp, but a set of physicians that disagree
12        with Barth's evaluation or study determining
13        injury-relatedness, work-relatedness, and
14        claim-relatedness?
15   A.   I don't know of anyone.
16        I think it's a generally accepted causation
17        method both by the American Academy of
18        Orthopedic Surgeons, American Medical
19        Association, and other societies.
20   Q.   How long have you been a follower of Barth's
21        theories?
22        MS. CHICKERING:
23            Object to the form.
24        THE WITNESS:
25            So probably about three or four

Dr. Kevin Watson

1    years ago, when I went to the American
2    Academy of Orthopedic Surgeons surgery
3    course.  There's a workers' compensation
4    course where they talk about injury
5    causation, work-relatedness.
6    claim-relatedness.
7        There are CME courses that I've done
8    for the past two or three years, three or
9    four years on causation.
10   BY MR. FAVRET:
11   Q.   Who put on that course?
12   A.   American Academy of Orthopedic Surgeons.
13   Q.   Doc, let's go to the Daimon study.  That's the
14        second one.
15   A.   Okay.
16   Q.   That's the "20-year prospective longitudinal
17        study of degeneration of the cervical spine in
18        a volunteer cohort assessment using MRI?"
19   A.   Yes.
20        MS. CHICKERING:
21            A standing objection to the extent
22        the doctor has already testified he
23        doesn't have a photographic memory.  And
24        that these studies will speak for
25        themselves when we have them.

Dr. Kevin Watson

1        MR. FAVRET:
2            Subject to that.
3        MS. CHICKERING:
4            Subject to that, go ahead.
5    BY MR. FAVRET:
6    Q.   Doctor, is Daimon a biomechanical engineer?
7    A.   I don't know.
8    Q.   Is he a physician?
9    A.   I don't know.
10   Q.   If he is a physician, do you know his
11        specialty?
12   A.   I don't.
13   Q.   Do you know the number of participants in that
14        study?
15   A.   I'd have to look at the study.
16   Q.   Do you know the number of participants in that
17        study as you sit here today?
18   A.   I don't.
19   Q.   Were those participants screened for any
20        preexisting condition?
21   A.   These were asymptomatic patients.  These
22        patients had no preexisting conditions to
23        their cervical spine.
24   Q.   So what does that mean?  Does that mean they
25        had no preexisting condition on radiographs,

Dr. Kevin Watson

1    or they were just not experiencing symptoms?
2    A.   I believe they were asymptomatic controls to
3         start with.
4    Q.   What were the age of those participants?
5    A.   I'd have to look specifically.
6    Q.   Do you know as you sit here today?
7    A.   I don't offhand, no.
8    Q.   What was the gender of those participants?
9    A.   Both.
10   Q.   Do you know how many male, how many female?
11   A.   Not offhand.
12   Q.   Do you know the body habitus of those
13        participants in the Daimon study?
14   A.   Not offhand.
15   Q.   Was the selection process random or specific?
16   A.   I don't remember.
17        It's a longitudinal study, so they would
18        have selected asymptomatic patients and
19        followed them over 20 years with MRIs.
20        There's nothing really to randomize.
21   Q.   That's what I was going to say.  The fact that
22        it's longitudinal does not indicate whether
23        they're random or specific.
24        All it does is indicate that the same
25        people they chose at any one given time, they

1     continued to follow over a long period of
2     time. True?
3 A. Correct. But there's nothing to randomize to.
4     They're just doing MRIs on patients. There's
5     not something you need to compare it to.
6     You're just getting MRIs.
7 Q. Was there any control group in that study?
8 A. As far as I know, they just followed these
9     patients over time and MRI'd their spine. I
10     don't know if there was a control. I have to
11     look at the specific study.
12 Q. Was that article peer reviewed?
13 A. Yes.
14 Q. That's peer reviewed by who?
15 A. That was in the Journal of Bone and Joint
16     Surgery, which is the biggest, or probably the
17     most well-known orthopedic journal we have.
18     So it's been peer reviewed by the board of the
19     JBJS.
20 Q. That's generally accepted in the scientific
21     community?
22 A. The JBJS?
23 Q. That article.
24 A. I would think so, yes.
25 Q. How do you know that?

1 A. It's reviewed by the editorial board of the
2     JBJS.
3 Q. Are there articles that disagree with the
4     findings of Daimon?
5 A. There's articles that probably show slight
6     differences in the incidences of these changes
7     that happen in the cervical spine. But I
8     don't think anyone would argue that over time
9     degenerative changes in the spine worsen.
10 Q. Doc, let's go to Nordin, that's the next one.
11     That's the "Assessment of neck pain and its
12     associated disorders."
13        Is Nordin a biomechanical engineer?
14 A. I don't know.
15 Q. Is he a physician?
16 A. I don't know.
17 Q. Do you know his specialty?
18 A. I don't.
19 Q. Was this a study?
20 A. Yes. They studied patients looking for the
21     correlation between degenerative findings and
22     the presence of symptoms of neck pain in
23     adults.
24 Q. How many participants in that study?
25 A. I have to look at the study.

1 Q. You don't know?
2 A. Not specifically.
3 Q. Were the participants screened for any
4     preexisting condition?
5 A. I don't know. I'm sure they were, but I don't
6     know what they were.
7 Q. How were they screened?
8 A. I have to look at the study.
9 Q. What was the age of those participants?
10 A. It varied. Again, I'd have to look at the
11     study to tell you exactly.
12 Q. Can you tell me the estimate of the age
13     variance of the participants?
14 A. I would say probably 30s to 60s or 70s.
15 Q. And the gender, was it male and female, the
16     participants?
17 A. Yes.
18 Q. How many of each?
19 A. I don't know.
20 Q. Did they screen for body habitus?
21 A. I don't know.
22 Q. Were the participants selected randomly or
23     specific?
24 A. Again, I'd have to look at the specific study
25     to tell you.

1 Q. Was there any control group in that study?
2 A. I'd have to look at the study.
3 Q. That article, was it peer reviewed?
4 A. Yes.
5 Q. By whom?
6 A. It was in the Spine Journal. So again, the
7     editorial board of the Spine Journal.
8 Q. Do you know who that is or who they are?
9 A. Not currently.
10 Q. Is that article, or the theories in that
11     article, generally accepted in the scientific
12     community?
13 A. I think it is. And I think there are other
14     studies that support the findings.
15 Q. Are there studies that disagree with the
16     findings of Nordin in that study?
17 A. I think there might be a study that shows that
18     patients with severe disc protrusion can have
19     neck pain. Other than that, I don't think
20     there's a disagreement.
21 Q. So it's your testimony that, to your
22     knowledge, there's no disagreement in the
23     scientific community, and no studies that
24     question or disagree with the Nordin study?
25 A. Correct.

Dr. Kevin Watson

1  Q.  You're going to have to help me with the next
2      name.
3  A.  Nakashima.
4  Q.  So we are going to talk about Nakashima.  And
5      the article is "Cervical disc protrusion
6      correlates with severity of cervical disc
7      degeneration."  Right?
8  A.  Yes.
9  Q.  Is Nakashima a biomechanical engineer?
10 A.  I don't know.
11 Q.  Is he a physician?
12 A.  I don't know.
13 Q.  What specialty?
14 A.  I don't know.
15 Q.  What is the synopsis of what that study stood
16     for?
17 A.  They looked at young patients in their 20s
18     starting off.  They found that even at that
19     age, healthy patients, that they saw posterior
20     disc protrusions and disc degeneration.
21         They said those findings got worse as
22     individuals age.  So patients over 40, over
23     80 percent of them had disc protrusions.  They
24     found that the presence of these findings on
25     the MRI were not associated with the develop

Dr. Kevin Watson

1      of clinical symptoms.
2  Q.  What were the number of participants in that
3      study?
4  A.  I don't know.
5  Q.  Were the participants in that study screened
6      for any preexisting condition?
7  A.  I'd have to look at the study.
8  Q.  What were the age of the participants in that
9      study?
10 A.  I think it started in the 20s, and they
11     followed them through the years.  I don't
12     remember.  I don't know.
13 Q.  The gender of the participants?
14 A.  I believe it's male and female, but I have to
15     look.
16 Q.  How many male, how many female?
17 A.  I don't know.
18 Q.  What were the body habitus of the participants
19     in that study?
20 A.  I don't know.
21 Q.  Were the participants selected specifically or
22     randomly?
23 A.  Again, so they looked at healthy subjects, so
24     they would have randomly picked healthy
25     subjects that didn't have neck pain.

Dr. Kevin Watson

1  Q.  Was there a controlled group in that study?
2  A.  Again, there's nothing -- there's no treatment
3      arm, so there's nothing really to compare it
4      to.
5  Q.  That article is peer reviewed?
6  A.  Yes.
7  Q.  Who reviewed it?
8  A.  In the Spine Journal, the editorial board.
9  Q.  Do you know who participated in the editorial
10     board?
11 A.  No.
12 Q.  In your opinion, is that generally accepted in
13     the scientific community, the findings of that
14     study?
15 A.  Yes, I think it is.
16         And it agrees with the previous mention
17     Nordin study.
18 Q.  Any studies that question or disagree with the
19     Nakashima study?
20 A.  I think there are studies that will show that,
21     again, different percentages, whether it's
22     80 percent or 60 percent.
23         But, again, I think it's generally accepted
24     that these disc protrusions, disc
25     degenerations occur in patients without

Dr. Kevin Watson

1      symptoms.  Their findings on MRIs are not
2      associated with the development of symptoms.
3      I think that's general acceptance.
4  Q.  Would you say as a general rule that all of
5      the studies that you've cited in your 15-page
6      report, that there are peer-reviewed articles
7      that question or disagree with the findings of
8      the studies you've cited?
9          MS. CHICKERING:
10             Objections, form.
11 BY MR. FAVRET:
12 Q.  You can answer.
13 A.  Again, I think I went through, at least these
14     two, that I think there is general acceptance
15     that degenerative findings are seen commonly
16     with age, and they worsen with time, and that
17     they're not associated with symptoms.
18         The presence of these findings on MRI don't
19     correlate with patient's symptoms.
20 Q.  Are you of the opinion that degenerative
21     findings on individuals that undergo MRIs that
22     show degenerative findings, and I'm talking
23     about the spine right now, that they have a
24     higher likelihood of being injured with
25     trauma?

Dr. Kevin Watson

1   A.  No.
2   Q.  You think that the existence or preexistence
3       of degeneration does not weaken them or make
4       them more susceptible to injury and trauma?
5   A.  No.  I think there's a study in --
6   Q.  I need you to answer.
7   A.  I said no.
8           I think there's a Carragee study in here
9       that looked at, I think, specifically lumbar
10      spine, where they looked at patients who had
11      injury to their lumbar spine.  They had MRIs
12      that showed degenerative change before.
13          They MRI them afterwards, and there was no
14      significant change on the MRI.  But I think
15      more importantly, the patients who had lumbar
16      arthritis were not more likely to report
17      symptoms than those who did not have lumbar
18      arthritis.
19  Q.  Following trauma?
20  A.  Following trauma.
21  Q.  Doc, we are on -- you cite Nordin again.  Is
22      that a different article or same article?
23      It's the fifth article.
24  A.  Yes.  So it's a different article.
25  Q.  It looks like the same one.

Dr. Kevin Watson

1   A.  Let's see.  Is it different pages?  It's the
2       same page, so it's the same article, yes.
3   Q.  Same article?
4   A.  Correct.  Pages of the article are listed
5       there.  It's the same.
6   Q.  That's what I was looking at.
7           The next one is Cormier?
8   A.  Okay.
9   Q.  Do I have that right?
10  A.  Yes.
11  Q.  The name of that study is "A comprehensive
12      review of low-speed rear impact volunteer
13      studies and comparison to real world
14      outcomes."  That was apparently published in
15      what spine, is that the Spine Journal?
16  A.  Yes.
17  Q.  In 2018?
18  A.  Yes.
19  Q.  Is Cormier a biomechanical engineer?
20  A.  I don't know.
21  Q.  Do you know what company Cormier works for?
22  A.  No.
23  Q.  Is Cormier a physician?
24  A.  I don't know.
25  Q.  What is Cormier's specialty if he is a

Dr. Kevin Watson

1       physician?
2   A.  I don't know.  I'd have to look at the
3       article.
4   Q.  Tell me the gist of that study, the gist of
5       your understanding of that study.
6   A.  So they look at -- he looked at all these
7       crash tests volunteers, page nine, and looked
8       at all these rear-end motor vehicle collisions
9       that they exposed these volunteers to.
10          They say they can safely expose these
11      volunteers, looking at these different
12      studies, up to 11 miles an hour without
13      causing damage to these human volunteers.
14          So they correlate that to the real world
15      traffic collision reports and injury data to
16      show that the crash test volunteers is what's
17      correlating to the real world data that they
18      extracted from crash, real world crashes.
19  Q.  Doctor, in that -- strike that.
20          I'm going to talk about your ultimate
21      opinion in just a bit.  But is it a fair
22      statement that your ultimate opinion relies,
23      at least in part, on all of the articles that
24      you've cited on page 14 and 15 of your report?
25  A.  Yes.

Dr. Kevin Watson

1   Q.  Doctor, back to Cormier.  I think I asked you
2       already whether he was a biomechanical
3       engineer.
4   A.  Yes.  I don't know.
5   Q.  Do you know what company Cormier works for?
6   A.  No.
7   Q.  Do you know if he's a physician?
8   A.  I don't know.
9   Q.  If he is, do you know his specialty?
10  A.  No.
11  Q.  Do you know the number of participants in this
12      study that he performed?
13  A.  I'd have to look at it specifically, no.
14  Q.  Do you know if these participants were
15      screened for preexisting conditions?
16  A.  I'd have to look again at the study.
17  Q.  Do you know the age of the volunteer
18      participants in the Cormier study?
19  A.  I'd have to look.
20  Q.  I can't imagine volunteering for something
21      like that.
22  A.  If they pay you, I'd think they would do it.
23      If they told you, I guess, that there was no
24      risk of injury, you would do it.
25  Q.  Would it be a fair statement that the

1      participants in this study were aware that
2      they were going to be rear-ended?  That's
3      something that the study author would notify
4      them of.  Right?
5  A.  There are some studies where they would
6      notify.  There are some studies -- I don't
7      know if it's specifically quoted in this one
8      where they don't tell patients exactly when
9      the rear impact is going to come or when to
10     expect it.
11  Q.  Would you agree that there is a difference
12     between telling a participant that you're
13     getting ready to have a rear-end collision and
14     not?
15  A.  There is a difference in that, yes.
16  Q.  There's a difference in how they hold their
17     body?
18  A.  Potential.
19  Q.  Whether they brace?
20  A.  Potential.
21  Q.  There's probably a lesser potential of injury
22     if you brace and know the impact is coming
23     versus not knowing and not bracing.  Would you
24     agree with that or disagree?
25  A.  I don't know.  I don't think I've seen a study

1      that shows that.
2  Q.  So you would agree with that?
3  A.  I would disagree.
4  Q.  You would disagree with that?
5  A.  I don't know any study that would show that.
6  Q.  Understood.
7      What were the age of these volunteer
8      participants in the Cormier study?
9  A.  I think it's -- I don't know.  I think, again,
10     it's a review of multiple rear impact
11     volunteer studies.  It's not just the studies
12     that he's done, so he kind of reviews.
13     Again, it's all different types of rear
14     impacts, all different types of volunteers,
15     not just his study.
16  Q.  Would you agree that the results of the study,
17     if they do not show someone with Ms. Brooks'
18     same body habitus, same age, same preexisting
19     conditions, that the results may not apply to
20     Ms. Brooks?
21  A.  I think if they have -- around the same age,
22     same gender, the body habitus, I'm certain
23     will be similar as far as the overall number
24     of volunteers.
25     If it's totally out of wack, then, yeah, I

1      would say it wouldn't apply.
2  Q.  What would make it totally out of wack?
3  A.  If they studied all 20-year-old, 100-pound
4     males, then I'd say it wouldn't apply.
5  Q.  Or people in the military?
6  A.  No, not necessarily.
7  Q.  What were the gender in those various studies,
8     of the participants in those various studies?
9  A.  I'm sure it's male and female.
10  Q.  Do you know how many of each?
11  A.  No.
12  Q.  Do you know the body habitus of the volunteer
13     participants of those studies?
14  A.  No.
15  Q.  Were the volunteers selected randomly or
16     specifically?
17  A.  I'd have to look.
18     These are volunteers, so they're selected.
19     I'm sure they're screened, like you said,
20     different body habitus, age, things like that.
21  Q.  You would expect that?
22  A.  Yes.
23  Q.  What's the purpose of that selection?
24  A.  Again, you want to try to get a cross section
25     of individuals to get as much data as you can

1      to apply to as many individuals as possible.
2  Q.  Were there control groups in those various
3     studies?
4  A.  Not that I know of.
5  Q.  What does that do to the validity of the study
6     not having control groups?
7  A.  If you're trying to do some type of treatment,
8     then I think it makes a difference.  If you're
9     studying volunteer collisions and whether or
10     not they have injury or not, there's nothing
11     you control.
12     I mean, you can ask volunteers who never
13     had injuries if they have pain.  It doesn't
14     make sense to have a control.
15  Q.  You relied on Cormier to formulate your
16     opinions about causation in this particular
17     case, that is Ms. Brooks?
18  A.  Some degree, yes.
19  Q.  Is the Cormier study peer reviewed?
20  A.  Yes.
21  Q.  By whom?
22  A.  Spine Journal editorial board.
23  Q.  Do you know who participated in that peer
24     review?
25  A.  No.

Dr. Kevin Watson

1   Q.   Are the findings of Cormier and his study
2        generally accepted in the scientific
3        community?
4   A.   Again, I think the volunteer, that you can
5        expose them to impacts less than 11 miles an
6        hour, I think that's accepted because that's
7        what they routinely perform rear impact
8        testing on.
9             I'm sure there will be some debate whether
10       it applies to the real world.  But he looked
11       at the real world injury claimed on these
12       lower speed rear-end collisions.  He's
13       analyzing the data.
14  Q.   What makes you believe that it could be
15       questioned in the real world, the outcome of
16       that study?
17  A.   The fact that we're sitting here today.
18       There's a whole accident in litigation
19       surrounding a motor vehicle collision.
20  Q.   Do you know why Cormier published that study
21       and who backed his studying?
22  A.   I don't.
23  Q.   Would that be of interest to you?
24  A.   I can look at the article and see.  I don't
25       remember.

Dr. Kevin Watson

1   Q.   The next we have, you have to help me with the
2        spelling or the pronunciation.
3   A.   Brinjikji.
4   Q.   Brinjikji, the name of the article is
5        "Systemic literature review of image features
6        of spinal degeneration in asymptomatic
7        populations."  You've read that article?
8   A.   Yes.
9   Q.   Is Brinjikji a biomechanical engineer?
10  A.   I don't know.
11  Q.   Do you know what company he works for?
12  A.   I don't think he works for a company, but I
13       don't know.
14  Q.   Is Brinjikji a physician?
15  A.   I don't know.
16  Q.   What area of specialty if he is?
17  A.   I don't know.
18  Q.   What's the gist of that study or paper?
19  A.   Again, similar to the other studies.  It looks
20       at asymptomatic population.  And they're
21       reviewing what imaging findings are commonly
22       seen in patients who have no complaints of
23       pain.
24  Q.   How many participants in the Brinjikji study?
25  A.   I don't know.

Dr. Kevin Watson

1   Q.   Do you know if the participants were screened
2        for preexisting condition?
3   A.   Again, these are asymptomatic patients.  At
4        least, as it results to their spines, there
5        would be no preexisting conditions.
6   Q.   That would be no preexisting, symptomatic or
7        asymptomatic conditions, or either?
8   A.   Asymptomatic conditions.  Not symptoms,
9        patients who had no symptoms.
10  Q.   Understood.
11            The participants were selected without
12       symptoms?
13  A.   Correct.
14  Q.   What were the age of the participants?
15  A.   There were numerous ages.  It looked at
16       asymptomatic patients in different decades of
17       life.
18  Q.   Do you know what those decades are?
19  A.   I think they start, again, in the 30s and go
20       through the 70s.
21  Q.   Do you know the gender of those participants?
22  A.   It's both males and females.
23  Q.   Do you know how many male, how many female?
24  A.   I don't.
25  Q.   Do you know the body habitus of the various

Dr. Kevin Watson

1        participants?
2   A.   I don't.
3   Q.   Would that matter?
4   A.   Probably not.
5             These are asymptomatic patients.  So the
6        point of the study is to look at how age,
7        again, similar to the previous study, this has
8        to do with the lumbar spine.
9             Again, degenerative findings are common as
10       we age, and they don't correlate with the
11       development of symptoms.
12  Q.   Is that article peer reviewed?
13  A.   Yes.
14  Q.   The peer review was who?
15  A.   This is the American Journal of
16       Neuroradiology, or Neuroradiologists.
17  Q.   Is that within your field of expertise?
18  A.   I do review cervical and lumbar MRIs.
19  Q.   Neuroradiology, is that within your field?
20  A.   Yes.  That's what an MRI of the cervical and
21       lumbar spine is, neuroradiology.  I'm not a
22       neuroradiologist but I do evaluate
23       neuroradiology.
24  Q.   How did you learn how to interpret MRI
25       studies?  Was that in medical school, or did

Dr. Kevin Watson

1    you learn after you got out of medical school?
2  A.  Medical school and residency.
3  Q.  Doctor, back to the Cormier study just for a
4      moment.  Are there articles that disagree with
5      the findings in the Cormier study?
6  A.  I guess you'd have to say -- again, I think
7      the volunteer studies, I don't think are
8      argumentative at all.
9          Are there studies -- I don't know of any
10     study that looks at low-speed rear-end MVCs,
11     and showing that they have a meaningful risk
12     of injury.
13 Q.  That was a bad question.  The answer was all
14     right, bad question.
15         Are there any articles that criticize
16     Cormier and its findings?
17 A.  That I don't know.
18 Q.  Did you search for that?
19 A.  When I researched these, it's a PubMed search,
20     which is a literature search.  Regarding this
21     case, a low velocity rear-end collision, I did
22     not see any responses or critiques.
23 Q.  Did you search for any articles that came to
24     the contrary conclusion of Cormier?
25 A.  Again, I didn't see any.

Dr. Kevin Watson

1      Again, when I do a PubMed search, it
2      doesn't say -- it basically says injury after
3      low velocity rear-end motor vehicle
4      collisions, this was one of the articles that
5      appeared.  I don't remember seeing any other
6      articles to the contrary.
7  Q.  I think I understand what you're saying.  But
8      my question is, did you search for any
9      articles that would look at whether Cormier
10     and that publication was criticized in any
11     manner?
12 A.  Again, in the search, it would have included
13     any results related to that.  It would have
14     popped up, I would assume.
15 Q.  And you're saying there are none?
16 A.  I'm saying it didn't show up in my PubMed
17     search.
18 Q.  You don't know if they exist.  You just didn't
19     see it?
20 A.  Correct.
21 Q.  Let's move to Kalichman, "Facet joint
22     osteoarthritis and low-back pain in the
23     community-based population."  You're familiar
24     with that article?
25 A.  Yes.

Dr. Kevin Watson

1  Q.  Is Kalichman a biomechanical engineer?
2  A.  I don't know.
3  Q.  Do you know what company he works for?
4  A.  I don't know.
5  Q.  Is Kalichman a physician?
6  A.  I don't know.
7  Q.  Do you know Kalichman's specialty if he is a
8      physician?
9  A.  I don't know.
10 Q.  What's the gist of that article?
11 A.  We're talking about facet joint arthritis.
12     Again, they look at the lumbar spine in this
13     case.  And they look at the presence of who
14     has facet joint arthritis in the general
15     community population at different age groups.
16         So they took all-comers, did imaging of
17     their lumbar spine.  This case, I think it's a
18     CT scan.  They found the percentage of facet
19     joint arthritis is common, obviously worsened
20     with age.
21         Then they also found that patients who had
22     facet joint arthritis, didn't have any more
23     back pain or did not develop back pain any
24     more than those who did not have facet
25     arthritis.

Dr. Kevin Watson

1  Q.  So part of the study showed the prevalence of
2      facet joint arthritis in the population?
3  A.  Correct.
4  Q.  And I'm sorry, you told me something else and
5      I just forget it.
6  A.  So they said the patients who had facet
7      arthritis, are they having back pain?  They
8      compared that to those patients who didn't
9      have facet arthritis and if they did have back
10     pain.  There was no correlation between the
11     presence of facet joint arthritis and back
12     pain.
13 Q.  Are you of the opinion that the existence of
14     facet joint arthritis predisposes someone to
15     facet mediated pain with a trauma?
16 A.  No.
17 Q.  You do not think that is true?
18 A.  Right.  So I don't know a study that shows
19     that.
20         Again, I note the Carrage study showed
21     that, again, patients with degenerative change
22     in their lumbar spine weren't more susceptible
23     to injury, nor did they have more pain
24     complaints than those who didn't have it.
25 Q.  After trauma?

Dr. Kevin Watson

1   A.   After trauma.
2   Q.   I think you cited that prior study for the
3        proposition of degeneration in the lumbar
4        spine.  You're including not just discs and
5        vertebrae, but you're talking about the facet
6        joints as well?
7   A.   This is a study done by Carragee in 2006.  It
8        says, "Does minor trauma cause serious
9        low-back illness?"
10       So it talks about trauma causing chronic
11       back pain.  Again, the finding was that
12       patients who had preexisting lumbar arthritis
13       didn't develop chronic lumbar pain any more
14       than those who did not have lumbar arthritis.
15  Q.   Understood.
16       The lumbar arthritis you're talking about,
17       is that specifically a facet joint or other
18       parts of the spinal process?
19  A.   Both, it's both.
20  Q.   So on Kalichman, I don't know if I asked you
21       this, but is Kalichman a biomechanical
22       engineer?
23  A.   I don't know.
24  Q.   Do you know what company he works for?
25  A.   No.

Dr. Kevin Watson

1   Q.   Do you know if he's a physician?
2   A.   I don't.
3   Q.   Do you know what his specialty is?
4   A.   I don't know.
5   Q.   Do you know the number of participants in his
6        study?
7   A.   I don't.
8   Q.   Do you know if his participants were screened
9        for any preexisting condition?
10  A.   I don't know.
11  Q.   Do you know the age of those participants?
12  A.   Again, this is more of a decade.  So they
13       would have been, again, 20s to 30s to 70s to
14       80s.
15  Q.   Do you know the gender of the participants?
16  A.   It would have been both.
17  Q.   Do you know the number of male versus the
18       number of female?
19  A.   No.
20  Q.   Do you know the body habitus of the
21       participants?
22  A.   No.
23  Q.   Do you know whether the participants were
24       selected randomly or specifically?
25  A.   I think they were selected randomly from the

Dr. Kevin Watson

1        population.
2   Q.   Was there any need for a control group in this
3        study?
4   A.   No.  Because they looked at the presence of --
5        just the findings that they saw on a CT scan
6        in the population.
7   Q.   Is it your opinion that this publication, the
8        Kalichman publication, was peer reviewed?
9   A.   Yes.
10  Q.   By the editorial board of the Spine Journal?
11  A.   Yes.
12  Q.   Do you know who that would have been in 2008?
13  A.   No.
14  Q.   Has the study ever been criticized?
15  A.   Not that I'm aware of.
16  Q.   Are there studies that contradict the
17       Kalichman study?
18  A.   Again, I don't think there is any study that
19       showed, that will contradict that facet
20       arthritis happens as we age.
21       I think there is good consensus that no
22       finding on CT scan of the facet joint can
23       prove that the facet joint is symptomatic.
24       And that's what they're saying, just because
25       you have arthritis in the facet joint, there

Dr. Kevin Watson

1        is no way you can say that it is symptomatic.
2        That's generally accepted.
3   Q.   Would you agree, as a general proposition,
4        that the degeneration seen on a radiological
5        study does not dictate whether the person
6        being studied is symptomatic or asymptomatic?
7   A.   Correct.
8   Q.   A person with degeneration in their spine can
9        be asymptomatic.  True?
10  A.   Yes.
11  Q.   And a person with degeneration in their spine,
12       if subjected to trauma, can become
13       symptomatic.  True?
14  A.   Anything can cause, can make symptoms present,
15       yes.
16  Q.   Including trauma?
17  A.   Yes.
18  Q.   The next Kalichman, that's a separate article.
19       Right?
20  A.   Right.  It's a separate article that basically
21       goes in, and it's kind of an update on the
22       second part.
23       So the first part was just documenting the
24       prevalence of the facet joint.  The second
25       part was correlating, whether it correlates to

Dr. Kevin Watson

1  low-back pain or not. They were both lumped
2  together.
3  Q.  What was the gist of that study, the second
4      Kalichman study in 2010?
5  A.  Again, what I mentioned previously. There was
6      no association between facet joint arthritis
7      and the development of low-back pain.
8  Q.  Does the study stand for the proposition that
9      there is no correlation between facet joint
10     arthritis and the -- and back pain in
11     non-traumatic, or patients that have not been
12     injured?
13 A.  I don't understand the question.
14 Q.  The study, the Kalichman study, the second one
15     in 2010, does that study stand for the
16     proposition that just because there is
17     degeneration in the facet joint, doesn't mean
18     that there is pain in the spine? Is that what
19     you're telling me? I might be simplifying it.
20 A.  Yeah.
21     Again, I think the presence of facet joint
22     degeneration or arthritis on a study, CT scan,
23     MRI, it doesn't mean that the patient has
24     pain. There's no correlation, in fact.
25     Whether or not you have it or not, you can't

Dr. Kevin Watson

1  predict spinal pain.
2  Q.  I think I understand.
3      It's essentially saying the mere presence
4      of degeneration doesn't equate to pain?
5  A.  Correct.
6  Q.  The presence of degeneration with a trauma can
7      create pain, you would agree with that
8      proposition?
9  A.  Trauma can create pain, yes.
10 Q.  The next one we have is Hartvigsen.
11 A.  Okay.
12 Q.  The title of the article is "Low-back pain."
13 A.  Okay.
14 Q.  Is Hartvigsen a biomechanical engineer?
15 A.  Not that I know of.
16 Q.  Do you know what company Hartvigsen works for?
17 A.  No.
18 Q.  Is Hartvigsen a physician?
19 A.  I don't know.
20 Q.  Do you know, if he is a physician, what his or
21     her specialty is?
22 A.  I don't know.
23 Q.  What's the proposition of that article?
24 A.  It's kind of a review article from the Lancet,
25     which is a British publication, a large

Dr. Kevin Watson

1  British publication.
2      Again, they looked at studies similar to
3      what we previously talked about. That there
4      is no association between arthritis of the
5      facet joint and the prevalence of low-back
6      pain.
7      There's no investigation. They talk about
8      disc problems. So disc bulge, disc
9      protrusions as being a source of discogenic
10     pain, so pain from a disc. There's been no
11     widely accepted reference standard that
12     validates that.
13     The identification of the individuals whose
14     facets are contributing to their pain, they
15     say is not possible.
16 Q.  Are you of the opinion that a herniated disc
17     can cause pain?
18 A.  I would say if it causes nerve compression, it
19     can cause pain.
20     The disc itself, there's no reference to
21     prove that that is generating pain.
22 Q.  Are there nerve fibers in discs?
23 A.  Yes.
24 Q.  Can a herniated or bulging disc affect those
25     nerve fibers and create pain?

Dr. Kevin Watson

1  A.  It's not proven.
2  Q.  What does that mean?
3  A.  There's no way to tell that a bulging disc is
4      generating pain. We don't have a diagnostic
5      tool to be able to determine that a bulging
6      disc is irritating a nerve and causing pain.
7      Now, we can prove that if a herniated disc
8      impinges on a nerve it affects the nerve, and
9      you start having weakness in your arms and
10     numbness and tingling.
11     There are some objective measures to -- you
12     know, you can objectively examine weakness
13     that corresponds to a pinched nerve. But
14     there's no objective way to accurately
15     determine if a disc is, in and of itself, is
16     generating pain.
17 Q.  Can herniated discs leak enzymes that create
18     nerve root irritation?
19 A.  Yes.
20 Q.  What are those enzymes called?
21 A.  So they have different inflammatory processes,
22     inflammatory markers. So when you herniate a
23     disc, it generates cytokines and interleukin
24     factors and found inflammatory factors into
25     the region, which can cause inflammation

Dr. Kevin Watson

1   around the nerve and cause irritation.
2   Q.  Okay.  Are those the names of those enzymes?
3   A.  I have to look up the specific name of the
4       enzyme.  But they are involved in the
5       inflammatory cascade.
6   Q.  Can you educate me about what those enzymes
7       are called, the names of those enzymes, or no?
8   A.  Again, I'd have to look up the specific names
9       of the inflammatory cascade.  It's been since
10      medical school since we learned inflammatory
11      cascade.
12  Q.  Understood.
13      The science that you know, is it reasonable
14      to assume that if a disc has nerve fibers, and
15      those nerve fibers are interrupted or injured
16      by a herniation, that the herniation can cause
17      pain in and of itself?
18  A.  The potential is there.  But there's no way
19      that we know of to objectively detect it at
20      this point.
21  Q.  Are there things in science that you can't
22      objectively measure but you know is true?
23  A.  Not that I know of in science.
24  Q.  We're to Carragee I think.  The name of his
25      study is, "Does minor drama cause serious

Dr. Kevin Watson

1   low-back illness?"  Is Carragee a
2   biomechanical engineer?
3   A.  No.
4   Q.  Is he a physician?
5   A.  Yes.
6   Q.  What is his specialty?
7   A.  He is a spine physician.
8   Q.  Where does he work?
9   A.  I don't know.
10  Q.  Have you ever met him?
11  A.  No.
12  Q.  Do you know what prompted this study?
13  A.  I think like everything else, we're trying to
14      figure out if trauma does lead to problems in
15      lumbar spine, chronic back pain, and how can
16      we best determine what is causing chronic pain
17      in these patients.
18  Q.  Is Carragee study limited to the lumbar spine?
19  A.  Yes.
20  Q.  No other body parts?
21  A.  Correct.
22  Q.  What does the Carragee study stand for?  If
23      you could give me a synopsis of that.
24  A.  They looked at patients who -- well, they
25      followed patients who had MRIs, and they

Dr. Kevin Watson

1   followed them over time.
2       If they had a traumatic event, that was
3   recorded.  And they repeated an MRI study
4   after the traumatic event looking for changes,
5   whether or not the traumatic event caused MRI
6   changes and whether it led to the presence of
7   chronic pain.
8       What they found was that in these types of
9   traumas, which they call minor, but basically
10  what it means is that trauma that had no long
11  bone fracture or pelvis fracture or visceral
12  injury, which is an organ injury, that minor
13  trauma didn't cause, lead to chronic low-back
14  pain outside of a compensation-type setting.
15      And that patients who had lumbar
16  degeneration prior to this trauma, were not
17  more likely to develop serious chronic
18  low-back pain than those who did not have
19  lumbar degeneration.
20  Q.  I'm going to have to go back to this a little
21      bit.  How did Carragee define minor trauma?
22  A.  So the lack of -- if the trauma did not cause
23      a long bone fracture, like a humerus fracture
24      or a femur fracture, if it didn't cause pelvis
25      fracture, or if it didn't cause organ injury,

Dr. Kevin Watson

1   so kidney, liver, spleen, then it was
2   classified as minor trauma in their study.
3   Q.  That could be a 50-mile-an-hour impact, just
4       as long as that impact didn't cause a femur
5       fracture, a pelvis fracture, a femur fracture,
6       humerus fracture, or organ damage or injury,
7       that's still a minor trauma?
8   A.  According to Carragee.  According to the
9       participants in the Carragee study.
10      I don't know if that -- he lists in the
11      study what traumas there were.  There were
12      falls.  There were motor vehicle collisions.
13      I don't think he said 50-mile-an-hour
14      collision.  But he does document what the
15      minor trauma was.  I'd have to look and see if
16      he specifically said what the top miles an
17      hour in the collision.
18  Q.  Does that study indicate the definition of
19      minor trauma beyond the lack of a long bone
20      fracture, pelvis fracture, or organ injury?
21  A.  Again, in their study, that's what he is
22      calling minor trauma.
23  Q.  Do you consider automobile accidents, just as
24      long as there is no long bone fracture, no
25      pelvic fracture, or organ injury, minor?

Dr. Kevin Watson

1      MS. CHICKERING:
2          Object to form.
3      THE WITNESS:
4          I think it depends on what you mean
5      by "minor."
6  BY MR. FAVRET:
7  Q.  What would you consider minor?
8  A.  I think a low-speed motor vehicle collision is
9      minor trauma.
10 Q.  And what is low speed?
11 A.  Again, I think things with a change in
12     velocity, below ten to 11 miles an hour, would
13     be a low-speed motor vehicle collision.
14 Q.  Is it your general opinion that a low-speed
15     collision, less than ten or 11 miles per hour,
16     cannot cause injury?
17 A.  I'm saying it can't cause injury -- I guess
18     the studies show -- again, the Cormier study,
19     the Carragee study, show it can cause strains,
20     but it can't cause injury that leads to
21     chronic pain.
22 Q.  You ascribe to that theory that low speed,
23     below ten or 11 miles per hour, can't cause,
24     can't lead to chronic pain?
25 A.  Yeah.

Dr. Kevin Watson

1      To boil it down, looking at the studies,
2  low-speed MVCs that don't produce these types
3  of injuries, fractures, whether it be the
4  spine, long bone, pelvis, organ injury, has
5  not been shown to lead to chronic pain outside
6  of a compensation-type setting.
7  Q.  What's compensation?
8  A.  So where there's a litigation or potential for
9      gain.
10 Q.  Is that a medical opinion?
11 A.  No.
12     That's what the Carragee study says.  It
13     says that patients who, again, who are
14     involved in these minor traumas, the only
15     patients that develop low-back pain were those
16     involved in the compensation or the litigation
17     setting.
18 Q.  Do you ascribe to that opinion?
19 A.  Again, I think minor trauma isn't responsible
20     for the generation of chronic low-back pain.
21 Q.  The fact that people who do experience it,
22     they do so for compensation potential, is how
23     you're saying it?
24 A.  It is a risk factor for the development of
25     chronic pain.

Dr. Kevin Watson

1  Q.  Is that a medical opinion?
2  A.  Again, it is quoted in I think one of the AMA
3      articles, again, by Dr. Barth, who talks about
4      the risk factors of the development of chronic
5      pain.  That is one of the risk factors for the
6      development of chronic pain.
7  Q.  I'm asking, do you subscribe to that opinion
8      that a person who is seeking compensation will
9      do so -- a person seeking compensation, that
10     is what's responsible for their pain symptoms?
11 A.  No.  It is a risk factor for the development
12     of their chronic pain.
13 Q.  So what does that mean?
14 A.  You have to be evaluated.  You have to look
15     at, is it part of the problem?  So you look at
16     the whole picture.  Right?  So you look at the
17     objective findings, the subjective complaints.
18     You look at the mechanism of injury.
19     You put it all together, and you try to
20     find out what is the most dominant thing that
21     is generating this persistence of chronic
22     pain.  That may or may not be able to be
23     explained through the findings and treatment
24     thus far.
25 Q.  Is Ms. Brooks experiencing chronic pain

Dr. Kevin Watson

1  because she is seeking compensation?
2  A.  So if you look at the -- you're basically
3      asking to summarize the whole thing.
4      If you look at all findings, that there's
5      no objective findings on the objective study
6      that would explain her chronic pain, the
7      mechanism of injury in this accident wouldn't
8      explain her chronic pain.
9      So you're looking at what is the most
10     likely risk factor.  The studies that I quoted
11     showed that these other things don't seem to
12     be risk factors for the development of chronic
13     pain.
14     So that is one of the risk factors, and one
15     of the reasons that could be here as one of
16     the reasons she's having chronic pain.
17 Q.  In your opinion, is Ms. Brooks malingering?
18 A.  No.
19 Q.  In your opinion, is Ms. Brooks exaggerating?
20 A.  I don't think I have a way to tell that, no.
21 Q.  I didn't think so.  I was asking you.
22     Do you think that Ms. Brooks is
23     experiencing pain so she can collect
24     compensation?
25 A.  Again, I can't speak to her motives or her --

1    again, pain is a subjective thing.  There is
2    no way to measure her pain or to tell that
3    she's having pain.
4        She could certainly have pain.  I have no
5    reason to doubt that she says that she has
6    pain.  But it's not a measurable thing that I
7    can objectively quantify for you.
8  Q. So back to the Carragee study.  That's what we
9    were on, wasn't it?
10 A. Yes, sir.
11 Q. What were the number of participants?
12 A. I don't remember.
13 Q. Were the participants screened for preexisting
14    conditions?
15 A. Yes.
16 Q. How was that done?
17 A. Again, so they looked at preexisting, they got
18    a lumbar MRI prior to the start of the study.
19    They knew if they had preexisting conditions
20    or not.
21 Q. And the people in the study were all involved
22    in a subsequent trauma?
23 A. No.  Some were, some weren't.
24 Q. I thought you said some -- that the
25    participants were involved in a trauma, and

1    then they were MRI'd afterwards to see if
2    there was any change?
3  A. Some of them were, yes, and some weren't
4    involved in trauma.
5  Q. How many of those participants were involved
6    in a subsequent trauma and then MRI'd?
7  A. I don't know.  I'd have to look at the study.
8  Q. How soon after the trauma were they MRI'd for
9    back pain?
10 A. I'd have to look at the study.
11 Q. Are you of the opinion that MRIs -- strike
12    that.
13    Are you of the opinion that trauma
14    sustained in an accident that before the
15    findings -- strike that.  It was poorly
16    worded.
17    Are you of the opinion that trauma
18    sustained in an accident will show up the
19    traumatic findings on an MRI immediately?
20 A. If you're relating the findings to the trauma,
21    yes.
22 Q. How soon after a trauma, say to a disc in the
23    lumbar spine, will that disc trauma show up on
24    MRI?
25 A. If you're going to ascribe the disc trauma --

1    the disc herniation to the trauma, it should
2    show up immediately.
3    Patients are in an accident, they have an
4    acute disc herniation or a spine fracture,
5    they present to the E.R.  Their herniation is
6    there immediately.  Their symptoms are there
7    immediately.
8  Q. That's 100 percent of times, 100 percent of
9    times where a trauma such as an automobile
10    accident, if it causes a herniated disc, the
11    herniation will immediately develop with the
12    trauma?
13 A. I would say more probably than not, yes.
14 Q. Is that 100 percent of the time?
15 A. No.
16 Q. What percentage develops, in terms of
17    herniations in the spine, develop after a
18    trauma?
19 A. Well, herniations develop naturally regardless
20    of trauma.  There's no way to tell you that a
21    herniation that you see a year later is from
22    the trauma.  It's more likely just from the
23    natural degenerative process.
24    If you're going to ascribe a herniation
25    from trauma, it has to appear after the

1    trauma, immediately after the trauma.
2  Q. We're back on Carragee.  I asked you the
3    number of participants and the preexisting
4    condition.  You told me those answers.  What
5    were the age of the participants?
6  A. I don't know.  I'd have to look.
7  Q. Do you know the range of ages of the
8    participants?
9  A. Not offhand.
10 Q. Do you know the gender of the participants?
11 A. I don't.
12 Q. Do you know the body habitus of the
13    participants studied?
14 A. I don't.
15 Q. Do you know whether the participants were
16    selected randomly or specifically?
17 A. Again, I think they were randomly selected
18    from the population.
19 Q. Did that study require a control group, in
20    your opinion?
21 A. No.  There was really no control group, other
22    than they did use a control group for the
23    trauma part of the study.
24    So they looked at patients who didn't have
25    trauma, their MRI findings, versus those who

1    did have trauma.
2  Q.  And how did those correlate?
3  A.  So basically, those with trauma and without
4    trauma had no change, there's no difference in
5    their lumbar degenerative findings nor their
6    complaints, again, outside of a compensation
7    setting.
8  Q.  This Carragee study, I just forgot, is that
9    the one where Carragee called a minor trauma
10    the one that doesn't cause long bone fracture,
11    pelvic fracture, and organ injury?  Or was
12    that a different study?
13  A.  Yes.  For the purpose of his study, that's how
14    he classified these patients.
15  Q.  And that study, Carragee is peer reviewed?
16  A.  Yes.
17  Q.  That's by the Spine Journal?
18  A.  Yes.
19  Q.  And the editorial board of the Spine Journal?
20  A.  Yes.
21  Q.  Has that study ever been called into question?
22  A.  Again, not that I know of.
23  Q.  Are you aware of any critiques or criticizing
24    of the Carragee study?
25  A.  I don't know of any.

1  Q.  The findings in the Carragee study, is that
2    generally accepted in the scientific
3    community?
4  A.  Again, I'm sure people can argue with it.  I
5    don't know of any other study that contradicts
6    it.
7  Q.  Do you know if the Carragee study is generally
8    accepted in the scientific community or not?
9  A.  Yes, I think it is.
10  Q.  You base that on?
11  A.  Again, Carragee was one of the editors of the
12    Spine Journal at some point.  He's a very
13    well-known author.
14  Q.  Let's move to Wood.  The title of the article
15    is, "Do low-speed vehicle collisions cause
16    intervertebral disc degeneration or
17    Herniations?"  Is Wood a biomechanical
18    engineer?
19  A.  I don't know.
20  Q.  Do you know what company Wood works for?
21  A.  No.
22  Q.  Is Wood male or female?
23  A.  I don't know.  I'd have to look.
24  Q.  Is Wood a physician?
25  A.  I don't know.

1  Q.  Do you know what specialty Wood is if Wood is
2    a physician?
3  A.  No.
4  Q.  Do you know -- tell me, first of all, the
5    synopsis of that article.
6  A.  Again, this is another study from the AMA, the
7    American Medical Association.
8    Again, they look at different real world
9    data, simulation data of motor vehicle
10    collision, low-speed motor vehicle collision,
11    and whether or not they have been shown to
12    have the forces needed to generate disc
13    degeneration or disc herniation.
14  Q.  Do you, independent of all of these articles,
15    know the force required in an automobile crash
16    to cause injury?
17      MS. CHICKERING:
18        Object to the form.
19      THE WITNESS:
20        No, I couldn't quote you an exact
21    Newton force, no.
22  BY MR. FAVRET:
23  Q.  That's not within your knowledge or expertise.
24    Is that fair to say?
25  A.  Yes.

1  Q.  How did Wood describe low speed?
2  A.  He said low change in velocity.  I would have
3    to look at the exact number that he used.  I
4    don't remember offhand.
5  Q.  You don't know what that low speed is?
6  A.  It's in the article.  I don't remember
7    offhand.
8  Q.  Do you know if the low speed in that article
9    is comparable to the impact we're dealing with
10    Ms. Brooks?
11  A.  I believe it would be, yeah.
12  Q.  What about Ms. Brooks' accident makes you
13    believe that the same low speed we're dealing
14    with in Brooks as Wood?
15  A.  Well, I think the traffic crash report
16    reported they were in traffic.  There was --
17    the other vehicle was reported as going
18    10 miles an hour.  There was minimal damage to
19    the vehicles.  No injuries reported at the
20    scene.  All would be consistent with a
21    low-speed motor vehicle collision.
22  Q.  Are you of the opinion that Ms. Brook was not
23    injured in this crash?
24  A.  Again, I don't think she has an injury that
25    would lead to chronic spinal pain or chronic

Dr. Kevin Watson

1    knee pain or shoulder pain.
2  Q.  Are you of the opinion she was not injured in
3      this crash?
4  A.  There's no way for me to say that she couldn't
5      have sustained some type of neck pain or back
6      pain.  I would say, given the mechanism of
7      injury, it would be unlikely.
8  Q.  What were the number of participants in the
9      Wood study?
10  A.  Again, I don't know.  It wasn't necessarily a
11     study by Wood.  It's a review of different
12     studies.
13  Q.  Do you know the various studies that Wood
14     reviewed in coming to whatever conclusion Wood
15     came to?
16  A.  No.  I'd have to look again at the
17     bibliography.
18  Q.  Can car crashes cause spine pain?
19         MS. CHICKERING:
20              Object to the form.
21         THE WITNESS:
22              Patients in car crashes can complain
23         of spine pain, yes.
24  BY MR. FAVRET:
25  Q.  Can car crashes cause axial spine pain?

Dr. Kevin Watson

1         MS. CHICKERING:
2              Object to the form.
3         THE WITNESS:
4              Again, patients in car crashes can
5         complain of axial spine pain.
6  BY MR. FAVRET:
7  Q.  What's the difference between the way I asked
8      it and the way you answered it?
9  A.  Well, again, pain is a subjective thing.  So
10     there's no way to show that a car accident can
11     cause pain.  There's no objective way to
12     determine that.
13         A patient can complain of pain and say it
14     was from a car accident.  But there's no way
15     to definitely say that the car accident caused
16     the pain.
17  Q.  If a person is not in pain before a car crash,
18     they get in a car crash, they start
19     experiencing pain, do you correlate that?
20  A.  So it is a factor in causation, but it's not
21     the most reliable factor in determining
22     causation.
23  Q.  So if a person has no, say, neck or back pain
24     before a crash, they're in a crash, they start
25     experiencing neck and back pain following the

Dr. Kevin Watson

1      crash, shortly following the crash, would you
2      correlate the neck and back pain based upon
3      the fact no pain before and pain after?
4  A.  No, I don't think you can do that.
5         I think using subjective complaints only as
6      causation isn't a good way to make the
7      correlation.
8         Again, if I have knee arthritis and it's
9      not bothering me.  But I walk into this office
10     and sit in a chair and my knee starts hurting,
11     and I blame the chair for causing my knee
12     arthritis.  I didn't have pain until I sat in
13     that chair.
14        The reason for my pain isn't because I sat
15     in the chair.  It's because of my preexisting
16     knee arthritis.  So because when someone
17     complains of pain, doesn't mean why they
18     complain of their pain.
19  Q.  Back to your analogy.  Sitting in a chair is
20     not causing trauma to your knee.
21  A.  Let's say I fall into the chair, I sit hard
22     into the chair.
23  Q.  Is that causing trauma to the knee?
24  A.  There's some force on my knee that happens.
25     So if you consider mild force trauma, then

Dr. Kevin Watson

1      yeah, it would be trauma.
2  Q.  Can a person involved in a car crash develop
3      axial spine pain?
4  A.  Yes.
5  Q.  Can a car crash cause herniations, herniated
6      discs?
7  A.  Yes.
8  Q.  Can car crashes cause bulging discs?
9  A.  It's difficult to say that a car crash would
10     cause a bulging disc.  Bulging disc, again,
11     are physiologic.  They happen with age.
12     Usually, there's no evidence of trauma when
13     there's a bulging disc.
14  Q.  Can a car crash aggravate a preexisting
15     asymptomatic degenerative condition in the
16     spine?
17  A.  So an aggravation, to me, means a permanent
18     worsening of a preexisting condition.  To me,
19     that you would have to show evidence of trauma
20     on an objective study to that area to prove an
21     objective permanent aggravation.
22  Q.  All I'm asking, can a car crash cause an
23     aggravation of a preexisting degenerative
24     condition in the spine?
25  A.  And I answered that question.

Dr. Kevin Watson

1        To me, an exacerbation is different. An
2    exacerbation is temporary increase in pain as
3    a result of whatever, whether sitting in the
4    chair or a car accident. That is temporary.
5        But to prove an aggravation, I think you
6    need some type of objective evidence of
7    injury.
8    Q. I'm not understanding the distinction in word
9       usage. What's the --
10   A. An exacerbation --
11   Q. Wait, I need to get it all on the record.
12      What's the difference between an
13      aggravation and that terminology, an
14      exacerbation? Is that a medical terminology?
15   A. It's in the AMA Guides to Injury and Disease
16      Causation.
17        So an exacerbation is a temporary increase
18      in symptoms that returns to baseline. And an
19      aggravation is a permanent worsening of a
20      preexisting condition.
21   Q. Did not know that.
22   A. It's in the --
23   Q. I believe you, I just didn't know it.
24        Can a car crash cause a previously
25      asymptomatic degenerative condition to become

Dr. Kevin Watson

1    symptomatic?
2    A. Yes, it's possible.
3    Q. Can a car crash cause meniscal tears in the
4       knees?
5    A. I would say that a car crash that involves
6       some type of twisting of the knee or ejection
7       from the vehicle could cause a meniscus
8       injury.
9        But a car accident where you're belted in
10      the seat, there's no displacement of the seat,
11      would not cause meniscus injury.
12   Q. The only way a meniscus can be torn in a car
13      crash is, you said, a twisting injury or if
14      the person is ejected out of the vehicle?
15   A. So the most common -- I think the traumatic
16      meniscus tears are from flexion of the knee,
17      deep flexion of the knee, compression with a
18      rotation component. Lacking that injury
19      mechanism, then it would not be associated
20      with the trauma.
21   Q. Does it matter to you, in terms of causation
22      of a meniscal tear, the condition of that knee
23      before the crash? That is, if there is
24      preexisting degeneration in that knee?
25   A. Yeah.

Dr. Kevin Watson

1        So patients who have preexisting
2    degenerative of the knee, even minor narrowing
3    of a knee arthritis, they have a 90 something
4    percent chance of having a meniscus tear on
5    their MRI.
6    Q. Would they be more prone to a meniscal tear in
7       an automobile crash with preexisting
8       degeneration of the knees?
9    A. I'm unaware of anything that would show that.
10      Again, 90 something percent of the time
11      they already have a meniscus tear.
12   Q. Can a car crash cause an increase in symptoms
13      in already existing degenerative knees?
14   A. So again, symptoms are a subjective finding.
15      So, yes, anybody can say a car crash can
16      increase their symptoms.
17   Q. Can car crashes cause rotator cuff tears in
18      shoulders?
19   A. In general, I would say car crashes, again,
20      with ejection, patient thrown about in the
21      vehicle, thrown out of their seat, have a
22      chance of producing rotator cuff injury.
23   Q. But only if they're ejected out of the
24      vehicle?
25   A. Or thrown about within the vehicle into

Dr. Kevin Watson

1    another seat, they reach out somehow, try to
2    grab on to hold onto a handlebar or something.
3        There are some studies that talk about
4    rear-end motor vehicle collisions. The
5    literature does not support them developing
6    rotator cuff tears as a result of that.
7    Q. Can car crashes with a safety restraint belt
8       on, the harness, create a rotator cuff tear in
9       the shoulder?
10   A. No.
11   Q. Can one bracing themselves on the steering
12      wheel at the time of a car crash create a
13      rotator cuff tear?
14   A. The studies that I quoted specifically talk
15      about that with rear-end motor vehicle
16      collisions, gripping the steering wheel,
17      bracing for impact. Again, it hasn't been
18      shown to generate rotator cuff tearing,
19      particularly supraspinatus.
20   Q. Is it your testimony that car crashes where
21      you're rear-ended, with hands on the steering
22      wheel and a seat belt on, that a person cannot
23      have a rotator cuff tear from an impact such
24      as that?
25   A. So patients can have rotator cuff tears, but a

Dr. Kevin Watson

1      lot of them, again, like other degenerative
2      findings, are there prior to the accident.
3          Again, finding a rotator cuff tear in an
4      MRI after an accident doesn't prove that it
5      came from the accident.
6          So again, these low-speed rear-end motor
7      vehicle collisions haven't been shown to
8      generate rotator cuff tears.
9   Q.  That's a little different.  I don't understand
10     your answer, but that's not necessarily to my
11     question.
12         My question is, a person belted, with hands
13     on steering wheel, and rear-ended, are you of
14     the opinion that a crash like that can or
15     cannot cause a rotator cuff tear?
16  A.  I would say it would be unlikely.  More likely
17     than not that it would not generate a rotator
18     cuff tear.
19  Q.  So I understand it's unlikely.
20         Are you saying that rear-end collisions,
21     with two hands on the steering wheel, and a
22     seat belt on, cannot cause a rotator cuff
23     tear?  Or are there circumstances when it can?
24  A.  I would say it's unlikely.
25         Again, if you're belted, you're holding on

Dr. Kevin Watson

1      to the steering wheel, you're not ejected,
2      you're not thrown out, then I would say it
3      would not generate a rotator cuff tear.
4   Q.  Doctor, you're not a physical medicine and
5      rehabilitation physician, are you?
6   A.  No.
7   Q.  You're not a spine interventionist?
8   A.  No.
9   Q.  You have board certification in physical
10     medicine and rehabilitation?
11  A.  No.
12  Q.  Do you have sub-specialty in pain management?
13  A.  No.
14  Q.  Do you have any sub-specialty in spinal cord
15     injury?
16  A.  No.
17  Q.  We're going to get back to those articles in
18     just a moment.
19         Would you agree, Doctor, that two
20     physicians -- strike that.
21         Would you agree that different physicians
22     can evaluate the same individual, have very
23     similar physical examinations of an
24     individual, and arrive at different opinions?
25  A.  Yes.

Dr. Kevin Watson

1   Q.  For instance, you evaluated Ms. Brooks, and
2      you arrived at the opinion that you have.
3      Right?
4   A.  Yes.
5   Q.  Do you agree that your opinion is different
6      from the opinion of Dr. Voorhies?
7   A.  I'd have to look at what opinion you refer to.
8          Dr. Voorhies, I think I quoted -- I
9      reviewed his report.  I'd have to see what his
10     opinion was.
11  Q.  Ultimately, it's your opinion what, Doctor,
12     about the injuries sustained by Ms. Brooks?
13  A.  Ultimately, I think there's no objective
14     evidence of injury on the studies.  And
15     there's no objective evidence for the
16     development of chronic pain that she is
17     experiencing, according to the objective
18     study.
19  Q.  Does that mean that Ms. Brooks is not injured
20     in this accident?  Or you just do not have the
21     objective evidence to support it?
22  A.  So when we look at the causation method, that
23     is the basis, as much as you can, on the
24     objective evidence that's available to you.
25  Q.  Understood, Doc.

Dr. Kevin Watson

1          We are in the business of probability.
2      Opposing counsel and myself, in the legal
3      world, we are in the business of probability.
4          So my question is, are you saying more
5      probably than not that Ms. Brooks was or was
6      not injured in this October 31, 2016, crash?
7   A.  I'd say more probably than not she was not
8      injured in a way that would generate the
9      continued chronic pain that she's having.
10  Q.  Are you aware that Dr. Voorhies is of the
11     opinion that this October 31, 2016, crash
12     caused injury to Ms. Brooks' spine.
13  A.  No, I'm not aware of that.
14  Q.  Are you aware that Dr. Rodriguez is of the
15     opinion that the October 31, 2016, crash
16     caused cervical injuries, lumbar injuries,
17     including cervical facet joint syndrome,
18     lumbar facet joint syndrome, and herniations?
19  A.  I'm aware.
20  Q.  Are you aware of the opinion from Dr. Finney
21     that this crash caused injury to Ms. Brooks'
22     knees and shoulder?
23  A.  I'm aware of his opinion.
24  Q.  Are you aware of the opinion from Dr. Bostick
25     that this crash caused injury to Ms. Brooks'

1    right shoulder and bilateral knees?

2  A.  Yes.

3  Q.  Are you aware of the opinion from

4    Dr. Defrancesch that this crash caused facet

5    joint syndrome of both the cervical and lumbar

6    spine?

7  A.  Yes.

8  Q.  Now, from what I can tell from reading your

9    report and talking to you today, you disagree

10    with all those doctors?

11  A.  Yes.

12  Q.  It goes back to what I was asking you before.

13    Different physicians can look at a patient, or

14    an individual such as Ms. Brooks, they're

15    looking at the same thing. Right? They're

16    looking at the same studies, looking at the

17    same evaluations, they arrive at different

18    opinions. Do you agree with that?

19  A.  They did, yes.

20  Q.  Are you saying that your opinion is right,

21    Dr. Voorhies's is wrong, Dr. Rodriguez is

22    wrong, Dr. Finney is wrong, Dr. Bostick is

23    wrong, and Dr. Defrancesch is wrong? Or do

24    you just have different opinions?

25  A.  I'm saying that their opinions are mostly

1    based off of, it seems, subjective complaints.

2    That she had no pain prior to the accident,

3    now she's having pain after the accident.

4    Whereas my opinion is largely based off of

5    the objective findings and the medical

6    literature. That's were our differing

7    opinions come from.

8  Q.  I get you have different opinions. That's not

9    in response to my question, though.

10    My question is, are you saying that your

11    opinion is right and the opinion of

12    Dr. Voorhies, Dr. Rodriguez, Dr. Finney,

13    Dr. Bostick, and Dr. Defrancesch are wrong?

14    Or do you just have different opinions?

15  A.  Well, I think their opinion -- again, it

16    depends on what their causation basis -- what

17    their causation method is.

18    If their causation method is relying on her

19    subjective complaints, then for them, their

20    opinion is correct.

21    My instance, my opinion is based off the

22    objective studies, the objective literature.

23    And I think my opinion is correct.

24    I don't think it's my job to tell you which

25    one is right. But I do disagree with their

1    opinions.

2  Q.  I fully understand that. I get that. I get

3    you disagree. I think that's very clear.

4    My question to you is, are you right and

5    all those other doctors are wrong? Or do you

6    just have different opinions about them?

7  A.  Again, I think I explained.

8    I think my -- as a scientist, as a

9    physician, I think it's right to use objective

10    data and objective studies to support your

11    opinion.

12    If you don't have the objective data and

13    the objective studies to support your opinion,

14    then I think your method of doing causation is

15    wrong, and they are wrong.

16  Q.  So if we did a synopsis of what your opinion

17    is, you think Dr. Voorhies, Dr. Rodriguez,

18    Dr. Finney, Dr. Bostick, and Dr. Defrancesch

19    are all wrong, but you have it right?

20    MS. CHICKERING:

21        Objection.

22    THE WITNESS:

23        Again I think my opinion of the

24    causation, again, based off the objective

25    findings and the objective studies, is

1    the more valid method of determining

2    causation in this case. That's all I can

3    say.

4  BY MR. FAVRET:

5  Q.  I've heard physicians talk about opinions kind

6    of like looking at a painting. Like your

7    painting of cranes on the wall, you may look

8    at it and love it, I may look at it and hate

9    it. It's just opinions. Neither one of us

10    are necessarily right or wrong, it's just our

11    opinion.

12    Is that where you are with regard to the

13    opinion of Ms. Brooks and how it differs from

14    the other doctors?

15  A.  Again, I think I explained the rational behind

16    my opinion.

17    I don't know -- again, from looking at the

18    studies, I think they used subjective

19    complaints to base their causation upon. So

20    yes, their opinion is different than mine. We

21    do have differing opinions.

22    I think my causation method has been

23    objectively validated by the AAOS and the AMA,

24    and it is the more proper way to determine

25    causation.

Dr. Kevin Watson

1   Q.   Doctor, by history, would you relate
2        Ms. Brooks' injuries to her neck, right
3        shoulder, knees, and lower back by her
4        history?
5   A.   By her history, I don't think I would related
6        her neck. Her neck pain was not immediate.
7        It presented over two weeks later. That
8        wouldn't be consistent just by subjective
9        history.
10           She had no immediate back pain, neck pain.
11       She had no pain immediately after the injury.
12       So if you're looking at just pure history,
13       subjective findings, it wouldn't be consistent
14       with trauma leading to pain.
15  Q.   So are you telling me by history you would not
16       relate the pain and symptoms in her neck,
17       right shoulder, knees, and lower back to the
18       October 31, 2016, crash?
19  A.   Again, if you're looking at the subjective
20       history, again, the lack of complaints at the
21       scene and no presentation to the E.R., coming
22       in three days later with pain. You would
23       think if a trauma caused injury and the injury
24       caused pain, that it would be immediate, not a
25       delayed presentation.

Dr. Kevin Watson

1   Q.   I'm not sure I understand that.
2   A.   So you just hit your knee on the table. You
3        had immediate pain. That's what happens in an
4        injury.
5            So if you're in a car accident that you're
6        claiming has an injury, the pain should be
7        immediate as well.
8   Q.   Okay.
9            But I'm not going to go to the emergency
10       room for hitting my knee on the table just
11       now.
12           My question to you is, based upon the
13       history of Ms. Brooks, is the fact that --
14       first of all, do you relate by history her
15       neck pain, low-back pain, right shoulder, and
16       bilateral knees? Just tell me yes or no by
17       history. And if so, I want to explore that a
18       little bit.
19  A.   I think I answered the question already.
20  Q.   That's what I'm not understanding. I didn't
21       get an answer.
22  A.   Again, first, by history of her neck, she had
23       no symptoms in her neck immediately after the
24       accident, even three days after the accident
25       when she was evaluated by physicians.

Dr. Kevin Watson

1        It wasn't till two weeks later that she
2        complained of neck pain. So by history, that
3        would not be consistent with neck pain as a
4        result of this motor vehicle accident.
5   Q.   So you would not, even by history, relate the
6        neck?
7   A.   Correct.
8   Q.   Now, how soon after the crash would Ms. Brooks
9        have had to -- this is hypothetical. But how
10       soon after the crash would Ms. Brooks, in your
11       opinion, have had to experience neck pain for
12       you to relate her symptoms to the crash?
13  A.   I would say within 24 hours.
14  Q.   That's just for her to experience it?
15  A.   Yes.
16  Q.   Same thing with right shoulder, left shoulder,
17       knees, and lower back?
18  A.   Yes.
19  Q.   It would have to develop within -- or the
20       symptoms would have to develop within 24
21       hours?
22  A.   Yes.
23  Q.   Hypothetically, if the symptoms in Ms. Brooks'
24       neck, both shoulders, knees, and lower back,
25       developed within 24 hours of the crash, by

Dr. Kevin Watson

1        history you would relate that, those symptoms,
2        to the October 31, 2016, crash?
3   A.   So by history, yeah, you would use her
4        subjective complaints only. There would be
5        nothing else to relate it to at that point
6        besides the crash.
7            She does have preexisting problems with her
8        knees and other areas, too, that cloudy the
9        history. But by subjective history, then yes,
10       you would relate it to the car accident.
11  Q.   How soon would Ms. Brooks, for you to relate
12       her neck, shoulders, low back, and knees, the
13       symptoms to this crash? How soon would
14       Ms. Brooks have had to have reported that to a
15       physician that she's treating with?
16  A.   It doesn't necessarily have to be a physician,
17       but at least report it to the police officer at
18       the scene that she's having pain.
19           I think the other person involved in the
20       vehicle documented there was no injury, no
21       problems at the scene. Those things would
22       be -- if she was having trouble, it should be
23       documented at that point.
24           Patients who are involved in significant
25       trauma that would generate chronic pain should

Dr. Kevin Watson

1    present to the emergency room immediately
2    after the accident, but certainly within the
3    onset of symptoms within 24 hours.
4  Q.  You know in the real world people sustain
5    injuries and don't rush to the emergency room,
6    not all people do.
7      Have you ever rolled your ankle, go to bed
8    at night, wake up in the morning and your
9    ankle is swollen? I've done that as a kid.
10 A.  Absolutely. But that doesn't lead to chronic
11   pain in your ankle.
12 Q.  Understood. But it led to a sprain. Right?
13 A.  Could have, yes.
14 Q.  So are you saying the fact that Ms. Brooks did
15   not report any symptoms to the other driver
16   and the police officer at the scene of the
17   accident, that she could not have been injured
18   in this crash?
19 A.  I would say it makes it unlikely that she
20   would sustain an injury that would lead to
21   chronic pain.
22 Q.  So Ms. Brooks could not have had a long-term
23   injury if she didn't experience pain at the
24   moment of impact and report that to the police
25   officer and the other driver?

Dr. Kevin Watson

1  A.  Have symptoms within 24 hours and present to
2    the emergency room subsequently. I would say
3    it's very unlikely for her to have chronic
4    pain as a result of this.
5  Q.  Now, hypothetically, if Ms. Brooks experienced
6    pain as a result of this crash in her neck,
7    her low back, her shoulders, and her knees
8    within 24 hours of the crash, and
9    hypothetically, if she reported all those
10   symptoms to the first doctor she saw three
11   days later, based upon that, would you relate
12   those symptoms to the crash of
13   October 31, 2016? I know this is
14   hypothetical.
15 A.  Yeah. I think, yes.
16 Q.  Do you have a recollection of Ms. Brooks?
17 A.  A little bit, not much.
18 Q.  What do you remember about her?
19 A.  Basically, only whatever I put here. She was
20   African-American female, middle-aged,
21   overweight.
22 Q.  Doctor, what injuries do you think Ms. Brooks
23   sustained in her neck and her back; strains,
24   sprains?
25 A.  Again, in her neck, I don't think there is a

Dr. Kevin Watson

1    way to say she had an injury. She didn't have
2    any pain for over two weeks after the
3    accident. So I don't think there is any
4    objective way, or even subjective way, to
5    relate her neck pain to the accident with such
6    a delayed presentation.
7      For her back, again, with the forces
8    involved in her lumbar spine, it's unclear
9    what type of injury could have been caused as
10   a result. It could be a small strain of the
11   muscle.
12 Q.  What would your current diagnosis of
13   Ms. Brooks' neck and back condition be? Not
14   that you relate it to the accident, but her
15   current neck and back condition.
16 A.  What is her diagnosis?
17 Q.  Yes.
18 A.  It would be cervical and lumbar arthritis with
19   non-specific axial neck and back pain.
20 Q.  And that means -- strike that.
21     In your opinion, Ms. Brooks has preexisting
22   arthritis, that is arthritis in her neck and
23   back, that preexisted the October 31, 2016,
24   accident?
25 A.  Yes.

Dr. Kevin Watson

1  Q.  And she has -- when she came to see you, she
2    had axial neck and back pain. That means pain
3    in the cervical and lumbar spine not
4    radiating?
5  A.  Correct.
6  Q.  And you don't know the source of that?
7  A.  Right. There's no objective study that
8    identifies the source of her pain at this
9    point.
10 Q.  Now, someone with the condition that
11   Ms. Brooks has, that is preexisting
12   degeneration in her neck and her back with
13   axial neck and back pain, can symptoms, can
14   that be caused by trauma? Not the
15   degeneration, but the axial neck and back
16   pain.
17 A.  Again, yes, pain can be caused by trauma, yes.
18 Q.  And people who were involved in car crashes
19   and experience neck, axial neck and axial back
20   pain following a crash, can those symptoms wax
21   and wane? Do you see that?
22 A.  Yeah.
23     So symptoms aren't always constant. So
24   symptoms can wax and wane in any condition,
25   trauma-related or not.

Dr. Kevin Watson

1   Q.  If a crash causes symptoms, even though they
2       wax and wane, that doesn't mean -- what is
3       waxing?
4   A.  Waxing is up, wane is down.
5   Q.  Even if car crashes, when symptoms are caused
6       by a car crash, axial neck and back pain --
7       how about good days, bad days, same thing?
8   A.  Yes.
9   Q.  They have good days and bad days.  Just
10      because a person has bad days, it doesn't mean
11      it's going to be permanent.  Right?
12  A.  Correct.
13  Q.  Just because they have good days, it doesn't
14      mean they're permanently well?
15  A.  Correct.
16  Q.  You'd agree that a person can have injury from
17      a car crash even though they don't report that
18      pain from a crash to the investigating police
19      officer?  Do you agree with that?
20  A.  Can patients have pain even though they don't
21      report it?
22  Q.  Yeah.  Can a person be -- let me make it
23      easier.
24          Can a person be injured in an automobile
25      accident and not report it to the

Affiliated Reporting                                    Page: 112

Dr. Kevin Watson

1       investigating police officer?
2   A.  It's possible, yes.
3   Q.  Can a person be injured in an automobile
4       accident and not rush to the hospital?
5   A.  It's possible, yes.
6   Q.  Can a person with an injury from a car crash,
7       do you see sometimes they self-treat until
8       they think they need to go to a doctor?
9   A.  Yes.
10  Q.  And do you see people, in your experience,
11      involved in car crashes and who are injured
12      that wait three days to go to a doctor?
13  A.  Yes.
14  Q.  You agree, Doctor, that physical therapy can
15      help a person with neck and back injuries have
16      good days?
17  A.  Yes.
18  Q.  Just because a person has good days, it
19      doesn't mean that their underlining injury is
20      resolved.  True?
21  A.  Correct.
22  Q.  Doc, just because Ms. Brooks had preexisting
23      degeneration in her neck and back before this
24      crash, doesn't necessarily mean that she was
25      experiencing symptoms before this crash.  Is

Affiliated Reporting                                    Page: 113

Dr. Kevin Watson

1       that a fair statement?
2   A.  Correct.
3   Q.  In fact, based upon her history to you, she
4       hadn't experienced neck pain, back pain, or
5       shoulder pain for at least ten years before
6       the crash; is that true?
7   A.  Correct.
8   Q.  Would you say from a symptom standpoint that
9       Ms. Brooks was doing well in her neck and back
10      before the crash?
11  A.  Again, I don't know.  I have her history to go
12      off of where she said she had no problem.
13  Q.  Based upon Ms. Brooks' history that she wasn't
14      having neck, back, or shoulder pain, for that
15      matter, for a period of let's say greater than
16      ten years, from a symptom standpoint, would
17      Ms. Brooks have been in good health in her
18      neck, her back, and her shoulders?
19  A.  From a symptom standpoint, yes.
20  Q.  Knees, not so.  Right?  She reported to you
21      that she had some symptoms in her knees before
22      this crash that she self-treated.  Is that a
23      fair statement?
24  A.  Yes.
25  Q.  She also gave you the history that even though

Affiliated Reporting                                    Page: 114

Dr. Kevin Watson

1       she had some symptoms in her knees, she never
2       treated with a physician for that.  Right?
3   A.  She had had -- I think she had seen someone in
4       the past for her knee when she slipped in the
5       shower.
6           I think Dr. Bostick talked about a presence
7       meniscus tear being diagnosed.  Obviously,
8       there was some diagnostic and treatment at
9       that time.
10  Q.  The slip in the shower was 2004, and the
11      accident was 2016.  Right?
12  A.  Yes.
13  Q.  So at least based on her history, even though
14      she had some symptoms in her knees 12 years
15      before from the slip in the shower, and she
16      had some residual symptoms in her knee, the
17      pain was not bad enough for her to see a
18      physician; fair to say?
19  A.  Correct.
20  Q.  Based upon a review of the medical records,
21      did the symptoms in Ms. Brooks' medical record
22      in her neck and back, and I know her back
23      waxed and waned, but did the symptoms, were
24      they continuously reported by the physicians
25      all the way to the time where you saw her?

Affiliated Reporting                                    Page: 115

Dr. Kevin Watson

1   A.   Again, like you said, there was some
2        off-and-on reports of pain.  I think she said
3        her low back was back to normal.
4            At least by the medical record, yes, they
5        continued, according to the providers.  There
6        was some gaps in treatment for seven months,
7        four months, that there is no treatment that I
8        know about.
9            But when she did, when she did seek
10       treatment, she did continue to complain of
11       those symptoms.
12   Q.  The same thing with the right shoulder and the
13       knees, she reported those symptoms shortly
14       following the crash.  And she continued to
15       report them to the various physicians that she
16       was treating with for those body parts?
17   A.  Yeah.  I think at times she said her knee is
18       better, no weakness, locking, buckling.
19           Again, some symptoms kind of waxed and
20       waned, or good days and bad days.  Yes, she
21       did continue to complain of symptoms.
22   Q.  Doctor, can you point to any other specific
23       incident responsible for the neck symptoms,
24       low-back symptoms, right shoulder symptoms,
25       and knee symptoms following this crash other

Dr. Kevin Watson

1        than the October 31, 2016, crash?
2   A.   Looking for an incident?
3   Q.   A specific incident.
4   A.   No.
5   Q.   Doctor, you treat patients with similar
6        conditions that Ms. Brooks experienced in this
7        crash?
8   A.   Yes.
9   Q.   You treat patients with neck and back axial
10       back pain?
11   A.   Yes.
12   Q.   I should say axial spine pain, neck and back?
13   A.   Yes.
14   Q.   You treat patients with shoulder complaints?
15   A.   Yes.
16   Q.   You treat patients with arthritis in the
17       knees, meniscal tears in the knees, and even
18       people who have increased symptoms in their
19       knees from an automobile crash or a trauma?
20   A.   I have, yes.
21   Q.   Some of the times, Doc, with regard to the
22       neck and back axial pain that you treat your
23       patients for, some patients take longer to
24       recover from those conditions.  True?
25   A.   Yes.

Dr. Kevin Watson

1   Q.   Some of those patients never recover.  True?
2   A.   I'd say some patients do develop chronic pain,
3        yes.
4   Q.   And chronic pain means they're not recovering.
5        True?
6   A.   They're continuing to complain of symptoms.
7        Depends on what you mean by "recovery."
8            If it's an injury that you're recovering
9        from, you can recover from an injury but still
10       have symptoms.
11   Q.  You sometimes treat people with axial neck and
12       back pain that the symptoms never go away?
13   A.  Yes.
14   Q.  Same thing with treating your patients for
15       shoulder pain.  Sometimes you treat patients
16       with shoulder pain, there's nothing to do, the
17       pain never recovers, or they continue to
18       experience shoulder pain?
19   A.  We treat patients with shoulder pain.
20       Sometime they have continued chronic pain,
21       yes.
22   Q.  Even though you do a great job, and even
23       though you treat them well, even though they
24       have shoulder surgery if they need it, some
25       people just don't stop hurting?

Dr. Kevin Watson

1   A.   Correct.
2   Q.   Doctor, in this particular case involving
3        Ms. Brooks, did you review the MRI film?
4   A.   In this case I reviewed reports.
5   Q.   That's what I thought.
6            You have the ability to review MRI film of
7        knees, shoulders, necks, and backs, you have
8        that expertise?
9   A.   Yes.
10   Q.  Why did you not do that in this case?
11   A.  In this case I had the CT scan of the cervical
12       spine.  I had the reports of the MRI.  And it
13       didn't seem like there was a contradiction
14       amongst the treating physicians in the report
15       of what was in question as far as diagnosis.
16   Q.  At trial, you're not going to look at this MRI
17       film and say, "Now I disagree with what the
18       radiologist said and the various physicians
19       said"?
20   A.  I'm happy to look at whatever you guys want me
21       to look at, and I'll tell you if I disagree or
22       not.
23   Q.  I don't think the court is going to let you do
24       that.  I just want to make sure because I
25       have, not as of today, I will not have had an

Dr. Kevin Watson

1   opportunity to ask you what you think about
2   that film.
3       Do you think that the radiologist and the
4   various treating physicians who treated
5   Ms. Brooks for neck, back, shoulders, knees,
6   had it right when they reviewed the MRI film?
7   A.  All I have is their report to go off of.  So
8   from the report, I don't have any reason to
9   doubt the reports.
10      MS. CHICKERING:
11          I'll lodge an objection to the
12      extent that I don't believe we were
13      provided with the actual MRI film until I
14      requested copies of all of your exhibits
15      that I got yesterday.  So to the extent
16      that I had the ability to give him those
17      film, it was not in my position before he
18      had issued his report.
19      MR. FAVRET:
20          I'm not suggesting that.  I'm not
21      suggesting that at all.  You had the
22      ability to subpoena it.  But I'm not
23      suggesting that you were hiding the
24      report, the film from him at all.  I just
25      want to know what I'm facing when we come

Dr. Kevin Watson

1       to trial.  That's all.
2   BY MR. FAVRET:
3   Q.  Doctor, your review of the medical records
4       from the treating physicians, in your review
5       of those records, has all of the treatment
6       provided to Ms. Brooks by her various treating
7       physicians, in your opinion, been reasonable
8       medical treatment?
9   A.  No, I don't think it all has been reasonable
10      medical treatment.
11  Q.  What has been not reasonable medical
12      treatment?
13  A.  So I think specifically the intra-articular
14      facet joint injections have not been shown to
15      have validity or efficacy.
16  Q.  Would we call that facet injections?  What I
17      call facet injections?
18  A.  Correct.
19  Q.  What else, Doctor, that you think is not
20      reasonable?
21  A.  I think performing the cervical medial branch
22      block and immediately performing
23      radiofrequency ablation based off of one
24      single block, is not a medically validated way
25      of performing those procedures.

Dr. Kevin Watson

1   Q.  So you would call that not reasonable medical
2       treatment?
3   A.  I would say it is not validated to evaluate
4       and treat facet joint pain.
5   Q.  Would that equate to unreasonable for you or
6       not reasonable?
7   A.  I don't think it's unreasonable.  I just think
8       it's not doing what it's designed to do.
9   Q.  From your review -- anything else that you
10      think is not reasonable medical treatment?
11  A.  Trying to look at other treatments that she
12      had.
13      There's mentioned of viscosupplementation
14      or Euflexxa for the knees.  In the face of
15      severe osteoarthritis of the knees, I would
16      say it's -- American Academy of Orthopedic
17      Surgeons would say that is not, is strongly
18      not recommended in those patients.
19  Q.  Because it's not going to help?
20  A.  Correct.
21  Q.  Are you of the opinion that the only thing
22      that will help Ms. Brooks' knee pain is knee
23      replacement?
24  A.  Yes.
25  Q.  What brings a person to knee replacement?

Dr. Kevin Watson

1   A.  So the main reason people have knee
2       replacement is from pain in their knees due to
3       knee arthritis.
4   Q.  So a person doesn't have knee replacement
5       unless they have degeneration in their knees?
6   A.  They shouldn't.
7   Q.  I mean absent of some fracture or damage to
8       the knee where they can't use it any more?
9   A.  Correct.
10  Q.  So that's one of the prerequisites, so to say,
11      is that a person usually doesn't go to knee
12      replacement unless they have degeneration in
13      the knees?
14  A.  Correct.
15  Q.  What drives -- would you say that this
16      statement is true:  That what drives a person
17      to knee replacement is ultimately the pain
18      that they're experiencing?
19  A.  A lot of times it's pain.  But also it can be
20      stiffness and swelling.
21  Q.  Symptoms?
22  A.  Correct.
23  Q.  Would it be a fair statement, based on the
24      fact that Ms. Brooks didn't even treat with a
25      doctor for her knees before the

Dr. Kevin Watson

1    October 31, 2016, crash, that she was not a
2    candidate for knee replacement before the
3    October 31, 2016, crash?
4  A.  No.  I would disagree with that.
5        I think the fact that she didn't treat with
6    a physician, again, doesn't mean that she
7    wasn't having significant pain in her knee,
8    but she was just self-treating it.
9        By her own admission, her knees had become
10   more knot-knee over the past ten years.  She
11   had terrible arthritis in her knee.  If she
12   would have shown up to any doctor's office ten
13   years ago with those types of knees, they
14   would have offered her knee replacement.
15 Q.  Understood.
16       But she would have to go there and say,
17   "Doc, my knees are so bad that I can't
18   function any more.  I don't want to function
19   any more.  Can you replace my knees?"
20 A.  Yes.  You would have to go to the doctor to
21   have that happen.
22 Q.  She didn't do that?
23 A.  She did not.
24 Q.  The only time that you're aware of that a
25   doctor has offered knee replacement is

Dr. Kevin Watson

1    following the October 31, 2016, crash?
2  A.  Correct.
3  Q.  Would you agree that if Ms. Brooks' symptoms
4    following this October 31, 2016, crash get to
5    the point where she can no longer manage and
6    the pain is severe enough, that you would say
7    she is a candidate for knee replacement?
8  A.  So if her symptoms became bad enough, then
9    yes, she is a candidate for knee replacement,
10   regardless of the accident or not.
11 Q.  Understood.
12       If the accident played a role in increasing
13   Ms. Brooks' knee pain, would it be your
14   opinion that the accident of October 31, 2016,
15   contributed to the need for knee replacement?
16 A.  So you would have to assume, one, that the
17   accident caused permanent worsening of her
18   arthritic condition, causing a permanent
19   worsening of the symptoms.
20       In this instance, again, a low-speed
21   rear-end motor vehicle collision, the
22   mechanism of injury that would be to the knee
23   would not be consistent with degeneration of
24   an aggravation of an arthritic condition in
25   her knees.

Dr. Kevin Watson

1        Again, so it goes back to could she have an
2    exacerbation of knee pain?  Yes.  Did it
3    permanately worsen the condition?  There's no
4    evidence of that.
5  Q.  If the court were to find that this crash
6    worsened her knee pain -- if the court were to
7    find that this crash worsened the symptoms on
8    a permanent basis in Ms. Brooks' knees, to the
9    point where she could no longer function and
10   she needs a knee replacement, would it be your
11   opinion that this crash contributed to the
12   need for the knee replacement?
13 A.  I think it would be very difficult, the fact
14   that the accident has been three years ago,
15   and she still has not progressed with knee
16   replacement surgery.
17       It is difficult for me to believe, or to
18   medically say that an accident three years
19   later caused the need for knee replacement.
20       If she had symptoms that presented
21   immediately after the accident, it was so
22   severe that she can't move around, she had
23   significant enough trauma to her knees that
24   would cause an aggravation, and she had knee
25   replacement surgery quickly, then yeah, you

Dr. Kevin Watson

1    could say that.
2        But three years later, it would be very
3    hard to make that argument.
4  Q.  So you think no?
5  A.  No.
6  Q.  By history, do you relate all of the medical
7    treatment Ms. Brooks has undergone that you're
8    aware of, from all of her treating physicians,
9    to the October 31, 2016, crash?
10 A.  Yes.
11 Q.  Doctor, nerve burn procedures such as
12   Ms. Brooks had on May 9, 2019, are designed to
13   decreased facet mediated pain.  Is that a fair
14   statement?
15 A.  Yes.
16 Q.  From your review of the medical records, did
17   it appear from Ms. Brooks reporting symptoms
18   in her neck, that the nerve burn procedure in
19   her neck did just that, it decreased her
20   cervical symptom?
21 A.  By her report she said it did, yes.
22 Q.  Even by you she said it did.  Right?
23 A.  Correct.
24 Q.  In fact, when she saw you, you examined
25   various body parts.

Dr. Kevin Watson

1      Tell me if I'm wrong.  My review is,
2   everything you examined was tender with the
3   exception of the cervical spine?
4  A.  She had some sensitivity around the paraspinal
5   muscles of the cervical spine.  So she did
6   have some tenderness there.
7  Q.  Did I get that wrong?
8  A.  Physical exam on the cervical spine, she
9   reports some sensitivity around the bilateral
10   paraspinal muscle, which is mild.  Page two.
11  Q.  What does that mean?  She reported sensitivity
12   around the bilateral --
13  A.  When we palpated it, she reported pain.  So it
14   was sensitivity to touch when you palpate
15   around her neck muscles.
16  Q.  Is that what you -- is that how you say pain,
17   sensitivity?
18  A.  Yeah, you can say sensitivity, tenderness,
19   pain.
20  Q.  Are all those all interchangeable?
21  A.  Yes.
22  Q.  Let's go through your examination, then.  Tell
23   me what you found examining the neck, the
24   cervical spine.
25  A.  Again, she had some sensitivity around the

Affiliated Reporting                                    Page: 128

Dr. Kevin Watson

1   bilateral paraspinal muscle, which is mild.
2   She had full range of motion through her
3   cervical spine.  She had five out of five
4   strength in the upper extremities, with one
5   plus symmetric reflexes bilaterally, which are
6   symmetric trace reflexes in her upper arm.
7  Q.  So mild sensitivity when you examined her
8   neck.  That's a good thing for her.  Right?
9  A.  Well, in any sense that pain is good, I guess
10   mild pain is better that severe pain.
11  Q.  I would think so, yeah.
12      So the examination that she had mild pain,
13   better than what you saw looking at all the
14   other records about her reporting of pain in
15   her neck.  Is that a fair statement?
16  A.  Yes.
17  Q.  The mild pain that she reported in her neck is
18   consistent with the nerve burn in her neck
19   being successful.  True?
20  A.  It's consistent with decreased symptoms in her
21   neck following the nerve burn.  It doesn't
22   mean that the nerve burn was successful in
23   treating that condition.
24  Q.  It means she had the nerve burn, her neck pain
25   decreased?

Affiliated Reporting                                    Page: 129

Dr. Kevin Watson

1  A.  Correct.
2  Q.  And apparently been decreased -- you saw her
3   July 18th, so that is two and a half months
4   after the nerve burn.  Right?
5  A.  Correct.
6  Q.  It means that the nerve burn, apparently, is
7   still working, still decreasing her pain?
8  A.  To some degree, yes.
9  Q.  You wouldn't expect a nerve burn to take away
10   the neck pain, would you?
11  A.  You would.
12  Q.  Completely 100 percent?
13  A.  Yes.  At least of the side that was burned,
14   yes.
15  Q.  You believe -- is it your testimony that nerve
16   burns are a reasonable medical treatment?
17  A.  I think there have been some studies in the
18   cervical spine which show that it can be a
19   reasonable treatment under the proper
20   diagnostic conditions.
21      In the lumbar spine, I would say that is
22   not so much the case.  The evidence is far
23   lacking on the lumbar spine.
24  Q.  So you favor nerve burn procedure in the neck?
25  A.  I don't favor them.  But the medical

Affiliated Reporting                                    Page: 130

Dr. Kevin Watson

1   literature, there are some studies that do
2   support it in the proper, properly selected
3   patients.
4  Q.  Do you ever send your patients for nerve burn
5   procedures?
6  A.  I have not.
7  Q.  Do you think nerve burn procedures have a
8   place in the treatment of axial spine pain?
9  A.  I think you have to, again, be more specific.
10   In the low back, I do not.  Lumbar spine, no.
11      In the cervical spine, there are some
12   studies -- again, it's still early to know.
13   It's controversial still, that cervical nerve
14   burns can be effective.  But it is
15   controversial, and that's why I don't send
16   patients to them.
17  Q.  In your opinion, are cervical nerve burns a
18   reasonable choice of medical treatment when
19   there is no other treatment available?
20  A.  Under the right diagnostic conditions.
21  Q.  So it's fair to say Ms. Brooks is still
22   experiencing neck pain.  What she tells you,
23   it's better after the nerve burn?
24  A.  Correct.
25  Q.  What does the examination of the lumbar spine

Affiliated Reporting                                    Page: 131

1    show?
2  A.  So she had mild tenderness to palpation in the
3      lower lumbar spine centrally, but none off to
4      the side, which is around the paraspinal
5      muscles.
6          She was able to flex and extend.  When we
7      asked her to flex, she was able to touch the
8      floor.  She had extension to 20 to 30 degrees
9      without pain.  Full rotation in the lumbar
10     spine without pain.
11         There were no non-organic signs seen.  She
12     was able to heel and toe walk.  She had five
13     over five strength in the bilateral lower
14     extremities.  One plus symmetric reflexes.
15     And negative straight leg raises.
16 Q.  So the tender to palpation in the lower lumbar
17     spine centrally, is that in the area of the
18     facet joints?
19 A.  It would be more over the, kind of spinus
20     processes of the lumbar spine.  It would not
21     be in the area of the facet joint.
22 Q.  It's real close, isn't it?
23 A.  The spine is not that big.  So if you press
24     anywhere, it's going to be close.
25         Again, the medical literature will say

1      there's no way by physical exam to determine
2      facet joint pain by palpation.
3  Q.  Is there a way to -- I've heard physicians
4      talk about loading up a facet joint to kind of
5      isolate the facet when they do an examination.
6      Are you of the opinion that that is a valid
7      testing of the facet joint?
8  A.  No.
9          I think there's no objective study that
10     shows that that is a valid method that's been
11     confirmed -- that confirms facet joint pain.
12     There's no physical exam finding that can
13     confirm facet joint pain.  So people do these
14     blocks to try to confirm it.
15 Q.  When you examine cervical and lumbar spines,
16     do you attempt to load the facet joint when
17     you do the examination?
18 A.  No.  Because it hasn't be validated to
19     determine the facet joint.
20 Q.  Do you know how to do it?  Do you know how to
21     load a facet joint in the examination of a
22     cervical and lumbar spine to try to isolate it
23     to see if a facet hurts?
24 A.  I've seen a description.  People do extension
25     with rotation and some compression to help

1      load the facet joint.
2          Again, it hasn't been validated in the
3      literature to prove what you're doing.
4  Q.  Do you know how to do that examination?  That
5      is, do you know how to load a facet joint to
6      examine it?
7  A.  Yeah.  Again, the description that I've seen
8      is extension with slight rotation and some
9      compression of the spine.
10 Q.  Do you do that when you examine spines?
11 A.  So I do rotation, extension, and compression,
12     not necessarily all at the same time.
13         Again, I don't believe the facet loading
14     test is a valid test, so I don't perform it on
15     patients.
16 Q.  So if I'm understanding you right, you do
17     rotation range of motion, you do
18     flexion/extension range of motion, you even do
19     compression range of motion, but you don't do
20     them together in concert, which is what other
21     physicians call "loading the facet joint"?
22 A.  Correct.
23 Q.  So you have no way of knowing what Ms. Brooks'
24     response would be to facet loading in an
25     examination.  True?

1  A.  Not on my exam, correct.
2  Q.  The examination of the lumbar spine showing
3      tenderness in the lower lumbar spine
4      centrally, is that consistent with facet joint
5      pain?
6          I know you can't say it is facet joint
7      pain.  But is that consistent with it?
8  A.  No.
9          Again, there's no physical exam finding
10     that is consistent with facet joint pain.
11     There's no way to prove it on physical exam.
12         So you palpate centrally in the lumbar
13     spine.  You're palpating over the spinus
14     processes.  There's ligaments that connect the
15     spinus processes together that you're
16     palpating.  But you're not directly palpating
17     the facet joints.
18         You wouldn't think it would generate facet
19     joint pain in theory, and certainly in
20     practice.
21 Q.  Does that examination rule out facet joint
22     mediated pain?
23 A.  There's no way to rule out facet joint
24     mediated pain on physical exam.
25 Q.  Then you say there were some non-organic

1    signs.  Right?
2  A.  There were no non-organic signs.
3  Q.  No non-organic signs.
4       Do you do non-organic testing of your
5       patients?
6  A.  So some of it -- it's not even a specific
7       non-organic test.
8       On every patient we see, we evaluate, we
9       move their arms, we move their joints, we
10      palpate.  If they have an inappropriate
11      response, you press them lightly, and they
12      withdraw and grimace to light touch, that is a
13      non-organic sign.
14      So indirectly, you always do non-organic
15      sign test.
16  Q.  When you say in your report there were no
17      non-organic signs seen, are you referring to
18      Waddell, or you're referring to other things?
19  A.  Waddell describes some of the non-organic
20      signs.  Some of those we use simulated
21      rotation, simulated compression, which Waddell
22      describes.
23      Hyper-sensitivity to light touch, which
24      Waddell describes.  Distracted testing, where
25      seated straight leg raise testing doesn't

1    cause problems, but supine straight leg raise
2    testing does.  Those are all described by
3    Waddell.
4       But there are other non-organic signs where
5    you test grip strength.  You can tell if they
6    give inconsistent effort.  Those are other
7    non-organic signs not necessarily that Waddell
8    described.
9  Q.  How many Waddells are there?
10  A.  Five.
11  Q.  That's what I thought.
12      Did you do all five Waddell tests?
13  A.  Again, indirectly did.
14      She had no pain with straight leg raise
15      testing.  There's nothing more to add there.
16  Q.  She passed that test?
17  A.  Well, the failure would be if one was
18      positive, one was negative.  They were both
19      negative.
20  Q.  What were you looking for non-organic for?
21      Why do you, as a physician, look for
22      non-organic signs?
23  A.  Again, you're trying to marry subjective
24      complaints to objective findings.  So you're
25      trying to figure out if their subjective

1    complaints fit with objective findings.
2       Clearly, if on physical exam their
3    subjective complaints don't fit with objective
4    findings, that will give you caution to rely
5    on their subjective symptoms alone in
6    determining causation.
7  Q.  Do you do non-organic tests to see if the
8       patient is faking?
9  A.  No.
10  Q.  Do you do non-organic testing to see if the
11      person is exaggerating?
12  A.  It's one -- it has been shown that patients
13      who exhibit non-organic signs are known to
14      over-report or having over-reporting of their
15      physical complaints.
16  Q.  So why do you do non-organic testing?
17  A.  Again, I think I said, it looks at -- again,
18      you're trying to see if their subjective
19      complaints on physical exam findings will fit
20      with objective findings.
21      If their subjective complaints on physical
22      exam are out of proportion or don't fit with
23      what you would think, then, again, you would
24      question their using their subjective symptoms
25      alone in determining causation or their

1    ongoing complaint.
2  Q.  Because if organic signs were present, that
3    would lead you to believe that the person is
4    not truthful?
5  A.  If non-organic signs are present, it would
6    lead you to believe that they are
7    over-reporting or have an exaggeration of
8    their symptoms.
9  Q.  Because you want to know that?
10  A.  Yes.
11  Q.  You want to know if they're exaggerating or
12      not telling the truth.  And you can uncover
13      that with a non-organic test?
14  A.  I don't think you can 100 percent uncover it.
15      But there is literature that does support
16      that.
17  Q.  She passed all those tests.  Right?
18  A.  Correct.
19  Q.  That means to you that she wasn't
20      over-complaining, over-reporting,
21      exaggerating, or lying?
22  A.  On physical exam, correct.
23  Q.  Did you find Ms. Brooks to be truthful?
24  A.  Yes.  I have no reason to doubt her.
25  Q.  Was she pleasant?

Dr. Kevin Watson

1   A.   Yes.
2   Q.   Did you tell her that you were not there to
3        help her?
4   A.   I told her we're here to do an evaluation.
5   Q.   Did you tell her you were not evaluating her
6        to treat her?
7   A.   I don't remember if I specifically said I'm
8        not to treat her.  But I told her I was just
9        here to do the evaluation.
10  Q.   Did you tell her who you were working for?
11  A.   No.
12  Q.   Do you ever do that?
13  A.   No.  Because most of the time, I don't know
14       who I'm working for.  I just see the patient.
15  Q.   Did you tell Ms. Brooks who paid you?
16  A.   No.
17  Q.   Your examination of her knees -- so with
18       regard to the non-organic testing, some of the
19       things that you would have done would have
20       been to pretend like you were rotating her
21       body, even though you weren't, to see if she
22       complained of pain?
23  A.   Correct.
24  Q.   And she didn't complain of pain, and that's
25       appropriate.  True?

Dr. Kevin Watson

1   A.   Yes.
2   Q.   You also, as part of the non-organic testing,
3        pretended like you were compressing her spine,
4        when, in fact, you were not compressing her
5        spine.  Right?
6   A.   Yes.
7   Q.   You wanted to see if she reported pain when
8        you knew she shouldn't be reporting pain.  And
9        she did not report pain.  True?
10  A.   Correct.
11  Q.   Then you did some light touching of her.
12       That's where you rubbed your finger on her to
13       see if she said that hurt when you know that
14       shouldn't hurt.  True?
15  A.   Correct.
16  Q.   She didn't reply that it hurt?
17  A.   Correct.
18  Q.   Which is truthful?
19  A.   It should be truthful.
20  Q.   And she was?
21  A.   Yes.
22  Q.   Then you did some pinching test.  Is that a
23       pinch test?
24  A.   You can do pinch test.  I did not do a pinch
25       test.

Dr. Kevin Watson

1   Q.   Then you did straight leg raising test to see
2        if you could -- or see if she elicited
3        radicular-type symptoms from catching or
4        stretching the sciatic nerve?
5   A.   Correct.
6   Q.   You did that prone, or laying down, and also
7        in a seated position?
8   A.   Supine and seated, yes.
9   Q.   Both results were consistent?
10  A.   Correct.
11  Q.   Which mean she told you the truth on both of
12       those?
13  A.   Again, she told me that neither hurt, which is
14       a consistent response.  Correct.
15  Q.   Because if she told you that one provoked
16       pain, radiating pain in her legs, and the
17       other one didn't, that would be inconsistent,
18       and you'd say something is wrong here?
19  A.   Correct.
20  Q.   But that did not occur?
21  A.   Correct.
22  Q.   Then your examination of the knees, tell me
23       what that showed.
24  A.   She had a marked valgus deformity, which is
25       what lay people would say knock-knee, where

Dr. Kevin Watson

1        the knees touch each other and the feet kind
2        of display out.  The left was worse than the
3        right.
4            She was tender both on the medial and
5        lateral, which is the inner and outer half of
6        her knees.  No locking with range of motion.
7            She had one plus laxity, so she did have a
8        little give on Lachman's, which is testing the
9        ACL.  Her range of motion was five degrees shy
10       of full extension to 110 degrees of flexion.
11  Q.   So the laxity showed that she had some
12       stretching of her ACL?
13  A.   Some looseness on her ACL.
14  Q.   You'd call that a sprain or stretching?
15  A.   It doesn't have to be a sprain.  It could just
16       be loose or laxity.
17           Some people have physiologic laxity without
18       any injury to their ACL.
19  Q.   Can you say one way or the other whether
20       Ms. Brooks' ACL was injured in this crash?
21  A.   Again, I would say it was not injured in this
22       crash.  According to, again, the mechanism of
23       injury, would not be consistent with
24       degeneration of an ACL tear.  Patients with
25       severe arthritis often have ACL tears already.

Dr. Kevin Watson

1  Q.  That's more probable than not?
2  A.  Yes.
3  Q.  Then you talked about the range of motion.  It
4      was restricted?
5  A.  Correct.
6  Q.  By how much?
7  A.  So 5 degrees shy of full extension.  Normal
8      flexion would be 120 to 130, so about 10 to 20
9      degrees.
10 Q.  So flexion and extension, she's limited?
11 A.  Correct.
12 Q.  In your opinion, on July 18, 2019, was
13     Ms. Brooks a candidate for bilateral knee
14     replacement?
15 A.  Again, looking at the records where they
16     report severe arthritis in her knees, her
17     deformity in her knees, she said she could not
18     go on any longer, then she would be a
19     candidate for knee replacement.
20 Q.  Tell me what your examination of the shoulders
21     revealed.
22 A.  So both shoulders showed good active and
23     passive range of motion.  So we asked her to
24     move her arm.  And we moved her arm for her.
25     She had normal rotator cuff strength.  She had

Dr. Kevin Watson

1      some anterior shoulder pain when we pressed on
2      it.
3  Q.  Is that bilateral or just the right?
4  A.  It think it's just the right.  It's not listed
5      there.
6  Q.  That's the one she said she injured in the
7      crash?
8  A.  I think at some point she said the left
9      shoulder hurt her, too, but mostly the right
10     shoulder.
11 Q.  An anterior portion of the shoulder, that's
12     the front portion?
13 A.  Correct.
14 Q.  The pain anteriorly, is that consistent with
15     supraspinatus tendon tear?
16 A.  No.  Supraspinatus would be more lateral where
17     the supraspinatus attaches.
18     So anteriorly, it would be more in the
19     front by the biceps tendon, anterior deltoid
20     region.  Supraspinatus would be more lateral
21     off to the side.
22 Q.  What is the rotator cuff that is in the front?
23 A.  Subscapularis.
24 Q.  What is the anterior tenderness consistent
25     with in terms of shoulder problems?

Dr. Kevin Watson

1  A.  It's very non-specific.
2      It could be deltoid muscle pain.  It could
3      be biceps pain.  It could be deeper capsular
4      pain from the shoulder joint.  It's not a
5      specific finding.
6  Q.  Consistent with a subscapularis problem?
7  A.  Subscapularis problem could cause anterior
8      shoulder pain.
9  Q.  What's the significance of a right shoulder
10     MRI showing fluid collection in the
11     subscapularis muscle?
12 A.  Again, it's very non-specific.
13     If you saw a tearing of the muscle or
14     tearing of the tendon, then you could say it's
15     probably traumatic-related.  Otherwise,
16     there's nothing.  You can get fluid
17     collection, burst of fluid around the tendon
18     that's not-specific.
19 Q.  Consistent with a hematoma?
20 A.  If there was evidence of trauma.  A tendon
21     tear around the subscapularis tendon or muscle
22     tear that would generate a hematoma, yes.
23 Q.  That would be consistent with a traumatic
24     injury such as an automobile accident?
25 A.  Traumatic injury can cause a hematoma around

Dr. Kevin Watson

1      the shoulder.
2      Again, I would say in a rear-end motor
3      vehicle collision, it would be difficult to
4      say how a hematoma would occur.
5  Q.  But you can't rule that out?
6  A.  Again, it's more likely than not, unless her
7      shoulder hit something on the steering wheel,
8      that a hematoma on the front of the shoulder
9      would not have occurred.
10 Q.  Is Dr. Defrancesch committing malpractice in
11     performing nerve burns in Ms. Brooks' neck?
12 A.  No, it's not malpractice.
13     It's just not -- it's controversial, for
14     one; and two, it's only really been proven
15     under strict diagnostic criteria in small
16     studies.
17 Q.  What do you attribute the improvement in
18     Ms. Brooks' neck condition to since she had
19     the nerve burn in her neck a couple of months
20     before you saw her?
21 A.  I mean, like you said, pain can wax and wane
22     over time.
23     It could be that the nerve burn was done as
24     her pain was decreasing.  It could be placebo
25     effect.  There's a strong placebo effect with

Dr. Kevin Watson

1   recommends them.   There's medical literature
2   that shows it's not effective, but health
3   insurance still pays for it.
4        So it doesn't mean they're up-to-date on
5   the latest objective study.
6   Q.   I think I'm going to call it quits.   I have
7   more questions, but I think I'm done.
8        MS. CHICKERING:
9             I have no questions.
10            (Conclusion.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Affiliated Reporting                                    Page: 152

Dr. Kevin Watson

1             REPORTER'S CERTIFICATE
2
3        This certification is valid only for a
    transcript accompanied by my original signature
4   and original required seal on this page
5
6
7        I, THERESA MATHERNE, Certified Court Reporter,
    in and for the State of Louisiana, as the officer
8   before whom this testimony was taken, do hereby
    certify that DR. KEVIN WATSON, after having been
9   duly sworn by me upon authority of R.S. 37:2554,
    did testify as hereinbefore set forth in the
10  foregoing 152 pages; that this testimony was
    reported by me in stenotype reporting method, was
11  prepared and transcribed by me or under my
    personal direction and supervision, and is a true
12  and correct transcript to the best of my ability
    and understanding, that the transcript has been
13  prepared in compliance with transcript format
    guidelines required by statute or by rules of the
14  board, that I have acted in compliance with the
    prohibition on contractual relationships, as
15  defined by Louisiana Code of Civil Procedure
    Article 1434 and in rules and advisory opinions of
16  the board, that I am not related to counsel or to
    the parties herein, nor am I otherwise interested
17  in the outcome of this matter.
18
19
20
21
22
23
24  _____
25  THERESA (TERRI) MATHERNE

Affiliated Reporting                                    Page: 153

## WORD INDEX

**< $ >**
$1,400  9:1
$125,000  10:21
  11:17
$2,500  7:14  8:2
  10:17
$625  8:21  9:6
$633  9:5
$800  8:21
$833  8:21  9:6

**< 1 >**
1  2:8  3:4  5:15, 17
  10  87:18  144:8
  130:12  139:14
100-pound  54:3
11  22:19  50:12
  56:5  76:12, 15, 23
110  143:10
12  22:19  115:14
120  144:8
13  22:19
130  144:8
14  3:7  22:19
  50:24
1400  1:1
1434  153:15
14-page  22:13
14th  29:24
15  1:1  2:4  50:24
1515  1:1
152  153:10
15-page  28:19
  29:7  47:5
17  3:4
18  2:11  6:16
  28:20  29:12, 14, 21
  144:12
18-7736  1:1
18th  130:3

**< 2 >**
2  1:1  2:9, 13  3:5
  7:4, 9
20  39:19  132:8
  144:8
2002  12:20, 23, 25
  13:4, 6
2004  115:10
2006  64:7
2007  12:20, 25
  13:6
2008  66:12
2010  68:4, 15
2016  6:19  99:6, 11,
  15  104:18  107:2

109:13  110:23
  115:11  117:1
  124:1, 3  125:1, 4,
  14  127:9
2018  49:17
2019  1:1  2:4, 11
  6:16  28:20  29:12,
  14, 21  127:12
  144:12
20s  44:17  45:10
  65:13
20-year  37:16
20-year-old  54:3
24  106:13, 20, 25
  108:3  109:1, 8
29  3:6, 7

**< 3 >**
3  2:10, 13  3:6
  29:3
30  132:8
30s  42:14  58:19
  65:13
31  6:19  99:6, 11,
  15  104:18  107:2
  109:13  110:23
  117:1  124:1, 3
  125:1, 4, 14  127:9
3434  1:1
37:2554  153:9

**< 4 >**
4  2:11  3:7  29:11,
  14
40  44:22
430  1:1

**< 5 >**
5  3:4, 10  144:7
50  9:21  10:16
  11:18
50-mile-an-hour
  75:3, 13

**< 6 >**
60  46:22
60s  42:14
650  1:1

**< 7 >**
7  3:5
70112  1:1
70130  1:1
70s  42:14  58:20
  65:13

**< 8 >**
80  44:23  46:22

80s  65:14

**< 9 >**
9  3:5  127:12
90  94:3, 10

**< A >**
AAOS  103:23
  151:25
ability  119:6
  120:16, 22  153:12
ablation  15:16
  121:23
ablations  150:3
able  71:5  78:22
  132:6, 7, 12
above-mentioned
  5:3
absent  123:7
Absolutely  108:10
Academy  15:1
  26:11  27:4  36:17
  37:2, 12  122:16
accept  150:22
acceptable  150:21,
  25  151:9, 17, 18
acceptance  47:3, 14
accepted  25:15
  27:19, 22  35:19
  36:16  40:20  43:11
  46:12, 23  56:2, 6
  67:2  70:11  85:2, 8
accident  25:21
  26:1, 7, 17, 22
  27:20, 25  28:5
  56:18  79:7  81:14,
  18  82:3, 10  87:12
  89:10, 14, 15  92:4
  93:9  96:2, 4, 5
  98:20  101:2, 3
  105:5, 24  106:4
  107:10  108:2, 17
  110:3, 5, 14, 24
  112:25  113:4
  115:11  125:10, 12,
  14, 17  126:14, 18,
  21  146:24
accidents  75:23
accompanied  153:3
accurately  71:14
ACL  143:9, 12, 13,
  18, 20, 24, 25
ACLs  36:2
acted  153:14
ACTION  1:1
active  144:22
activity  18:21
actual  120:13

acute  82:4
add  137:15
administering  4:20
admission  124:9
adults  41:23
advise  151:2
advisory  153:15
affect  33:18  70:24
aforementioned  4:5
African-American
  109:20
age  34:6  39:4
  42:9, 12  44:19, 22
  45:8  47:16  51:17
  53:7, 18, 21  54:20
  58:14  59:6, 10
  62:15, 20  65:11
  66:20  83:5  91:11
ages  58:15  83:7
aggravate  91:14
aggravation  91:17,
  21, 23  92:5, 13, 19
  125:24  126:24
ago  21:20, 22, 24
  37:1  124:13
  126:14
agree  22:22  52:11,
  24  53:2, 16  67:3
  69:7  97:19, 21
  98:5  100:18
  112:16, 19  113:14
  125:3  148:9, 11, 13
  149:19  151:8
agreed  4:3
agrees  46:16
ahead  38:4
Alabama  12:20
all-comers  62:16
alleviate  19:15
AMA  31:14  32:20
  35:8, 24  78:2  86:6
  92:15  103:23
AMERICA  1:1
  2:1  6:1, 6  26:11
American  14:4, 5
  15:1  27:4  35:9, 12
  36:17, 18  37:1, 12
  59:15  86:7  122:16
amount  8:7  10:25
  11:11, 20
analogy  90:19
analyzing  56:13
ankle  108:7, 9, 11
ankles  16:23
answer  4:14  24:11
  27:1  47:12  48:6
  60:13  96:10
  105:21

answered  24:10
  26:24  27:11  89:8
  91:25  105:19
answers  27:8  83:4
anterior  145:1, 11,
  19, 24  146:7
anteriorly  145:14,
  18
anticipate  9:25
anti-inflammatory
  17:6  18:6
anxiety  34:2
anybody  94:15
apparently  49:14
  130:2, 6
appear  82:25
  127:17
APPEARANCES
  1:1
appeared  61:5
applied  27:14
applies  56:10
apply  53:19  54:1,
  4  55:1
appropriate  140:25
area  35:10  57:16
  91:20  132:17, 21
  150:7
areas  107:8
argue  41:8  85:4
argument  127:3
argumentative  60:8
arm  46:3  129:6
  144:24
arms  71:9  136:9
arrive  8:1  97:24
  100:17
arrived  98:2
arthritic  19:13
  125:18, 24
arthritis  34:4
  48:16, 18  62:11, 14,
  19, 22, 25  63:2, 7, 9,
  11, 14  64:12, 14, 16
  66:20, 25  68:6, 10,
  22  70:4  90:8, 12,
  16  94:3  110:18, 22
  117:16  123:3
  124:11  143:25
  144:16
article  31:13  32:7
  35:5  40:12, 23
  43:3, 10, 11  44:5
  46:5  48:22, 23, 24
  49:2, 3, 4  50:3
  56:24  57:4, 7
  59:12  61:24  62:10
  67:18, 20  69:12, 23,

Dr. Kevin Watson

*24* 85:*14* 86:5
87:*6, 8* 153:*15*
**Articles** 2:*10*
22:21 25:7 28:*18,
22* 29:*3, 6* 32:*1, 3,
16, 17* 35:*1* 41:*3, 5*
47:6 50:23 60:*4,
15, 23* 61:*4, 6, 9*
78:3 86:*14* 97:*17*
**ascribe** 76:22
77:*18* 81:25 82:24
**asked** 6:9 7:*11*
23:8 24:23 51:*1*
64:20 83:*2* 89:7
132:7 144:23
**asking** 26:*16*
28:*17* 78:7 79:*3,
21* 91:22 100:*12*
**assessment** 37:*18*
41:*11*
**assistant** 12:22
**assisting** 13:*13*
**associated** 41:*12*
44:25 47:2, *17*
93:*19*
**ASSOCIATES** 1:*1*
**Association** 35:*9,
13* 36:*19* 68:6
70:4 86:7
**assume** 61:*14*
72:*14* 125:*16*
**asymptomatic**
38:*21* 39:2, *18*
57:*6, 20* 58:3, *7, 8,
16* 59:5 67:*6, 9*
91:*15* 92:25
**attach** 7:5 28:23
29:*1, 11*
**attaches** 145:*17*
**attempt** 133:*16*
**attending** 13:9
**attorney** 23:*11*
**Attorneys** 1:*1*
**attribute** 147:*17*
**August** 1:*1* 2:*4*
**author** 52:3 85:*13*
**authored** 14:*16*
**authority** 153:9
**automobile** 75:23
82:9 86:*15* 94:7
112:*24* 113:*3*
117:*19* 146:*24*
**available** 98:24
131:*19*
**average** 9:22 10:6,
*11, 18*
**aware** 31:*12* 52:*1*
66:*15* 84:23 99:*10,
13, 14, 19, 20, 23, 24*

100:*3* 124:*24*
127:*8*
**axial** 18:*8* 88:25
89:5 91:*3* 110:*19*
111:*2, 13, 15, 19*
112:*6* 117:*9, 12, 22*
118:*11* 131:*8*
149:*20* 151:*10*

**< B >**
**back** 18:*1, 15, 16,
22* 19:*2, 13, 21*
23:*15, 17* 28:*19*
29:*7* 32:6 51:*1*
60:*3* 62:23 63:*7, 9,
11* 64:*11* 68:*10*
73:*15* 74:*20* 80:*8*
81:*9* 83:*2* 88:*5*
89:*23, 25* 90:*2, 19*
97:*17* 100:*12*
104:*3, 10, 17*
106:*17, 24* 107:*12*
109:*7, 23* 110:*7, 13,
15, 19, 23* 111:*2, 12,
13, 15, 19* 112:6
113:*15, 23* 114:*4, 9,
14, 18* 115:22
116:*3* 117:*9, 10, 12,
22* 118:*12* 120:5
126:*1* 131:*10*
148:*10, 13*
**backed** 56:*21*
**backs** 119:*7*
**bad** 60:*13, 14*
112:*7, 9, 10* 115:*17*
116:*20* 124:*17*
125:*8*
**Barth** 30:*8, 13, 15*
31:*24* 33:*1, 8, 9, 14,
23* 34:*5, 7, 21* 35:*1,
19* 36:*6* 78:*3*
**Barth's** 35:*7, 10*
36:*8, 12, 20*
**base** 85:*10* 103:*19*
**based** 8:*4* 90:*2*
101:*1, 4, 21* 102:*24*
105:*12* 109:*11*
114:*3, 13* 115:*13,
20* 121:*23* 123:*23*
149:*6*
**baseline** 92:*18*
**basically** 10:*12*
31:*3* 32:*21* 61:*2*
67:*20* 74:*9* 79:*2*
84:*3* 109:*19*
**basis** 98:*23*
101:*16* 126:*8*
**bed** 108:*7*

**beginning** 7:*21*
8:*19*
**behalf** 6:*7, 8* 7:*7*
9:*15* 10:*16* 11:*1,
18* 22:*1, 8, 25*
23:*20* 24:*8*
**believe** 14:*10* 39:*2*
45:*14* 56:*14* 87:*11,
13* 92:23 120:*12*
126:*17* 130:*15*
134:*13* 139:*3, 6*
**belt** 95:*7, 22* 96:22
**belted** 93:*9* 96:*12,
25*
**best** 7:*24* 25:*6, 9*
73:*16* 153:*12*
**better** 25:*8* 116:*18*
129:*10, 13* 131:*23*
**beyond** 75:*19*
151:*20*
**Bible** 149:*14*
**bibliography** 30:*3*
33:*11* 88:*17*
**biceps** 145:*19*
146:*3*
**big** 132:*23*
**bigger** 149:*11*
**biggest** 40:*16*
**bilateral** 100:*1*
105:*16* 128:*9, 12*
129:*1* 132:*13*
144:*13* 145:*3*
**bilaterally** 129:*5*
**biomechanical**
25:*24* 26:*4, 19*
27:*10, 12, 15, 23*
28:*2, 9, 10* 30:*13*
38:*6* 41:*13* 44:*9*
49:*19* 51:*2* 57:*9*
62:*1* 64:*21* 69:*14*
73:*2* 85:*17*
**biomechanics**
26:*12* 27:*5*
**Birmingham** 12:*20*
**bit** 11:*25* 50:*21*
74:*21* 105:*18*
109:*17*
**blame** 90:*11*
**blinded** 150:*1*
151:*4*
**block** 15:*13*
121:*22, 24*
**blocks** 133:*14*
150:*1* 151:*4*
**board** 13:*23* 14:*2,
4, 5, 13* 20:*17*
35:*12, 17* 40:*18*
41:*1* 43:*7* 46:*8, 10*

55:*22* 66:*10* 84:*19*
97:*9* 133:*14, 16*
**body** 23:*24* 24:*15*
34:*11* 39:*12* 42:20
45:*18* 52:*17* 53:*18,
22* 54:*12, 20* 58:25
65:*20* 73:*20* 83:*12*
116:*16* 127:25
140:*21*
**boil** 77:*1*
**Bone** 40:*15* 74:*11,
23* 75:*19, 24* 77:*4*
84:*10*
**book** 31:*14*
**borderline** 21:*2*
**Bostick** 99:*24*
100:*22* 101:*13*
102:*18* 115:*6*
**bothering** 90:*9*
**brace** 52:*19, 22*
**bracing** 52:*23*
95:*11, 17*
**brain** 15:*24*
**branch** 15:*13, 21*
121:*21* 150:*1*
**brief** 31:*1*
**brings** 122:*25*
**Brinjikji** 57:*3, 4, 9,
14, 24*
**British** 69:*25* 70:*1*
**Brook** 87:*22*
**BROOKS** 1:*1* 2:*1*
5:*7, 22* 6:*3, 9, 11,
15* 7:*20* 8:*8* 17:*23,
25* 22:*13, 15* 23:*18,
24* 24:*14, 19* 28:*5,
9* 29:*19* 53:*17, 20*
55:*17* 78:25 79:*17,
19, 22* 87:*10, 12, 14*
98:*1, 12, 19* 99:*5,
12, 21, 25* 100:*14*
103:*13* 104:*2*
105:*13* 106:*8, 10,
23* 107:*11, 14*
108:*14, 22* 109:*5,
16, 22* 110:*13, 21*
111:*11* 113:22
114:*9, 13, 17*
115:*21* 117:*6*
119:*3* 120:*5* 121:*6*
122:22 123:*24*
125:*3, 13* 126:*8*
127:*7, 12, 17*
131:*21* 134:*23*
139:*23* 140:*15*
143:*20* 144:*13*
147:*11, 18* 149:*19*
**buckling** 116:*18*
**bulge** 70:*8*

**bulging** 70:*24*
71:*3, 5* 91:*8, 10, 13*
**burn** 16:*3, 10, 14*
127:*11, 18* 129:*18,
21, 22, 24* 130:*4, 6,
9, 24* 131:*4, 7, 23*
147:*19, 23* 148:*4*
149:*4, 8, 9, 10, 12,
22, 23* 151:*8*
**burned** 130:*13*
**burning** 15:*20*
**burns** 130:*16*
131:*14, 17* 147:*11*
148:*9, 19* 149:*17,
25* 150:*3, 5*
**burst** 146:*17*
**business** 99:*1, 3*

**< C >**
**call** 16:*5* 30:*2*
36:*10* 74:*9* 121:*16,
17* 122:*1* 134:*21*
143:*14* 152:*6*
**called** 14:*9, 10*
18:*8* 71:*20* 72:*7*
84:*9, 21* 149:*15*
**calling** 75:*22*
**camp** 36:*10, 11*
**candidate** 19:*22*
20:*6, 20, 24* 124:*2*
125:*7, 9* 144:*13, 19*
**candidates** 17:*19*
**capsular** 146:*3*
**car** 88:*18, 22, 25*
89:*4, 10, 14, 15, 17,
18* 91:*2, 5, 8, 9, 14,
22* 92:*4, 24* 93:*3, 5,
9, 12* 94:*12, 15, 17,
19* 95:*7, 12, 20*
105:*5* 107:*10*
111:*18* 112:*5, 6, 17*
113:*6, 11*
**Carragee** 48:*8*
63:*20* 64:*7* 72:24
73:*1, 18, 22* 74:*21*
75:*8, 9* 76:*19*
77:*12* 80:*8* 83:*2*
84:*8, 9, 15, 24* 85:*1,
7, 11*
**carried** 8:*6*
**cascade** 72:*5, 9, 11*
**CASE** 1:*1* 5:22,
23* 6:*6* 8:*8* 21:*2*
22:*3, 7, 12* 23:*5, 13,
18, 20* 24:*6, 9*
55:*17* 60:*21.* 62:*13,
17* 103:*2* 119:*2, 4,
10, 11* 130:*22*

Dr. Kevin Watson

cases 21:20, 25
catching 142:3
causation 22:22
23:3, 7, 12, 19 24:6,
22 31:4, 12, 15, 17
32:20 36:1, 4, 16
37:5, 9 55:16
89:20, 22 90:6
92:16 93:21 98:22
101:16, 17, 18
102:14, 24 103:2,
19, 22, 25 138:6, 25
cause 64:8 67:14
70:17, 19 71:25
72:1, 16, 25 74:13,
22, 24, 25 75:4
76:16, 17, 19, 20, 23
84:10 85:15 86:16
88:18, 25 89:11
91:5, 8, 10, 22
92:24 93:3, 7, 11
94:12, 17 96:15, 22
126:24 137:1
146:7, 25
caused 24:18, 23,
24 25:8 74:5
89:15 99:12, 16, 21,
25 100:4 104:23,
24 110:9 111:14,
17 112:5 125:17
126:19
causes 70:18
82:10 112:1
causing 50:13
64:10 71:6 73:16
90:11, 20, 23
125:18
caution 138:4
Center 150:6
centrally 132:3, 17
135:4, 12
certain 31:22
53:22
certainly 9:20
11:10 80:4 108:2
135:19
CERTIFICATE
153:1
certification 4:11
14:2, 6, 13 97:9
153:3
Certified 1:1 4:18
13:23 20:17 153:7
certify 153:8
cervical 12:6, 8, 10
13:13 17:23 18:2,
9 19:11 37:17
38:23 41:7 44:5, 6
59:18, 20 99:16, 17

100:5 110:18
111:3 119:11
121:21 127:20
128:3, 5, 8, 24
129:3 130:18
131:11, 13, 17
133:15, 22 148:20
150:1
chair 90:10, 11, 13,
15, 19, 21, 22 92:4
chance 94:4, 22
change 48:12, 14
63:21 76:11 81:2
84:4 87:2
changes 19:13
41:6, 9 74:4, 6
charge 7:1, 6 8:7
charging 8:21
CHICKERING
1:1 5:25 11:3
36:22 37:20 38:3
47:9 76:1 86:17
88:19 89:1 102:20
120:10 152:8
choice 131:18
choose 149:9, 10
chose 39:25
chronic 64:10, 13
73:15, 16 74:7, 13,
17 76:21, 24 77:5,
20, 25 78:4, 6, 12,
21, 25 79:6, 8, 12,
16 87:25 98:16
99:9 107:25
108:10, 21 109:3
118:2, 4, 20 150:14
chunk 8:12
circumstances
96:23
cite 25:7 32:16
48:21
cited 33:23 34:4, 7,
21 35:1 47:5, 8
50:24 64:2
cites 32:1
CIVIL 1:1 4:6
153:15
claim 31:8 36:2
claimed 56:11
claiming 105:6
claim-relatedness
33:20 36:14 37:6
claims 34:3
clarify 11:13
classes 31:20
classified 75:2
84:14
clear 102:3

Clearly 138:2
clever 14:11
clinic 9:10 13:17
clinical 11:10 45:1
clinically 8:16
close 132:22, 24
cloudy 107:8
CME 37:7
Cochrane 148:16
Code 153:15
cohort 37:18
collect 79:23
collection 146:10,
17
collision 50:15
52:13 56:19 60:21
75:14, 17 76:8, 13,
15 86:10 87:21
125:21 147:3
collisions 26:13
27:7 50:8 55:9
56:12 61:4 75:12
85:15 95:4, 16
96:7, 20
come 10:3, 4, 7
25:5 34:1 52:9
101:7 120:25
coming 52:22
88:14 104:21
committing 147:10
150:9, 10
common 59:9
62:19 93:15
commonly 47:15
57:21
communicate 151:1
communicating
16:10
community 35:20
40:21 43:12, 23
46:13 56:3 62:15
85:3, 8
community-based
61:23
companies 7:8
9:16 10:17 11:2,
19
company 7:13
22:2 49:21 51:5
57:11, 12 62:3
64:24 69:16 85:20
comparable 87:9
compare 40:5 46:3
compared 63:8
comparison 49:13
compensation 37:3
77:7, 16, 22 78:8, 9
79:1, 24 84:6

compensation-type
74:14 77:6
complain 88:22
89:5, 13 90:18
116:10, 21 118:6
140:24
complained 106:2
140:22
complains 18:12
90:17
complaint 139:1
complaints 17:14
18:8 20:5, 9 57:22
63:24 78:17 84:6
90:5 101:1, 19
103:19 104:20
107:4 117:14
137:24 138:1, 3, 15,
19, 21
Completely 130:12
compliance 153:13,
14
component 93:18
comprehensive
49:11
compressing 141:3,
4
compression 17:18
70:18 93:17
133:25 134:9, 11,
19 136:21
concert 134:20
conclusion 20:23
60:24 88:14
152:10
conclusions 149:5
condition 33:16
38:20, 25 42:4
45:6 58:2 65:9
83:4 91:15, 18, 24
92:20, 25 93:22
110:13, 15 111:10,
24 125:18, 24
126:3 129:23
147:18
conditions 32:13
33:18, 21 38:22
51:15 53:19 58:5,
7, 8 80:14, 19
117:6, 24 130:20
131:20
confirm 133:13, 14
confirmed 133:11
151:16
confirms 133:11
connect 135:14
consensus 66:21
conservative 17:9

consider 10:24
11:17 12:1 16:17
27:12 75:23 76:7
90:25
consistent 87:20
104:8, 13 106:3
125:23 129:18, 20
135:4, 7, 10 142:9,
14 143:23 145:14,
24 146:6, 19, 23
constant 111:23
continue 116:10,
21 118:17
continued 18:21
40:1 99:9 116:5,
14 118:20
continues 19:6
continuing 118:6
continuously
115:24
contractual 153:14
contradict 66:16,
19
contradiction
119:13
contradicts 85:5
contrary 60:24
61:6
contributed 125:15
126:11
contributing 70:14
control 34:24 40:7,
10 43:1 55:2, 6, 11,
14 66:2 83:19, 21,
22
controlled 34:20,
22 46:1 148:15
149:25 151:4, 5
controls 39:2
controversial
131:13, 15 147:13
148:21
copies 28:21
120:14
copy 29:11
cord 17:17 97:14
core 18:22 19:7
Cormier 49:7, 19,
21, 23 51:1, 5, 18
53:8 55:15, 19
56:1, 20 60:3, 5, 16,
24 61:9 76:18
Cormier's 49:25
Correct 12:5, 7, 9,
11 13:11 21:14
40:3 43:25 49:4
58:13 61:20 63:3
67:7 69:5 73:21
101:20, 23 106:7

Dr. Kevin Watson

111:5 112:12, 15
113:21 114:2, 7
115:19 119:1
121:18 122:20
123:9, 14, 22 125:2
127:23 130:1, 5
131:24 134:22
135:1 139:18, 22
140:23 141:10, 15,
17 142:5, 10, 14, 19,
21 144:5, 11
145:13 153:12
correlate 47:19
50:14 59:10 84:2
89:19 90:2
correlates 44:6
67:25
correlating 50:17
67:25
correlation 41:21
63:10 68:9, 24
90:7
corresponds 71:13
counsel 4:4 99:2
153:16
couple 10:13
147:19
course 18:3 37:3,
4, 11
courses 26:10
27:3 37:7
COURT 1:1 2:14
4:18 5:3 21:15
23:20 25:12, 14
28:15, 22 119:23
126:5, 6 153:7
cranes 103:7
crash 6:19 50:7,
16, 18 86:15 87:15,
23 88:3 89:17, 18,
24 90:1 91:2, 5, 9,
14, 22 92:24 93:3,
5, 13, 23 94:7, 12,
15 95:12 96:14
99:6, 11, 15, 21, 25
100:4 104:18
106:8, 10, 12, 25
107:2, 6, 13 108:18
109:6, 8, 12 111:20
112:1, 6, 17, 18
113:6, 24, 25 114:6,
10, 22 116:14, 25
117:1, 7, 19 124:1,
3 125:1, 4 126:5, 7,
11 127:9 143:20,
22 145:7
crashes 50:18
88:18, 22, 25 89:4
91:8 94:17, 19

95:7, 20 111:18
112:5 113:11
create 69:7, 9
70:25 71:17 95:8,
12
criteria 147:15
148:7 149:2, 3
150:20
criticize 60:15
criticized 61:10
66:14
criticizing 84:23
critiques 60:22
84:23
cross 54:24
CT 62:18 66:5, 22
68:22 119:11
cuff 23:6 94:17,
22 95:6, 8, 13, 18,
23, 25 96:3, 8, 15,
18, 22 97:3 144:25
145:22
current 110:12, 15
currently 43:9
Curriculum 2:8
5:17
CV 5:13
cytokines 71:23

< D >
Daimon 37:13
38:6 39:13 41:4
damage 50:13
75:6 87:18 123:7
data 50:15, 17
54:25 56:13 86:9
102:10, 12
days 28:24 104:22
105:24 109:11
112:7, 9, 10, 13
113:12, 16, 18
116:20
deal 31:24
dealing 15:5
22:21 87:9, 13
DEAN 1:1 5:6
debate 56:9
decade 65:12
decades 58:16, 18
decreased 127:13,
19 129:20, 25
130:2
decreasing 130:7
147:24
deep 93:17
deeper 146:3
DEFENDANT 1:1
5:23 6:6 7:13
22:2, 9

defendants 6:21
7:7 8:7 9:16
10:17 11:1, 18
defense 10:1 22:7
define 74:21
defined 153:15
definitely 89:15
definition 75:18
deformity 142:24
144:17
Defrancesch 100:4,
23 101:13 102:18
147:10 148:10
149:12, 17
degeneration 37:17
44:7, 20 48:3 57:6
64:3 67:4, 8, 11
68:17, 22 69:4, 6
74:16, 19 85:16
86:13 93:24 94:8
111:12, 15 113:23
123:5, 12 125:23
143:24
degenerations
46:25
degenerative 41:9,
21 47:15, 20, 22
48:12 59:9 63:21
82:23 84:5 91:15,
23 92:25 94:2, 13
96:1
degree 55:18 130:8
degrees 132:8
143:9, 10 144:7, 9
delayed 104:25
110:6
deltoid 145:19
146:2
DEMAREST 1:1
DEPARTMENT
1:1
depends 9:8 34:25
35:5 76:4 101:16
118:7
Deposition 1:1 2:3
4:4, 15 7:5
depression 34:2
describe 87:1
described 137:2, 8
describes 31:9
136:19, 22, 24
describing 32:21
description 133:24
134:7
design 15:23
designed 122:8
127:12
detect 72:19

determination
19:24 20:1 22:22
148:8
determine 71:5, 15
73:16 89:12
103:24 133:1, 19
determines 19:20
determining 31:5
36:12 89:21 103:1
138:6, 25
develop 44:25
62:23 64:13 74:17
77:15 82:11, 17, 19
91:2 106:19, 20
118:2
developed 106:25
developing 95:5
development 47:2
59:11 68:7 77:24
78:4, 6, 11 79:12
98:16
develops 82:16
diagnosed 115:7
diagnosis 110:12,
16 119:15 151:15,
16
diagnostic 71:4
115:8 130:20
131:20 147:15
148:7 149:2, 3
150:19 151:3
dictate 67:5
difference 52:11,
15, 16 55:8 84:4
89:7 92:12
differences 41:6
different 32:1, 16
34:16 46:21 48:22,
24 49:1 50:11
53:13, 14 54:20
58:16 62:15 71:21
84:12 86:8 88:11
92:1 96:9 97:21,
24 98:5 100:13, 17,
24 101:8, 14 102:6
103:20 149:22
differing 101:6
103:21
differs 103:13
difficult 91:9
126:13, 17 147:3
direction 153:11
directly 135:16
disabilities 23:9
disagree 36:6, 7, 11
41:3 43:15, 24
46:18 47:7 52:24
53:3, 4 60:4 100:9
101:25 102:3

119:17, 21 124:4
150:2
disagreement
43:20, 22
disc 43:18 44:5, 6,
20, 23 46:24 70:8,
10, 16, 20, 24 71:3,
6, 7, 15, 23 72:14
81:22, 23, 25 82:1,
4, 10 85:16 86:12,
13 91:10, 13
discogenic 70:9
discs 18:13 64:4
70:22 71:17 91:6,
8
discuss 151:12
discussion 25:11
32:19
Disease 31:15
92:15
disorders 41:12
displacement 93:10
display 143:2
distinction 92:8
Distracted 136:24
DISTRICT 1:1
DIVISION 1:1
Doc 5:6, 13, 16
29:24 37:13 41:10
48:21 98:25
113:22 117:21
124:17
doctor 22:9 28:17
29:2, 12, 21 37:22
38:6 50:19 51:1
60:3 97:4, 19
98:11 104:1
109:10, 22 113:8,
12, 14 116:22
117:5 119:2 121:3,
19 123:25 124:20,
25 127:11 150:22
doctors 100:10
102:5 103:14
doctor's 124:12
document 75:14
documented
107:20, 23
documenting 67:23
documents 7:18
doing 8:10, 11, 23
11:7, 9, 23 12:18
32:23 40:4 102:14
114:9 122:8 134:3
148:22 149:25
150:4, 10, 16
dominant 78:20
doubt 80:5 120:9
139:24

**DR** 1:*1* 2:3 5:*1* 20:22 78:3 98:6, *8* 99:*10, 14, 20, 24* 100:*4, 21, 22, 23* 101:*12, 13* 102:*17, 18* 115:6 147:*10* 148:*10* 149:*12, 17* 153:*8*
**drama** 72:25
**dramatically** 19:8
**driver** 108:*15, 25*
**drives** 123:*15, 16*
**due** 123:2
**duly** 5:2 153:9
**duties** 8:*16, 23* 9:7 11:*10*

**< E >**
**E.R** 82:5 104:*21*
**early** 131:*12*
**earn** 8:9, *22* 9:5 10:24 11:24
**earned** 10:*21*
**earning** 11:*17*
**easier** 112:23
**easily** 9:*13*
**EASTERN** 1:*1*
**editorial** 35:*12, 17* 41:*1* 43:7 46:8, *9* 55:22 66:10 84:*19*
**editors** 85:*11*
**educate** 72:6 150:*16*
**effect** 33:*19* 147:25 151:20 152:2
**effective** 131:*14* 148:25 150:*13*
**efficacy** 121:*15* 149:*1*
**effort** 137:6
**eight** 22:*18*
**either** 58:7
**ejected** 93:*14* 94:23 97:*1*
**ejection** 93:6 94:20
**elicited** 142:2
**ELIZABETH** 1:*1*
**emergency** 105:*9* 108:*1, 5* 109:2
**engineer** 25:24 28:*2, 9, 10* 30:*13* 38:6 41:*13* 44:9 49:*19* 51:3 57:9 62:*1* 64:22 69:*14* 73:2 85:*18*
**engineering** 26:*5, 20* 27:*10, 12, 15, 23*
**enzyme** 72:4

**enzymes** 71:*17, 20* 72:2, 6, 7
**epidural** 17:*15*
**equal** 11:*11*
**equate** 69:*4* 122:5
**especially** 31:*20*
**ESQUIRE** 1:*1*
**essentially** 15:20 69:*3*
**established** 9:*11*
**estimate** 7:24 42:*12*
**Euflexxa** 122:*14*
**evaluate** 6:9 8:8 17:3 22:*14* 31:*10* 59:22 97:22 122:3 136:8 148:25
**evaluated** 78:*14* 98:*1* 105:25
**evaluating** 7:6 8:*18* 13:*17* 27:*16* 140:5
**evaluation** 6:22 7:*12, 17* 8:*10* 22:*1* 23:3, *19* 24:6, *17, 22* 29:*18* 31:*12* 36:*12* 140:*4, 9*
**evaluations** 8:2, *13* 9:*15* 100:*17*
**event** 74:2, *4, 5*
**evidence** 4:*16* 17:*12* 18:*11* 25:9 91:*12, 19* 92:6 98:*14, 15, 21, 24* 126:*4* 130:22 146:*20*
**exacerbation** 92:*1, 2, 10, 14, 17* 126:2
**exact** 13:*1* 32:7 86:*20* 87:3
**exactly** 13:*1* 32:7 42:*11* 52:8
**exaggerating** 79:*19* 138:*11* 139:*11, 21*
**exaggeration** 139:7
**exam** 7:*14* 11:*12* 17:*4* 18:*12* 128:8 133:*1, 12* 135:*1, 9, 11, 24* 138:2, *19, 22* 139:22
**EXAMINATION** 3:*10* 5:5 8:*19* 10:*18* 22:*16* 128:22 129:*12* 131:*25* 133:5, *17, 21* 134:*4, 25* 135:*2, 21* 140:*17* 142:*22* 144:20

**examinations** 10:*1, 16, 22, 25* 11:*18* 97:*23*
**examine** 71:*12* 133:*15* 134:*6, 10*
**examined** 22:*17* 127:24 128:2 129:7
**examining** 7:*19* 128:23
**example** 8:25
**exception** 128:3
**EXHIBIT** 2:7 3:*4, 5, 6, 7* 5:*17* 7:*4, 9* 29:3, *14* 138:*13*
**Exhibits** 2:*13* 120:*14*
**exist** 61:*18*
**existence** 48:2 63:*13*
**existing** 94:*13*
**expect** 52:*10* 54:*21* 130:9
**experience** 26:7, *19* 27:*10* 77:*21* 106:*11, 14* 108:23 111:*19* 113:*10* 118:*18*
**experienced** 109:5 114:*4* 117:6
**experiencing** 39:*1* 78:*25* 79:*23* 89:*19, 25* 98:*17* 113:25 123:*18* 131:22
**expert** 16:*20* 25:*16* 27:*20, 23* 28:*13*
**expertise** 21:*7, 9* 26:*17, 22* 30:*24* 59:*17* 86:*23* 119:8
**explain** 19:*1* 24:*24* 79:*6, 8*
**explained** 78:*23* 102:7 103:*15*
**explanation** 25:*2, 3*
**explore** 105:*17*
**expose** 50:*10* 56:5
**exposed** 50:9
**exposure** 13:*12*
**extend** 132:6
**extension** 132:8 133:24 134:8, *11* 143:*10* 144:7, *10*
**extensive** 24:*14*
**extent** 37:*21* 120:*12, 15*
**extracted** 50:*18*
**extremities** 16:*21*

129:4 132:*14*

**< F >**
**face** 122:*14*
**facet** 15:*10, 25* 61:*21* 62:*11, 14, 18, 22, 24* 63:*2, 6, 9, 11, 14, 15* 64:5, *17* 66:*19, 22, 23, 25* 67:24 68:6, *9, 17, 21* 70:5 99:*17, 18* 100:*4* 121:*14, 16, 17* 122:*4* 127:*13* 132:*18, 21* 133:2, *4, 5, 7, 11, 13, 16, 19, 21, 23* 134:*1, 5, 13, 21, 24* 135:*4, 6, 10, 17, 18, 21, 23* 148:*19* 151:*15*
**facets** 70:*14*
**facilities** 150:7
**facing** 120:25
**fact** 39:*21* 56:*17* 68:24 77:*21* 90:3 105:*13* 108:*14* 114:3 123:24 124:5 126:*13* 127:24 141:*4*
**factor** 77:24 78:*11* 79:*10* 89:20, *21*
**factors** 71:24 78:*4, 5* 79:*12, 14*
**failure** 137:*17*
**fair** 50:*21* 51:25 86:24 114:*1, 23* 115:*18* 123:23 127:*13* 129:*15* 131:*21*
**faking** 138:8
**fall** 90:*21*
**falls** 75:*12*
**familiar** 15:*15, 17* 17:22 29:6, *9* 33:2 61:23
**far** 32:*19* 34:*17* 40:8 53:23 78:24 119:*15* 130:22
**fast** 5:*10, 11*
**favor** 130:*24, 25*
**FAVRET** 1:*1* 3:*10* 5:5, *6* 11:*15* 37:*10* 38:*1, 5* 47:*11* 76:6 86:22 88:24 89:6 103:*4* 120:*19* 121:2
**features** 57:5
**Federal** 4:6
**Fee** 2:9 6:25 7:4,

9 8:3, *5*
**feet** 143:*1*
**Felipe** 20:*16*
**fellowship** 13:*19, 21*
**female** 34:*10* 39:*10* 42:15 45:*14, 16* 54:9 58:23 65:*18* 85:22 109:20
**females** 58:22
**femur** 74:24 75:*4, 5*
**fibers** 70:*22, 25* 72:*14, 15*
**field** 25:*16* 28:5 30:22 59:*17, 19*
**fifth** 48:23
**figure** 73:*14* 137:25
**filing** 4:*11*
**film** 119:3, *6, 17* 120:2, *6, 13, 17, 24*
**find** 78:20 126:5, *7* 139:23
**finding** 64:*11* 66:22 94:*14* 96:3 133:*12* 135:9 146:5
**findings** 18:3 41:*4, 21* 43:*14, 16* 44:*21, 24* 46:*13* 47:*1, 7, 15, 18, 21, 22* 56:*1* 57:*21* 59:9 60:5, *16* 66:5 78:*17, 23* 79:*4, 5* 81:*15, 19, 20* 83:25 84:5 85:*1* 96:2 101:5 102:25 104:*13* 137:24 138:*1, 4, 19, 20*
**fine** 16:6
**finger** 141:*12*
**Finney** 99:*20* 100:22 101:*12* 102:*18*
**first** 5:2 24:*11* 30:8 31:*11* 67:23 86:*4* 105:*14, 22* 109:*10* 149:25 150:*4*
**fit** 138:*1, 3, 19, 22*
**five** 129:3 132:*12, 13* 137:*10, 12* 143:*9*
**flex** 132:6, 7
**flexion** 93:*16, 17* 143:*10* 144:8, *10*
**flexion/extension**

134:*18*
flip 29:*24*
floor 132:*8*
fluid 146:*10, 16, 17*
follow 40:*1*
followed 39:*19*
40:*8* 45:*11* 73:*25*
74:*1*
follower 36:*20*
Following 48:*19,*
*20* 89:*25* 90:*1*
111:*20* 116:*14, 25*
125:*1, 4* 129:*21*
follows 5:*4* 151:*13*
foot 16:*23*
footnotes 30:*3*
force 86:*15, 21*
90:*24, 25*
forces 86:*12* 110:*7*
foregoing 153:*10*
forget 63:*5* 149:*14*
forgot 84:*8*
form 4:*12* 11:*4*
25:*11* 36:*23* 47:*10*
76:*2* 86:*18* 88:*20*
89:*2*
formalities 4:*8, 10*
format 153:*13*
forming 13:*17*
formulate 55:*15*
forth 31:*13*
149:*13* 153:*9*
found 44:*18, 24*
62:*18, 21* 71:*24*
74:*8* 128:*23*
four 7:*25* 8:*20*
10:*10* 21:*23* 36:*25*
37:*9* 116:*7*
fracture 74:*11, 23,*
*24, 25* 75:*5, 6, 20,*
*24, 25* 82:*4* 84:*10,*
*11* 123:*7*
fractures 31:*22*
77:*3*
front 29:*22*
145:*12, 19, 22*
147:*8*
full 129:*2* 132:*9*
143:*10* 144:*7*
fully 102:*2*
function 124:*18*
126:*9*
fusions 12:*10, 16*

< G >
gain 77:*9*
gaps 116:*6*
gender 34:*9* 39:*8*
42:*15* 45:*13* 53:*22*

54:*7* 58:*21* 65:*15*
83:*10*
general 12:*1*
16:*22* 25:*16* 28:*13*
32:*18* 47:*3, 4, 14*
62:*14* 67:*3* 76:*14*
94:*19*
generally 8:*22* 9:*5*
35:*19* 36:*16* 40:*20*
43:*11* 46:*12, 23*
56:*2* 67:*2* 85:*2, 7*
generate 86:*12*
95:*18* 96:*8, 17*
97:*3* 99:*8* 107:*25*
135:*18* 146:*22*
generated 31:*22*
generates 71:*23*
generating 70:*21*
71:*4, 16* 78:*21*
generation 7:*15*
77:*20*
gentleman 23:*5*
getting 10:*9* 40:*6*
52:*13*
gist 50:*4* 57:*18*
62:*10* 68:*3*
give 18:*5* 21:*3*
25:*7* 73:*23* 120:*16*
137:*6* 138:*4* 143:*8*
given 14:*21* 39:*25*
88:*6* 151:*12*
globo 29:*2*
go 5:*8* 10:*8, 9*
23:*2* 24:*16, 21*
30:*1* 32:*6* 37:*13*
38:*4* 41:*10* 58:*19*
74:*20* 105:*9* 108:*7*
113:*8, 12* 114:*11*
118:*12* 120:*7*
123:*11* 124:*16, 20*
128:*22* 144:*18*
goes 67:*21* 100:*12*
126:*1*
going 5:*15* 19:*5*
25:*6* 26:*15* 27:*9*
29:*11* 30:*1, 5*
39:*21* 44:*1, 4*
50:*20* 52:*2, 9*
74:*20* 81:*25* 82:*24*
87:*17* 97:*17* 105:*9*
112:*11* 119:*16, 23*
122:*19* 132:*24*
150:*17* 152:*6*
good 66:*21* 90:*6*
112:*7, 9, 13* 113:*16,*
*18* 114:*17* 116:*20*
129:*8, 9* 144:*22*
grab 95:*2*

great 118:*22*
greater 114:*15*
grimace 136:*12*
grip 137:*5*
gripping 95:*16*
group 8:*5* 34:*24*
40:*7* 43:*1* 46:*1*
66:*2* 83:*19, 21, 22*
groups 34:*20, 23*
55:*2, 6* 62:*15*
guess 34:*25* 35:*5,*
*12, 13* 51:*23* 60:*6*
76:*17* 129:*9*
guessing 21:*22*
guidelines 149:*13,*
*18* 151:*13, 14*
153:*13*
Guides 31:*14*
32:*20* 35:*8* 92:*15*
guys 119:*20*

< H >
habitus 34:*11*
39:*12* 42:*20* 45:*18*
53:*18, 22* 54:*12, 20*
58:*25* 65:*20* 83:*12*
half 130:*3* 143:*5*
handlebar 95:*2*
hands 7:*19* 95:*21*
96:*12, 21*
happen 41:*7*
91:*11* 124:*21*
happened 23:*15*
happens 17:*11*
66:*20* 90:*24* 105:*3*
happy 25:*2* 119:*20*
hard 34:*18* 90:*21*
127:*3*
harm 150:*16*
harness 95:*8*
Hartvigsen 69:*10,*
*14, 16, 18*
hate 103:*8*
health 114:*17*
151:*21, 23* 152:*2*
healthy 44:*19*
45:*23, 24*
heard 103:*5* 133:*3*
heel 132:*12*
help 18:*18* 44:*1*
57:*1* 113:*15*
122:*19, 22* 133:*25*
140:*3*
hematoma 146:*19,*
*22, 25* 147:*4, 8*
hereinbefore 153:*9*
hereto 4:*4*
herniate 71:*22*

herniated 70:*16, 24*
71:*7, 17* 82:*10*
91:*5*
herniation 72:*16*
82:*1, 4, 5, 11, 21, 24*
86:*13*
herniations 82:*17,*
*19* 85:*17* 91:*5*
99:*18*
hiding 120:*23*
higher 47:*24*
hips 16:*23*
hired 5:*23, 25* 6:*5,*
*11*
history 17:*4* 104:*1,*
*4, 5, 9, 12, 15, 20*
105:*13, 14, 17, 22*
106:*2, 5* 107:*1, 3, 9*
114:*3, 11, 13, 25*
115:*13* 127:*6*
hit 105:*2* 147:*7*
hitting 105:*10*
hold 52:*16* 95:*2*
holding 96:*25*
hospital 113:*4*
hour 8:*22* 9:*2, 6*
50:*12* 56:*6* 75:*17*
76:*12, 15, 23* 87:*18*
hourly 9:*4*
Hours 7:*23, 25*
8:*20* 106:*13, 21, 25*
108:*3* 109:*1, 8*
human 50:*13*
humerus 74:*23*
75:*6*
hurt 141:*13, 14, 16*
142:*13* 145:*9*
hurting 15:*25*
90:*10* 118:*25*
hurts 133:*23*
Hyper-sensitivity
136:*23*
hypothetical 106:*9*
109:*14*
Hypothetically
106:*23* 109:*5, 9*

< I >
identification 5:*18*
7:*10* 29:*4, 15*
70:*13*
identifies 111:*8*
illness 64:*9* 73:*1*
image 57:*5*
imagine 51:*20*
imaging 57:*21*
62:*16*
immediate 104:*6,*
*10, 24* 105:*3, 7*

immediately 81:*19*
82:*2, 6, 7, 11* 83:*1*
104:*11* 105:*23*
108:*1* 121:*22*
126:*21*
impact 49:*12* 52:*9,*
*22* 53:*10* 56:*7*
75:*3, 4* 87:*9* 95:*17,*
*23* 108:*24*
impacts 53:*14* 56:*5*
impingement 18:*14*
impinges 71:*8*
important 34:*24*
importantly 48:*15*
improve 19:*8*
improvement
147:*17*
inappropriate
136:*10*
incidences 41:*6*
incident 116:*23*
117:*2, 3*
included 61:*12*
includes 7:*15*
35:*13*
including 64:*4*
67:*16* 99:*17*
income 11:*22, 24*
inconsistent 137:*6*
142:*17*
increase 92:*2, 17*
94:*12, 16*
increased 117:*18*
increasing 125:*12*
independent 7:*14*
86:*14*
INDEX 2:*7* 3:*1*
indicate 39:*22, 24*
75:*18*
indications 21:*10*
indirectly 136:*14*
137:*13*
individual 23:*21*
97:*22, 24* 100:*14*
individuals 7:*7*
17:*2* 44:*22* 47:*21*
54:*25* 55:*1* 70:*13*
inflammation 71:*25*
inflammatory
71:*21, 22, 24* 72:*5,*
*9, 10*
information 5:*8*
injection 15:*8, 11*
21:*13* 148:*1*
injections 17:*15*
21:*7* 121:*14, 16, 17*
injured 15:*25*
24:*8* 47:*24* 68:*12*
72:*15* 87:*23* 88:*2*

98:19  99:6, 8
108:17  112:24
113:3, 11  143:20,
21  145:6
**injuries**  24:18
31:19, 21  55:13
77:3  87:19  98:12
99:16  104:2  108:5
109:22  113:15
**injury**  24:25  31:6,
8, 14, 17  37:4  48:4,
11  50:15  51:24
52:21  55:10  56:11
60:12  61:2  63:23
74:12, 25  75:6, 20,
25  76:16, 17, 20
77:4  78:18  79:7
84:11  86:16  87:24
88:7  92:7, 15  93:8,
11, 13, 18  94:22
97:15  98:14  99:12,
21, 25  104:11, 23
105:4, 6  107:20
108:20, 23  110:1, 9
112:16  113:6, 19
118:8, 9  125:22
143:18, 23  146:24,
25
**injury-relatedness**
33:19  36:13
**inner**  143:5
**instance**  98:1
101:21  125:20
**insurance**  7:8, 13
9:16  10:17  11:1,
19  22:2  151:21, 23
152:3
**interchangeable**
128:20
**interest**  56:23
**interested**  153:16
**interleukin**  71:23
**international**
149:14, 16
**interpret**  59:24
**interrupt**  15:23
**interrupted**  72:15
**Intervention**  149:16
**interventional**
151:14
**interventionalist**
21:5  151:11, 13
**interventionist**  97:7
**interventions**
151:17
**intervertebral**
85:16
**intra-articular**
15:10  121:13

**investigating**
112:18  113:1
**investigation**  70:7
**involved**  11:12
17:11  23:25  24:15
72:4  77:14, 16
80:21, 25  81:4, 5
91:2  107:19, 24
110:8  111:18
113:11
**involves**  93:5
**involving**  5:22
14:25  27:6  119:2
**irritating**  71:6
**irritation**  71:18
72:1
**isolate**  133:5, 22
**issue**  23:7, 8  149:7,
11
**issued**  14:1  28:19
120:18
**its**  41:11  60:16

< J >

**JBJS**  40:19, 22
41:2
**Jefferson**  4:19
**job**  101:24  118:22
**Joint**  40:15  61:21
62:11, 14, 19, 22
63:2, 11, 14  64:17
66:22, 23, 25  67:24
68:6, 9, 17, 21  70:5
99:17, 18  100:5
121:14  122:4
132:21  133:2, 4, 7,
11, 13, 16, 19, 21
134:1, 5, 21  135:4,
6, 10, 19, 21, 23
146:4  151:15
**joints**  64:6  132:18
135:17  136:9
**JOSEPH**  1:1
**journal**  35:6
40:15, 17  43:6, 7
46:8  49:15  55:22
59:15  66:10  84:17,
19  85:12
**JR**  1:1
**JUDGE**  1:1
**July**  2:11  6:16
28:20  29:12, 14, 21
130:3  144:12
**JUSTICE**  1:1

< K >

**Kalichman**  61:21
62:1, 5  64:20, 21

66:8, 17  67:18
68:4, 14
**Kalichman's**  62:7
**KEVIN**  1:1  2:3
5:1  153:8
**kid**  108:9
**kidney**  75:1
**kind**  8:6  13:19
31:9  32:6  53:12
67:21  69:24  103:5
116:19  132:19
133:4  143:1
**knee**  8:25  88:1
90:8, 10, 11, 16, 20,
23, 24  93:6, 16, 17,
22, 24  94:2, 3
105:2, 10  115:4, 16
116:17, 25  122:22,
25  123:1, 3, 4, 8, 11,
17  124:2, 7, 11, 14,
25  125:7, 9, 13, 15,
22  126:2, 6, 10, 12,
15, 19, 24  144:13,
19
**knees**  16:22  93:4
94:8, 13  99:22
100:1  104:3, 17
105:16  106:17, 24
107:8, 12  109:7
114:20, 21  115:1,
14  116:13  117:17,
19  119:7  120:5
122:14, 15  123:2, 5,
13, 25  124:9, 13, 17,
19  125:25  126:8,
23  140:17  142:22
143:1, 6  144:16, 17
**knew**  80:19  141:8
**knock-knee**  142:25
**knot-knee**  124:10
**know**  5:7  6:8, 25
7:1, 23  9:20  10:2,
3, 18  11:6, 21  26:9
27:8  31:15  32:9,
12  33:5  34:8, 22
35:16, 17, 22  36:2,
9, 10, 15  38:7, 9, 10,
13, 16  39:6, 10, 12
40:8, 10, 25  41:14,
16, 17  42:1, 5, 6, 19,
21  43:8  44:10, 12,
14  45:4, 12, 17, 20
46:9  49:20, 21, 24
50:2  51:4, 5, 7, 8, 9,
11, 14, 17  52:7, 22,
25  53:5, 9  54:10,
12  55:4, 23  56:20
57:10, 11, 13, 15, 17,
25  58:1, 18, 21, 23,

25  60:9, 17  61:18
62:2, 3, 4, 6, 7, 9
63:18  64:20, 23, 24
65:1, 3, 4, 5, 8, 10,
11, 15, 17, 20, 23
66:12  69:15, 16, 19,
20, 22  71:12  72:13,
19, 22, 23  73:9, 12
75:10  81:7  83:6, 7,
10, 12, 15  84:22, 25
85:5, 7, 19, 20, 23,
25  86:1, 4, 15  87:5,
8  88:10, 13  92:21,
23  103:17  108:4
109:13  111:6
114:11  115:22
116:8  120:25
131:12  133:20
134:4, 5  135:6
139:9, 11  140:13
141:13  149:15
151:21
**knowing**  52:23
134:23
**knowledge**  21:9
32:4  43:22  86:23
**known**  138:13

< L >

**Lachman's**  143:8
**lack**  74:22  75:19
104:20
**Lacking**  93:18
130:23
**laminectomies**  12:8,
14
**Lancet**  69:24
**large**  69:25  148:15
**largely**  101:4
**larger**  8:5
**lateral**  143:5
145:16, 20
**latest**  152:5
**Law**  1:1  4:7
**laxity**  143:7, 11, 16,
17
**lay**  142:25
**laying**  142:6
**lead**  73:14  74:13
76:24  77:5  87:25
108:10, 20  139:3, 6
**leading**  104:14
**leads**  76:20
**leak**  71:17
**learn**  59:24  60:1
**learned**  72:10
**learning**  13:8
**led**  74:6  108:12

**left**  106:16  143:2
145:8
**leg**  132:15  136:25
137:1, 14  142:1
**legal**  99:2
**legs**  142:16
**lessening**  148:5
**lesser**  52:21
**lie**  30:20
**life**  58:17
**ligament**  31:22
**ligaments**  135:14
**light**  136:12, 23
141:11
**lightly**  136:11
**likelihood**  47:24
**limited**  28:14
73:18  144:10
**Line**  3:3  19:16
**list**  33:25
**listed**  28:18  49:4
145:4
**lists**  75:10
**literature**  57:5
60:20  95:5  101:6,
22  131:1  132:25
134:3  139:15
148:22  150:13
151:6  152:1
**litigation**  6:21
56:18  77:8, 16
**little**  11:25  74:20
96:9  105:18
109:17  143:8
**liver**  75:1
**load**  133:16, 21
134:1, 5
**loading**  133:4
134:13, 21, 24
**locking**  116:18
143:6
**lodge**  120:11
**long**  7:17  21:20
36:20  40:1  74:10,
23  75:4, 19, 24
77:4  84:10  150:15,
21
**longer**  117:23
125:5  126:9
144:18
**longitudinal**  37:16
39:17, 22
**long-term**  23:9
108:22
**look**  20:3  23:15
30:21  33:10, 12
38:15  39:5  40:17
41:25  42:8, 10, 24
43:2  45:7, 15  50:2,

6  51:13, 16, 19
54:17  56:24  59:6
61:9  62:12, 13
72:3, 8  75:15
78:14, 15, 16, 18
79:2, 4  81:7, 10
83:6  85:23  86:8
87:3  88:16  98:7,
22  100:13  103:7, 8
119:16, 20, 21
122:11  137:21
150:17
looked  34:13
44:17  45:23  48:9,
10  50:6, 7  56:10
58:15  66:4  70:2
73:24  80:17  83:24
looking  17:5
18:13  31:3  41:20
49:6  50:11  74:4
77:1  79:9  100:15,
16  103:6, 17
104:12, 19  117:2
129:13  137:20
144:15
looks  48:25  57:19
60:10  138:17
loose  143:16
looseness  143:13
lose  19:6
loss  18:21
lost  19:11
lot  33:17  96:1
123:19  151:23
LOUISIANA  1:1
4:20  153:7, 15
love  103:8
low  60:21  61:3
76:10, 22  87:1, 2, 5,
8, 13  107:12  109:7
116:3  131:10
148:13
low-back  61:22
64:9  68:1, 7  69:12
70:5  73:1  74:13,
18  77:15, 20
105:15  116:24
150:14
lower  56:12  104:3,
17  106:17, 24
132:3, 13, 16  135:3
148:9
low-speed  49:12
60:10  76:8, 13, 14
77:2  85:15  86:10
87:21  96:6  125:20
lumbar  12:12, 14,
16  13:14  17:23
18:2, 10  19:12

48:9, 11, 15, 17
59:8, 18, 21  62:12,
17  63:22  64:3, 12,
13, 14, 16  73:15, 18
74:15, 19  80:18
81:23  84:5  99:16,
18  100:5  110:8, 18
111:3  130:21, 23
131:10, 25  132:3, 9,
16, 20  133:15, 22
135:2, 3, 12  148:19
150:5  151:4, 8, 10
lumped  68:1
LUTKEWITTE
1:1
lying  139:21

< M >
M.D  30:17, 20
M.D./Ph.D  30:21
MAGISTRATE  1:1
main  123:1
making  22:21  36:2
male  34:10  39:10
42:15  45:14, 16
54:9  58:23  65:17
85:22
males  54:4  58:22
malingering  79:17
malpractice  22:7,
10  147:10, 12
150:9, 10, 11, 23
manage  125:5
management  97:12
manner  61:11
mark  5:15  7:4
marked  5:18  7:10
29:3, 15  142:24
markers  71:22
marry  137:23
match  20:4, 9
matched  17:13
MATHERNE  1:1
4:18  153:7, 25
matter  5:7  7:11
59:3  93:21  114:15
153:17
mean  8:12  11:21
16:7  38:24  55:12
68:17, 23  71:2
76:4  78:13  90:17
98:19  112:2, 10, 14
113:19, 24  118:7
123:7  124:6
128:11  129:22
142:11  147:21
152:4
meaningful  60:11

means  11:7, 14
26:9  74:10  91:17
110:20  111:2
118:4  129:24
130:6  139:19
measurable  80:6
measure  72:22
80:2
measures  71:11
mechanics  26:14
mechanism  78:18
79:7  88:6  93:19
125:22  143:22
medial  15:13, 21
121:21  143:4
150:1
mediated  63:15
127:13  135:22, 24
medical  7:14  8:5
22:7, 10  31:18
35:9, 13, 14, 15
36:18  59:25  60:1,
2  72:10  77:10
78:1  86:7  92:14
101:5  115:20, 21
116:4  121:3, 8, 10,
11  122:1, 10  127:6,
16  130:16, 25
131:18  132:25
148:18  150:6
152:1
medically  121:24
126:18
medicine  18:6
97:4, 10
medicines  17:7
member  14:24
15:1
membership  15:4
memory  29:10
37:23
meniscal  93:3, 22
94:6  117:17
meniscus  93:7, 11,
12, 16  94:4, 11
115:7
mention  46:16
mentioned  32:19
68:5  122:13
mere  69:3
met  73:10
method  31:5, 10
32:22  36:1, 4, 5, 17
98:22  101:17, 18
102:14  103:1, 22
133:10  148:12, 14
150:25  151:5
153:10

methods  32:21
middle-aged  109:20
mild  90:25  128:10
129:1, 7, 10, 12, 17
132:2
miles  50:12  56:5
75:16  76:12, 15, 23
87:18
military  54:5
mine  103:20
minimal  87:18
minor  64:8  72:25
74:9, 12, 21  75:2, 7,
15, 19, 22, 25  76:5,
7, 9  77:14, 19  84:9
94:2
minute  26:15
modality  19:4
moment  60:4
97:18  108:24
money  10:25  11:7,
22
months  6:18  13:3,
7  116:6, 7  130:3
147:19
MORGAN  1:1
morning  108:8
motion  129:2
134:17, 18, 19
143:6, 9  144:3, 23
motives  79:25
motor  26:12  27:6
50:8  56:19  61:3
75:12  76:8, 13
86:9, 10  87:21
95:4, 15  96:6
106:4  125:21
147:2
move  61:21  85:14
126:22  136:9
144:24
moved  144:24
MRI  17:12, 17
18:2  37:18  44:25
47:18  48:13, 14
59:20, 24  68:23
74:3, 5  80:18
81:19, 24  83:25
94:5  96:4  119:3, 6,
12, 16  120:6, 13
146:10
MRI'd  40:9  81:1,
6, 8
MRIs  17:10, 23
20:8  39:19  40:4, 6
47:1, 21  48:11
59:18  73:25  81:11
multiple  23:24
24:15  53:10

muscle  110:11
128:10  129:1
146:2, 11, 13, 21
muscles  128:5, 15
132:5
MVCs  60:10  77:2

< N >
Nakashima  44:3, 4,
9  46:19
name  5:6  44:2
49:11  57:4  72:3,
24
names  72:2, 7, 8
narrowing  94:2
natural  82:23
naturally  82:19
necessarily  13:4
54:6  88:10  96:10
103:10  107:16
113:24  134:12
137:7
necessary  17:5
24:20
neck  18:1, 15, 16,
22  19:2, 13, 20
41:11, 22  43:19
45:25  88:5  89:23,
25  90:2  104:2, 6,
10, 16  105:15, 22,
23  106:2, 3, 6, 11,
24  107:12  109:6,
23, 25  110:5, 13, 15,
19, 22  111:2, 12, 13,
15, 19  112:6
113:15, 23  114:4, 9,
14, 18  115:22
116:23  117:9, 12,
22  118:11  120:5
127:18, 19  128:15,
23  129:8, 15, 17, 18,
21, 24  130:10, 24
131:22  147:11, 18,
19  148:5, 10
149:18, 20
necks  119:7
need  40:5  48:6
66:2  92:6, 11
113:8  118:24
125:15  126:12, 19
148:24  151:7
needed  17:7  86:12
needs  126:10
150:20
negative  132:15
137:18, 19
Neither  103:9
142:13

Dr. Kevin Watson

nerve 15:21, 24 16:3, 10, 14 17:18 18:11, 14 70:18, 22, 25 71:6, 8, 13, 18 72:1, 14, 15 127:11, 18 129:18, 21, 22, 24 130:4, 6, 9, 15, 24 131:4, 7, 13, 17, 23 142:4 147:11, 19, 23 148:4, 9, 19 149:4, 8, 9, 10, 12, 17, 22, 24 150:3, 5 151:8
neuroradiologist 59:22
Neuroradiologists 59:16
Neuroradiology 59:16, 19, 21, 23
neurotomy 15:17 16:9
never 21:12 55:12 115:1 118:1, 12, 17 149:23
New 1:1 9:12
newsletter 32:20
Newton 86:21
night 108:8
nine 6:18 22:19 23:22 24:3, 13 50:7
nine-page 23:3, 18 24:5, 17, 22
non-organic 132:11 135:25 136:2, 3, 4, 7, 13, 14, 17, 19 137:4, 7, 20, 22 138:7, 10, 13, 16 139:5, 13 140:18 141:2
non-specific 110:19 146:1, 12
non-traumatic 68:11
Nordin 41:10, 13 43:16, 24 46:17 48:21
normal 116:3 144:7, 25
note 63:20
notify 52:3, 6
not-specific 146:18
number 29:2 32:9 38:13, 16 45:2 51:11 53:23 65:5, 17, 18 80:11 83:3 87:3 88:8
numbness 71:10

numerous 33:24 58:15

< O >
oath 4:21
obesity 34:3
Object 11:4 36:23 76:2 86:18 88:20 89:2
objection 37:21 102:21 120:11
objections 4:12 47:10
objective 17:12 20:3, 8 31:5, 9 71:11, 14 78:17 79:5 89:11 91:20, 21 92:6 98:13, 15, 17, 21, 24 101:5, 22 102:9, 10, 12, 13, 24, 25 110:4 111:7 133:9 137:24 138:1, 3, 20 148:6 152:5
objectively 71:12 72:19, 22 80:7 103:23
obviously 9:14 19:25 20:12 62:19 115:7
occasions 25:13, 15
occur 46:25 142:20 147:4
occurred 147:9
Ochsner 150:6
October 6:19 99:6, 11, 15 104:18 107:2 109:13 110:23 117:1 124:1, 3 125:1, 4, 14 127:9
off-and-on 116:2
offer 6:10 18:6 19:3, 17
offered 25:15, 19, 20, 23 124:14, 25
offering 28:4, 8
offhand 6:25 34:8 39:7, 11, 14 83:9 87:4, 7
office 8:3 20:15 90:9 124:12
officer 107:17 108:16, 25 112:19 113:1 153:7
offices 1:1
officiated 4:20
Okay 5:11 8:14 9:3 10:5 29:5, 25

30:6, 7 37:15 49:8 69:11, 13 72:2 105:8
once 21:18
ongoing 139:1
onset 108:3
operate 20:13, 14
opinion 21:4 25:8, 20, 23 46:12 47:20 50:21, 22 63:13 66:7 70:16 76:14 77:10, 18 78:1, 7 79:17, 19 81:11, 13, 17 83:20 87:22 88:2 96:14 98:2, 5, 6, 7, 10, 11 99:11, 15, 20, 23, 24 100:3, 20 101:4, 11, 15, 20, 21, 23 102:11, 13, 16, 23 103:11, 13, 16, 20 106:11 110:21 121:7 122:21 125:14 126:11 131:17 133:6 144:12
opinions 6:10 27:16 28:4, 8 29:18 55:16 97:24 100:18, 24, 25 101:7, 8, 14 102:1, 6 103:5, 9, 21 153:15
opportunity 120:1
Opposing 99:2
order 17:15
organ 74:12, 25 75:6, 20, 25 77:4 84:11
organic 139:2
organization 14:25 15:5
original 153:3, 4
Orleans 1:1 21:18
ORTHOPAEDIC 1:1
Orthopedic 5:21 8:24 12:2 13:23 14:2, 4, 5 15:2 25:17 26:11 27:4 28:13 35:18 36:18 37:2, 12 40:17 122:16
orthopedics 13:10 16:20, 22 27:17 31:20, 21
orthopedist 5:20 9:7
osteoarthritis 61:22 122:15

outcome 56:15 153:17
outcomes 49:14
outer 143:5
outside 74:14 77:5 84:6
overall 53:23
over-complaining 139:20
over-report 138:14
over-reporting 138:14 139:7, 20
overview 32:18
overweight 109:21

< P >
Page 3:3 29:24 49:2 50:7, 24 128:10 153:4
pages 22:18, 19 23:22 24:3, 13 49:1, 4 153:10
paid 6:21 9:1 140:15
pain 15:24 16:24 17:2, 16 18:1, 9, 15, 16, 18 19:2, 5, 7, 12, 15, 21 41:11, 22 43:19 45:25 55:13 57:23 61:22 62:23 63:7, 10, 12, 15, 23 64:11, 13 68:1, 7, 9, 12 70:6, 10, 14, 17, 19, 21, 25 71:4, 6, 16 72:17 73:15, 16 74:7, 14, 18 76:21, 24 77:5, 15, 20, 25 78:5, 6, 10, 12, 22, 25 79:6, 8, 13, 16, 23 80:1, 2, 3, 4, 6 81:9 87:25 88:1, 5, 6, 18, 23, 25 89:5, 9, 11, 13, 16, 17, 19, 23, 25 90:2, 3, 12, 14, 17, 18 91:3 92:2 97:12 98:16 99:9 101:2, 3 104:6, 10, 11, 14, 16, 22, 24 105:3, 6, 15 106:2, 3, 11 107:18, 25 108:11, 21, 23 109:4, 6 110:2, 5, 19 111:2, 8, 13, 16, 17, 20 112:6, 18, 20 114:4, 5, 14 115:17 116:2 117:10, 12, 22 118:2, 4, 12, 15, 16,

17, 18, 19, 20 122:4, 22 123:2, 17, 19 124:7 125:6, 13 126:2, 6 127:13 128:13, 16, 19 129:9, 10, 12, 14, 17, 24 130:7, 10 131:8, 22 132:9, 10 133:2, 11, 13 135:5, 7, 10, 19, 22, 24 137:14 140:22, 24 141:7, 8, 9 142:16 145:1, 14 146:2, 3, 4, 8 147:21, 24 148:5 149:20 150:14 151:10, 15
painting 103:6, 7
palpate 128:14 135:12 136:10
palpated 128:13
palpating 135:13, 16
palpation 132:2, 16 133:2
PAMELA 1:1 2:1
paper 57:18
paraspinal 128:4, 10 129:1 132:4
Parish 4:19 21:18, 19
part 4:15 8:4, 15, 23 23:24 50:23 63:1 67:22, 23, 25 78:15 83:23 141:2
participant 52:12
participants 31:25 32:9, 12 33:2, 15, 22 34:6, 9, 12 38:13, 16, 19 39:4, 8, 13 41:24 42:3, 9, 13, 16, 22 45:2, 5, 8, 13, 18, 21 51:11, 14, 18 52:1 53:8 54:8, 13 57:24 58:1, 11, 14, 21 59:1 65:5, 8, 11, 15, 21, 23 75:9 80:11, 13, 25 81:5 83:3, 5, 8, 10, 13, 15 88:8
participated 12:21 46:9 55:23
particular 5:22 22:12 23:19 34:19 55:16 119:2
particularly 95:19
parties 4:4 153:16
partner 17:20

parts 23:24 24:15
64:18 73:20
116:16 127:25
passed 137:16
139:17
passenger 26:13
passengers 27:6
passive 144:23
pathology 17:6
patient 17:14
19:20 20:5, 22, 24
23:12 24:17, 23
25:1 68:23 89:13
94:20 100:13
136:8 138:8
140:14 150:17, 19,
22 151:1, 12
patients 8:17 9:9,
12 13:17 16:24
20:20 24:16 25:4,
5 31:10 32:23
38:21, 22 39:18
40:4, 9 41:20
43:18 44:17, 19, 22
46:25 48:10, 15
52:8 57:22 58:3, 9,
16 59:5 62:21
63:6, 8, 21 64:12
68:11 73:17, 24, 25
74:15 77:13, 15
82:3 83:24 84:14
88:22 89:4 94:1
95:25 107:24
112:20 117:5, 9, 14,
16, 23 118:1, 2, 14,
15, 19 122:18
131:3, 4, 16 134:15
136:5 138:12
143:24 148:23
150:16
patient's 47:19
pay 6:24 51:22
pays 151:21, 23
152:3
peer 35:1, 7, 8, 23
40:12, 14, 18 43:3
46:5 55:19, 23
59:12, 14 66:8
84:15
peer-reviewed 36:7
47:6
peers 35:4
pelvic 75:25 84:11
pelvis 74:11, 24
75:5, 20 77:4
people 39:25 54:5
77:21 80:21 85:4
108:4, 6 111:18
113:10 117:18

118:11, 25 123:1
133:13, 24 142:25
143:17
percent 44:23
46:22 82:8, 14
94:4, 10 130:12
139:14
percentage 62:18
82:16
percentages 46:21
perform 8:13 9:6
12:6, 8, 10, 12, 14,
16 17:4, 20 20:2
23:17 24:5 56:7
134:14 151:3
performance 21:10
149:22 150:2
performed 15:8, 10,
13 16:14 21:12
22:1, 16 23:6 32:2,
5, 22 51:12 150:5
performing 10:21,
25 11:17 121:21,
22, 25 147:11
149:24
performs 148:11
149:17
period 12:25 13:3,
6 40:1 114:15
permanately 126:3
permanent 91:17,
21 92:19 112:11
125:17, 18 126:8
permanently
112:14
persistence 78:21
person 23:1 67:5,
8, 11 78:8, 9 89:17,
23 91:23 93:14
95:22 96:12
107:19 112:10, 16,
22, 24 113:3, 6, 15,
18 122:25 123:4,
11, 16 138:11
139:3
personal 31:8
153:11
personally 10:3
Ph.D 30:16, 19, 21
photographic
29:10 37:23
physical 17:4, 7
18:7, 12, 17 22:16
97:4, 9, 23 113:14
128:8 133:1, 12
135:9, 11, 24 138:2,
15, 19, 21 139:22
151:20
physically 7:19

physician 6:3 22:6
23:1 24:7, 21
30:15 38:8, 10
41:15 44:11 49:23
50:1 51:7 57:14
62:5, 8 65:1 69:18,
20 73:4, 7 85:24
86:2 97:5 102:9
107:15, 16 115:2,
18 124:6 137:21
151:11
physicians 13:9
22:5 36:11 97:20,
21 100:13 103:5
105:25 115:24
116:15 119:14, 18
120:4 121:4, 7
127:8 133:3
134:21
physiologic 91:11
143:17
picked 45:24
picture 78:16
pinch 141:23, 24
pinched 71:13
pinching 141:22
place 131:8
placebo 147:24, 25
151:5, 20
PLAINTIFF 1:1
7:12 24:8
plans 13:18
played 125:12
pleasant 139:25
plus 129:5 132:14
143:7
point 18:25 59:6
72:20 85:12 107:5,
23 111:9 116:22
125:5 126:9 145:8
police 107:17
108:16, 24 112:18
113:1
poorly 81:15
popped 61:14
population 57:20
61:23 62:15 63:2
66:1, 6 83:18
populations 57:7
portion 145:11, 12
position 120:17
142:7
positive 137:18
possibilities 148:3
possible 55:1
70:15 92:4 93:2
113:2, 5 148:2, 6
posterior 44:19

potential 8:16
52:18, 20, 21 72:18
77:8, 22
Poydras 1:1
practice 8:24
11:25 12:1, 2
19:19, 23 135:20
practices 13:10
practitioner 151:1
practitioners
150:15
predict 69:1
predisposes 63:14
preexisted 110:23
preexistence 48:2
preexisting 32:13
33:16, 18, 21 38:20,
22, 25 42:4 45:6
51:15 53:18 58:2,
5, 6 64:12 65:9
80:13, 17, 19 83:3
90:15 91:14, 18, 23
92:20 93:24 94:1,
7 107:7 110:21
111:11 113:22
prepared 22:13
29:13, 17 153:11,
13
prerequisite 151:3
prerequisites
123:10
prescribe 17:6
prescriptions 18:17
presence 41:22
44:24 47:18 62:13
63:11 66:4 68:21
69:3, 6 74:6 115:6
present 67:14
82:5 108:1 109:1
139:2, 5
presentation
104:21, 25 110:6
presentations 14:21
presented 18:1
104:7 126:20
press 132:23
136:11
pressed 145:1
pretend 140:20
pretended 141:3
pretty 34:1
prevalence 63:1
67:24 70:5
previous 34:3
46:16 59:7
previously 8:4
68:5 70:3 92:24
primarily 22:21

prior 64:2 74:16
80:18 96:2 101:2
probability 99:1, 3
probable 144:1
148:4
Probably 9:24
11:11 18:20 36:25
40:16 41:5 42:14
52:21 59:4 82:13
99:5, 7 146:15
problem 24:25
25:10 78:15
114:12 146:6, 7
problems 17:13
18:11 70:8 73:14
107:7, 21 137:1
145:25
Procedure 4:6
15:15 16:2, 3, 15
21:13 127:18
130:24 153:15
procedures 15:18
21:8 121:25
127:11 131:5, 7
150:4 151:9, 22
process 39:15
64:18 82:23
processes 71:21
132:20 135:14, 15
produce 77:2
producing 94:22
professional 14:24
15:4
progressed 126:15
prohibition 153:14
prompted 73:12
prone 94:6 142:6
pronunciation 57:2
proper 103:24
130:19 131:2
properly 131:2
proportion 138:22
proposition 64:3
67:3 68:8, 16 69:8,
23
prospective 37:16
protocol 17:1
18:24 27:15
protrusion 43:18
44:5
protrusions 44:20,
23 46:24 70:9
prove 66:23 70:21
71:7 91:20 92:5
96:4 134:3 135:11
proven 19:14 71:1
147:14 150:12, 18
151:19
provide 28:21

Dr. Kevin Watson

provided 2:*13*
120:*13* 121:*6*
providers 116:*5*
providing 22:*8*
provoked 142:*15*
Prytania 1:*1*
Psychology 30:*23,*
*24*
publication 30:*9*
61:*10* 66:*7, 8*
69:*25* 70:*1*
publications 14:*16*
22:*20*
published 31:*16*
35:*6, 23* 49:*14*
56:*20*
PubMed 60:*19*
61:*1, 16*
pure 104:*12*
purpose 54:*23*
84:*13*
purposes 4:*7*
put 26:*10* 27:*4*
37:*11* 78:*19*
109:*19*
putting 7:*19*

< Q >
quantify 80:*7*
question 4:*13* 9:*3*
23:*17* 24:*4, 5, 10*
26:*25* 27:*8* 43:*24*
46:*18* 47:*7* 60:*13,*
*14* 61:*8* 68:*13*
84:*21* 91:*25* 96:*11,*
*12* 99:*4* 101:*9, 10*
102:*4* 105:*12, 19*
119:*15* 138:*24*
questioned 56:*15*
questions 20:*19*
30:*6* 152:*7, 9*
quickly 126:*25*
quite 24:*4, 14*
148:*2*
quits 152:*6*
quote 25:*4* 86:*20*
quoted 34:*5, 17*
52:*7* 78:*2* 79:*10*
95:*14* 98:*8*
quotes 32:*15*
quoting 32:*22*

< R >
R.S 153:*9*
radiating 111:*4*
142:*16*
radicular 17:*8, 16*
18:*10*

radicular-type
142:*3*
radiofrequency
15:*16* 121:*23*
150:*3*
radiographs 17:*5*
38:*25*
radiological 67:*4*
radiologist 119:*18*
120:*3*
raise 136:*25* 137:*1,*
*14*
raises 132:*15*
raising 142:*1*
Ramirez 20:*16, 22*
random 34:*14*
39:*15, 23*
randomize 39:*20*
40:*3*
randomized 34:*18*
148:*14*
randomly 42:*22*
45:*22, 24* 54:*15*
65:*24, 25* 83:*16, 17*
range 83:*7* 129:*2*
134:*17, 18, 19*
143:*6, 9* 144:*3, 23*
rate 9:*4, 10, 14*
rational 103:*15*
reach 95:*1*
read 33:*4, 9, 11*
57:*7*
reading 4:*8* 7:*18*
100:*8*
ready 52:*13*
real 49:*13* 50:*14,*
*17, 18* 56:*10, 11, 15*
86:*8* 108:*4* 132:*22*
really 18:*25* 39:*20*
46:*3* 83:*21* 147:*14*
148:*25* 149:*11*
150:*18*
rear 49:*12* 52:*9*
53:*10, 13* 56:*7*
rear-end 50:*8*
52:*13* 56:*12* 60:*10,*
*21* 61:*3* 95:*4, 15*
96:*6, 20* 125:*21*
147:*2*
rear-ended 52:*2*
95:*21* 96:*13*
reason 80:*5* 90:*14*
120:*8* 123:*1*
139:*24*
reasonable 72:*13*
121:*7, 9, 11, 20*
122:*1, 6, 10* 130:*16,*
*19* 131:*18* 151:*9*

reasons 79:*15, 16*
recognizes 14:*1*
recollection 109:*16*
recommend 18:*20*
148:*17, 19*
recommendation
19:*10*
recommendations
6:*13*
recommended
122:*18*
recommends 152:*1*
reconstruction
26:*2, 8, 17, 23*
27:*20* 28:*6*
reconstructionist
25:*21* 27:*25*
record 6:*10* 7:*15*
27:*2* 92:*11* 115:*21*
116:*4* 151:*7*
recorded 74:*3*
records 22:*17*
115:*20* 121:*3, 5*
127:*16* 129:*14*
144:*15*
recover 117:*24*
118:*1, 9*
recovering 118:*4, 8*
recovers 118:*17*
recovery 23:*8*
118:*7*
reduce 18:*18*
refer 16:*2* 17:*20*
19:*22* 20:*6, 11, 22*
22:*20* 98:*7*
reference 33:*13*
70:*11, 20*
referenced 29:*7*
32:*8*
References 30:*4, 5*
referencing 32:*3*
referring 136:*17,*
*18*
reflexes 129:*5, 6*
132:*14*
regard 28:*4*
103:*12* 117:*21*
140:*18*
Regarding 60:*20*
regardless 82:*19*
125:*10*
region 71:*25*
145:*20*
rehabilitation 97:*5,*
*10*
relate 104:*1, 16*
105:*14* 106:*5, 12*
107:*1, 5, 10, 11*

109:*11* 110:*5, 14*
127:*6*
related 28:*8* 29:*19*
31:*6* 61:*13* 104:*5*
153:*16*
relating 81:*20*
relationships
153:*14*
relative 29:*18*
reliable 89:*21*
relied 32:*25* 33:*1,*
*8, 14* 55:*15*
relies 50:*22*
rely 138:*2*
relying 101:*18*
remember 13:*1*
23:*14, 16* 24:*11*
33:*6* 39:*16* 45:*12*
56:*25* 61:*5* 80:*12*
87:*4, 6* 109:*18*
140:*7*
rendering 27:*16*
repeated 74:*3*
replace 124:*19*
replacement 9:*1*
122:*23, 25* 123:*2, 4,*
*12, 17* 124:*2, 14, 25*
125:*7, 9, 15* 126:*10,*
*12, 16, 19, 25*
144:*14, 19*
reply 141:*16*
report 2:*11* 7:*21*
22:*13, 14* 28:*19*
29:*8, 22, 13, 14, 17,*
*21* 47:*6* 48:*16*
50:*24* 87:*15* 98:*9*
100:*9* 107:*17*
108:*15, 24* 112:*17,*
*21, 25* 116:*15*
119:*14* 120:*7, 8, 18,*
*24* 127:*21* 136:*16*
141:*9* 144:*16*
REPORTED 1:*1*
87:*16, 17, 19*
107:*14* 109:*9*
114:*20* 115:*24*
116:*13* 128:*11, 13*
129:*17* 141:*7*
153:*10*
Reporter 1:*1* 2:*14*
4:*19* 5:*3* 28:*22*
153:*7*
REPORTER'S
153:*1*
reporting 127:*17*
129:*14* 141:*8*
153:*10*

reports 7:*16* 8:*13*
50:*15* 116:*2* 119:*4,*
*12* 120:*9* 128:*9*
represent 5:*6*
representing 23:*11*
represents 6:*1*
requested 120:*14*
require 83:*19*
required 86:*15*
153:*4, 13*
researched 60:*19*
reserved 4:*14*
residency 12:*18, 19,*
*23* 13:*8, 15* 60:*2*
resident 13:*13*
residual 115:*16*
resolved 113:*20*
resource 148:*18*
responding 17:*9*
response 27:*6*
101:*9* 134:*24*
136:*11* 142:*14*
responses 60:*22*
responsible 20:*10*
77:*19* 78:*10*
116:*23*
responsiveness 4:*13*
restraint 95:*7*
restricted 144:*4*
result 92:*3* 95:*6*
106:*4* 109:*4, 6*
110:*10*
results 53:*16, 19*
58:*4* 61:*13* 142:*9*
returns 92:*18*
revealed 144:*21*
review 7:*15* 36:*1,*
*3* 49:*12* 53:*10*
55:*24* 57:*5* 59:*14,*
*18* 69:*24* 88:*11*
115:*20* 119:*3, 6*
121:*3, 4* 122:*9*
127:*16* 128:*1*
reviewed 35:*2, 4, 7,*
*8, 10, 23* 40:*12, 14,*
*18* 41:*1* 43:*3* 46:*5,*
*7* 55:*19* 59:*12*
66:*8* 84:*15* 88:*14*
98:*9* 119:*4* 120:*6*
reviewing 57:*12*
reviews 53:*12*
148:*16*
RFA 16:*9*
RFAs 150:*20*
rhizotomy 15:*16*
16:*9*
Right 10:*19* 12:*24*
13:*15, 16* 16:*2*
21:*13* 26:*16* 44:*7*

47:23  49:9  52:4
60:14  63:18  67:19,
20  78:16  98:3
100:1, 15, 20
101:11, 25  102:4, 9,
19  103:10  104:2,
17  105:15  106:16
108:12  111:7
112:11  114:20
115:2, 11  116:12,
24  120:6  127:22
129:8  130:4
131:20  134:16
136:1  139:17
141:5  143:3  145:3,
4, 9  146:9
**risk**  51:24  60:11
77:24  78:4, 5, 11
79:10, 12, 14
150:22
**risks**  151:2, 12
**Rodriguez**  99:14
100:21  101:12
102:17
**role**  125:12
**rolled**  108:7
**room**  105:10
108:1, 5  109:2
**root**  71:18
**rotating**  140:20
**rotation**  12:23
13:2, 7  93:18
132:9  133:25
134:8, 11, 17
136:21
**rotator**  23:6  94:17,
22  95:6, 8, 13, 18,
23, 25  96:3, 8, 15,
17, 22  97:3  144:25
145:22
**roughly**  8:20
**routinely**  56:7
148:22
**rubbed**  141:12
**rule**  47:4  135:21,
23  147:5
**Rules**  4:6  153:13,
15
**running**  36:3
**rush**  108:5  113:4
**RUSSO**  1:1

**< S >**
**safely**  50:10
**safety**  95:7
**sat**  90:12, 14
**save**  4:12
**saw**  6:15  44:19
66:5  109:10

115:25  127:24
129:13  130:2
146:13  147:20
**saying**  61:7, 15, 16
66:24  69:3  76:17
77:23  96:20  99:4
100:20, 25  101:10
108:14
**says**  31:4  61:2
64:8  77:12, 13
80:5
**scan**  62:18  66:5,
22  68:22  119:11
**scene**  87:20
104:21  107:18, 21
108:16
**SCHAUMBURG**
1:1
**schedule**  2:9  7:1,
4, 9  8:3  10:2
**school**  31:18
59:25  60:1, 2
72:10
**sciatic**  142:4
**science**  72:13, 21,
23
**scientific**  35:20
40:20  43:11, 23
46:13  56:2  85:2, 8
**scientist**  102:8
**screen**  42:20
**screened**  32:12, 17
33:15, 22  38:19
42:3, 7  45:5  51:15
54:19  58:1  65:8
80:13
**seal**  `153:4`
**sealing**  4:10
**search**  60:18, 19,
20, 23  61:1, 8, 12,
17
**seat**  93:10  94:21
95:1, 22  96:22
**seated**  136:25
142:7, 8
**second**  37:14
67:22, 24  68:3, 14
**Secondly**  24:12
**section**  54:24
**see**  17:3  18:5
30:8, 9  49:1  56:24
60:22, 25  61:19
75:15  81:1  82:21
98:9  111:1, 21
113:7, 10  115:17
133:23  136:8
138:7, 10, 18
140:14, 21  141:7,

13  142:1, 2
**seeing**  8:17  61:5
**seek**  116:9
**seeking**  78:8, 9
79:1
**seen**  47:15  52:25
57:22  67:4  115:3
132:11  133:24
134:7  136:17
**selected**  39:18
42:22  45:21  54:15,
18  58:11  65:24, 25
83:16, 17  131:2
**selection**  34:14
39:15  54:23
**self-treat**  113:7
**self-treated**  114:22
**self-treating**  124:8
**send**  20:25  21:1, 3
131:4, 15
**sense**  55:14  129:9
**sensitivity**  128:4, 9,
11, 14, 17, 18, 25
129:7
**separate**  67:18, 20
**serious**  64:8  72:25
74:17
**set**  31:13  36:11
149:13  153:9
**setting**  74:14  77:6,
17  84:7
**seven**  22:19  116:6
**severe**  43:18
122:15  125:6
126:22  129:10
143:25  144:16
**severity**  44:6
**shortly**  90:1
116:13
**shoulder**  88:1
95:9  99:22  100:1
104:3, 17  105:15
106:16  114:5, 14
116:12, 24  117:14
118:15, 16, 18, 19,
24  145:1, 9, 10, 11,
25  146:4, 8, 9
147:1, 7, 8
**shoulders**  94:18
106:24  107:12
109:7  114:18
119:7  120:5
144:20, 22
**show**  41:5  46:20
47:22  50:16  53:5,
17  61:16  76:18, 19
81:18, 23  82:2
89:10  91:19  94:9
130:18  132:1

**showed**  48:12
63:1, 20  66:19
79:11  142:23
143:11  144:22
**shower**  115:5, 10,
15
**showing**  60:11
135:2  146:10
**shown**  77:5  86:11
95:18  96:7  121:14
124:12  138:12
148:16  149:1
**shows**  17:12, 17
43:17  53:1  63:18
133:10  152:2
**shy**  143:9  144:7
**side**  130:13  132:4
145:21
**sign**  136:13, 15
**signature**  153:3
**significance**  146:9
**significant**  8:12
17:17  48:14
107:24  124:7
126:23
**signing**  4:8
**signs**  132:11
136:1, 2, 3, 17, 20
137:4, 7, 22  138:13
139:2, 5
**Similar**  9:4  53:23
57:19  59:7  70:2
97:23  117:5
**simplifying**  68:19
**simulated**  136:20,
21
**simulation**  86:9
**single**  121:24
**sir**  5:12, 14  80:10
**sit**  33:5, 6  38:17
39:6  90:10, 21
**sitting**  56:17
90:19  92:3
**six**  13:3, 7
**six-month**  12:22
13:14
**slight**  41:5  134:8
**slip**  115:10, 15
**slipped**  115:4
**small**  110:10
147:15
**smoking**  34:2
**societies**  36:19
**Society**  149:16
**soon**  81:8, 22
106:8, 10  107:11,
13
**sorry**  8:21  9:6

63:4
**sought**  4:16
**source**  19:1  70:9
111:6, 8
**speak**  37:24  79:25
**specialist**  16:17
19:23  20:15
**specialization**  16:19
**specialties**  35:15
**specialty**  30:22
35:10, 14  38:11
41:17  44:13  49:25
51:9  57:16  62:7
65:3  69:21  73:6
86:1
**specific**  34:15, 18
35:16  39:15, 23
40:11  42:23, 24
72:3, 8  116:22
117:3  131:9  136:6
146:5
**specifically**  4:9, 11
15:5  39:5  42:2
45:21  48:9  51:13
52:7  54:16  64:17
65:24  75:16  83:16
95:14  121:13
140:7
**speed**  56:12  76:10,
22  87:1, 5, 8, 13
**spelling**  57:2
**spent**  13:4
**spinal**  15:8  19:23
20:15  21:7, 8, 12,
13  57:6  64:18
69:1  87:25  97:14
**spine**  12:4, 21
13:2, 7, 12, 13, 21
14:7, 10, 13, 17, 19,
21, 22, 25  15:2, 5
16:17, 22, 24  17:2,
10, 20  18:10  19:25
20:12, 13, 17, 20, 25
21:5  37:17  38:23
40:9  41:7, 9  43:6,
7  46:8  47:23
48:10, 11  49:15
55:22  59:8, 21
62:12, 17  63:22
64:4  66:10  67:8,
11  68:18  73:7, 15,
18  77:4  81:23
82:4, 17  84:17, 19
85:12  88:18, 23, 25
89:5  91:3, 16, 24
97:7  99:12  100:6
110:8  111:3
117:12  119:12
128:3, 5, 8, 24

129:3  130:18, 21, 23  131:8, 10, 11, 25  132:3, 10, 17, 20, 23  133:22  134:9  135:2, 3, 13  141:3, 5  148:20  149:16  151:5, 14
spines  58:4  133:15  134:10
spinus  132:19  135:13, 15
spleen  75:1
sprain  108:12  143:14, 15
sprains  109:24
St  21:19
stand  68:8, 15  73:22
standard  70:11
standing  37:21
standpoint  114:8, 16, 19
start  32:13  39:3  58:19  71:9  80:18  89:18, 24
started  28:17  45:10
starting  44:18
starts  90:10
State  4:20  6:1  153:7
statement  50:22  51:25  114:1, 23  123:16, 23  127:14  129:15
STATES  1:1  2:1  6:5
statute  153:13
stays  18:9
steering  95:11, 16, 21  96:13, 21  97:1  147:7
stenotype  153:10
steroid  17:15
stiffness  123:20
stint  13:14
stipulated  4:3
stood  44:15
stop  5:10  118:25
straight  132:15  136:25  137:1, 14  142:1
strain  110:10
strains  76:19  109:23
Street  1:1
strength  129:4  132:13  137:5  144:25

strengthen  18:21  19:7
stretching  142:4  143:12, 14
strict  147:15  149:2, 3  150:19
strike  8:18  25:13, 19  28:11  50:19  81:11, 15  97:20  110:20
strong  147:25
strongly  122:17  151:25
stuck  19:5
studied  31:25  41:20  54:3  67:6  83:13  151:16
studies  20:3, 9  25:4  32:4, 10, 23, 25  33:3, 8, 9, 12, 14, 15, 22  34:5, 7, 14, 21, 24  36:6, 7  37:24  43:14, 15, 23  46:18, 20  47:5, 8  49:13  50:12  52:5, 6  53:11  54:7, 8, 13  55:3  57:19  59:25  60:7, 9  66:16  70:2  76:18  77:1  79:10  88:12, 13  95:3, 14  98:14  100:16  101:22  102:10, 13, 25  103:18  130:17  131:1, 12  147:16  148:15, 24  149:1
study  31:2, 24  32:2  33:9  34:16, 17  35:7, 11, 19, 25  36:8, 12  37:13, 17  38:14, 15, 17  39:13, 17  40:7, 11  41:19, 24, 25  42:8, 11, 24  43:1, 2, 16, 17, 24  44:15  45:3, 5, 7, 9, 19  46:1, 14, 17, 19  48:5, 8  49:11  50:4, 5  51:12, 16, 18  52:1, 3, 25  53:5, 8, 15, 16  55:5, 19  56:1, 16, 20  57:18, 24  59:6, 7  60:3, 5, 10  63:1, 18, 20  64:2, 7  65:6  66:3, 14, 17, 18  67:5  68:3, 4, 8, 14, 15, 22  72:25  73:12, 18, 22  74:3  75:2, 9, 11, 18, 21  76:18, 19  77:12  79:5  80:8, 18, 21

81:7, 10  83:19, 23  84:8, 12, 13, 15, 21, 24  85:1, 5, 7  86:6  88:9, 11  91:20  98:18  111:7  133:9  152:5
studying  34:25  55:9  56:21
sub-board  14:6
Subject  38:2, 4
subjected  67:12
subjective  17:13  20:4, 9  78:17  80:1  89:9  90:5  94:14  101:1, 19  103:18  104:8, 13, 19  107:4, 9  110:4  137:23, 25  138:3, 5, 18, 21, 24
subjects  45:23, 25
subpoena  120:22
Subscapularis  145:23  146:6, 7, 11, 21
subscribe  78:7
subsequent  80:22  81:6
subsequently  109:2
sub-specialty  97:12, 14
substantial  10:24  11:6, 13, 19, 22
successful  129:19, 22
sued  22:9
suggesting  120:20, 21, 23
Suite  1:1
summarize  79:3
summary  31:1
supervision  153:11
supine  137:1  142:8
support  43:14  95:5  98:21  102:10, 13  131:2  139:15  148:22
suppose  21:2
supposedly  151:16
supraspinatus  95:19  145:15, 16, 17, 20
Sure  11:16  33:11  34:16  42:5  54:9, 19  56:9  85:4  105:1  119:24
surgeon  5:21  20:12, 13
surgeons  14:22  15:2, 3  19:25  26:11  27:5  35:18

36:18  37:2, 12  122:17
surgeries  12:6, 21
Surgery  9:13  12:4, 12  13:7, 12, 13, 16, 24  14:3, 4, 5, 7, 10, 14, 17, 19, 22, 25  15:6  16:4  17:21  20:2, 17, 21, 25  23:6  25:17  28:13  37:2  40:16  118:24  126:16, 25
surgical  17:19  19:21  20:6
surrounding  56:19
susceptible  48:4  63:22
SUSIE  1:1
sustain  108:4, 20
sustained  81:14, 18  88:5  98:12  109:23
swelling  123:20
swollen  108:9
sworn  5:2  153:9
symmetric  129:5, 6  132:14
symptom  114:8, 16, 19  127:20
symptomatic  58:6  66:23  67:1, 6, 13  93:1
symptoms  17:8, 16  18:10  20:10  31:6  39:1  41:22  45:1  47:1, 2, 17, 19  48:17  58:8, 9, 12  59:11  67:14  78:10  82:6  92:18  94:12, 14, 16  104:16  105:23  106:12, 20, 23  107:1, 13  108:3, 15  109:1, 10, 12  111:13, 20, 23, 24  112:1, 5  113:25  114:21  115:1, 14, 16, 21, 23  116:11, 13, 19, 21, 23, 24, 25  117:18  118:6, 10, 12  123:21  125:3, 8, 19  126:7, 20  127:17  129:20  138:5, 24  139:8  142:3
syndrome  99:17, 18  100:5
synopsis  44:15  73:23  86:5  102:16
Systemic  57:5

< T >
table  105:2, 10
take  7:17  10:12  117:23  130:9
taken  1:1  2:4  4:6  153:8
takes  9:1
talk  5:10  16:8  26:12  34:2  37:4  44:4  50:20  70:7  95:3, 14  103:5  133:4
talked  70:3  115:6  144:3
talking  7:18  16:11  22:12  33:17  47:22  62:11  64:5, 16  100:9
talks  27:5  64:10  78:3
Tammany  21:19
taught  14:19
tear  23:6  93:22  94:4, 6, 11  95:8, 13, 23  96:3, 15, 18, 23  97:3  115:7  143:24  145:15  146:21, 22
tearing  95:18  146:13, 14
tears  31:23  93:3, 16  94:17  95:6, 25  96:8  117:17  143:25
tell  9:21  11:25  19:6, 12  20:12  32:7  42:11, 12, 25  50:4  52:8  71:3  79:20  80:2  82:20  86:4  100:8  101:24  105:16  119:21  128:1, 22  137:5  140:2, 5, 10, 15  142:22  144:20
telling  23:11  52:12  68:19  104:15  139:12
tells  131:22
temporary  92:2, 17
ten  22:19  76:12, 15, 23  114:5, 16  124:10, 12
tend  5:10
tender  128:2  132:16  143:4
tendered  27:19, 22  28:12

tenderness 128:6,
18 132:2 135:3
145:24
tendon 145:15, 19
146:14, 17, 20, 21
terminology 92:13,
14
terms 13:10 16:19
19:17 82:16 93:21
145:25
TERRI 1:1 4:18
153:25
terrible 124:11
test 50:16 134:14
136:7, 15 137:5, 16
139:13 141:22, 23,
24, 25 142:1
testified 21:15
23:20 25:12, 14
37:22
testify 5:3 6:7
25:13 153:9
testifying 6:8
22:25 24:7
testimony 22:8
28:14 43:21 95:20
130:15 153:8, 10
testing 56:8 133:7
136:4, 24, 25 137:2,
15 138:10, 16
140:18 141:2
143:8
tests 50:7 137:12
138:7 139:17
Thank 29:1, 2
theories 36:21
43:10
theory 76:22
135:19
therapeutic 19:4
therapy 17:7 18:7,
17 113:14
thereof 4:15
THERESA 1:1
4:18 153:7, 25
thermal 15:20
thing 16:12 78:20
79:3 80:1, 6 89:9
100:15 106:16
112:7 116:12
118:14 122:21
129:8
things 31:23 34:4
54:20 72:21 76:11
79:11 107:21
136:18 140:19
151:24
think 9:8 10:11
11:12 17:19 20:5,

8, 24 21:9, 16, 18,
19 23:5, 7, 22 24:2,
10, 20, 24 32:15
36:16 40:24 41:8
43:13, 17, 19 45:10
46:15, 20, 23 47:3,
13, 14 48:2, 5, 8, 9,
14 51:1, 22 52:25
53:9, 21 55:8 56:4,
6 57:12 58:19
60:6, 7 61:7 62:17
63:17 64:2 65:25
66:18, 21 68:21
69:2 72:24 73:13
75:13 76:4, 8, 11
77:19 78:2 79:20,
21, 22 83:17 85:9
87:15, 24 90:4, 5
92:5 93:15 98:8,
13 101:15, 23, 24
102:3, 7, 8, 9, 14, 17,
23 103:15, 18, 22
104:5, 23 105:19
107:19 109:15, 22,
25 110:3 113:8
115:3, 6 116:2, 17
119:23 120:1, 3
121:9, 13, 19, 21
122:7, 10 124:5
126:13 127:4
129:11 130:17
131:7, 9 133:9
135:18 138:17, 23
139:14 145:4, 8
148:14, 21, 24
149:21 150:8, 21
151:23, 24 152:6, 7
thought 80:24
119:5 137:11
Three 7:25 8:20
10:8, 10 28:23
29:2 36:25 37:8
104:22 105:24
109:10 113:12
126:14, 18 127:2
thrown 94:20, 21,
25 97:2
Thursday 1:1
till 7:21 106:1
time 4:14 6:15
7:21 8:12, 15 11:8,
12 13:1, 3, 6 23:9
31:11 39:25 40:2,
9 41:8 47:16 74:1
82:14 94:10 95:12
115:9, 25 124:24
134:12 140:13
147:22

times 17:14 21:15,
17 28:12 82:8, 9
116:17 117:21
123:19
tingling 71:10
title 31:4 69:12
85:14
today 16:11 33:5,
7 38:17 39:6
56:17 100:9
119:25
toe 132:12
told 51:23 63:4
83:4 140:4, 8
142:11, 13, 15
tool 71:5
top 75:16
torn 93:12
totally 53:25 54:2
touch 128:14
132:7 136:12, 23
143:1
touching 141:11
trace 129:6
traffic 50:15
87:15, 16
trained 31:17, 19
training 26:1, 4
transcribed 153:11
transcript 153:3,
12, 13
transmitting 15:24
trauma 47:25
48:4, 19, 20 63:15,
25 64:1, 8, 10
67:12, 16 69:6, 9
73:14 74:10, 13, 16,
21, 22 75:2, 7, 15,
19, 22 76:9 77:19
80:22, 25 81:4, 6, 8,
13, 17, 20, 22, 23, 25
82:1, 9, 12, 18, 20,
22, 25 83:1, 23, 25
84:1, 3, 4, 9 90:20,
23, 25 91:1, 12, 19
93:20 104:14, 23
107:25 111:14, 17
117:19 126:23
146:20
trauma-related
111:25
traumas 74:9
75:11 77:14
traumatic 74:2, 4,
5 81:19 93:15
146:23, 25
traumatic-related
146:15

treat 6:11 16:24
17:16, 22, 25 18:13
24:16 117:5, 9, 14,
16, 22 118:11, 15,
19, 23 122:4
123:24 124:5
140:6, 8
treated 23:21
115:2 120:4
treating 6:3 18:14
22:5, 6 23:1 24:7,
21 25:9 107:15
116:16 118:14
119:14 120:4
121:4, 6 127:8
129:23 148:5
treatment 6:13
13:18 17:1, 9 18:4
19:9, 14, 17 22:15
25:6 46:2 55:7
78:23 115:8 116:6,
7, 10 121:5, 8, 10,
12 122:2, 10 127:7
130:16, 19 131:8,
18, 19 148:1, 12, 14
149:19 150:13, 25
151:10, 18
treatments 122:11
tree 36:3
trial 23:13 119:16
121:1
trouble 107:22
true 10:22 40:2
63:17 67:9, 13
72:22 113:20
114:6 117:24
118:1, 5 123:16
129:19 134:25
140:25 141:9, 14
153:11
truth 139:12
142:11
truthful 139:4, 23
141:18, 19
try 54:24 78:19
95:1 133:14, 22
150:17
trying 31:4, 10
35:25 55:7 73:13
122:11 137:23, 25
138:18
Tulane 150:6
twice 21:16
twisting 93:6, 13
two 6:18 9:18, 22
10:8, 9, 10, 11
21:17, 22, 23 25:12,
14 28:12, 23 37:8
47:14 96:21 97:19

104:7 106:1 110:2
128:10 130:3
147:14
type 14:6 19:3
21:12 23:2 31:7,
11 55:7 88:5 92:6
93:6 110:9 148:1
typed 7:21
types 31:21, 22
34:13 53:13, 14
74:8 77:2 124:13

< U >
U.S 1:1
Uh-huh 30:10
ultimate 20:1
50:20, 22
Ultimately 98:11,
13 123:17
unaware 94:9
unclear 110:8
uncover 139:12, 14
undergo 13:19
47:21
undergoes 150:19
undergone 22:15
127:7
underlining 113:19
understand 16:6
61:7 68:13 69:2
96:9, 19 102:2
105:1
understanding
16:8 50:5 92:8
105:20 134:16
151:19 153:12
Understood 32:24
53:6 58:10 64:15
72:12 98:25
108:12 124:15
125:11
UNITED 1:1 2:1
6:1, 5
University 12:19
150:6
unreasonable
122:5, 7
update 67:21
upper 129:4, 6
up-to-date 5:16
148:18 152:4
usage 92:9
use 83:22 102:9
107:3 123:8
136:20 149:2
usual 7:6
usually 7:13 91:12
123:11

Dr. Kevin Watson

< V >
vacations 10:13
valgus 142:24
valid 103:1 133:6,
10 134:14 153:3
validated 36:5
103:23 121:24
122:3 133:18
134:2
validates 70:12
validity 55:5
121:15 149:24
variance 42:13
varied 34:8 42:10
various 13:9
22:20 30:2, 5
33:21 34:11 54:7,
8 55:2 58:25
88:13 116:15
119:18 120:4
121:6 127:25
vehicle 26:13 27:7
50:8 56:19 61:3
75:12 76:8, 13
85:15 86:9, 10
87:17, 21 93:7, 14
94:21, 24, 25 95:4,
15 96:7 106:4
107:20 125:21
147:3
vehicles 87:19
velocity 60:21
61:3 76:12 87:2
VERSUS 1:1
52:23 65:17 83:25
vertebrae 64:5
visceral 74:11
viscosupplementatio
n 122:13 151:25
vitae 2:8 5:17
volunteer 37:18
49:12 51:17 53:7,
11 54:12 55:9
56:4 60:7
volunteering 51:20
volunteers 50:7, 9,
11, 13, 16 53:14, 24
54:15, 18 55:12
Voorhies 98:6, 8
99:10 101:12
102:17
Voorhies's 100:21
VS 2:1

< W >
wack 53:25 54:2
Waddell 136:18, 19,

21, 24 137:3, 7, 12
Waddells 137:9
Wait 92:11 113:12
waived 4:9, 11
wake 108:8
walk 90:9 132:12
wall 103:7
wane 111:21, 24
112:2, 4 147:21
waned 115:23
116:20
want 16:5 24:25
54:24 105:17
119:20, 24 120:25
124:18 139:9, 11
wanted 141:7
wants 25:1
WATSON 1:1 2:3
5:1, 15 29:11
153:8
wax 111:20, 24
112:2 147:21
waxed 115:23
116:19
waxing 112:3, 4
way 67:1 71:3, 14
72:18 79:20 80:2
82:20 88:4 89:7, 8,
10, 11, 14 90:6
93:12 99:8 103:24
110:1, 4 115:25
121:24 133:1, 3
134:23 135:11, 23
143:19 148:10
weaken 48:3
weakness 71:9, 12
116:18
week 9:17, 20, 23
10:9, 12
weeks 9:19, 25
10:8 104:7 106:1
110:2
weight 18:20 19:7,
11
Well 12:25 15:1
17:3 21:4 31:19
64:6 73:24 82:19
87:15 89:9 101:15
105:7 112:14
114:9 118:23
129:9 137:17
well-known 40:17
85:13
went 22:18 37:1
47:13
we're 16:11 24:20
31:19 56:17 62:11
72:24 73:13 83:2

87:9, 13 97:17
140:4 150:17
wheel 95:12, 16, 22
96:13, 21 97:1
147:7
widely 70:11
WILKINSON 1:1
withdraw 136:12
witness 4:5, 21
11:5 36:24 76:3
86:19 88:21 89:3
102:22
Wood 85:14, 17, 20,
22, 24 86:1 87:1,
14 88:9, 11, 13, 14
word 92:8
worded 81:16
work 8:11 10:11
18:23 73:8 151:19
workers 37:3
working 130:7
140:10, 14
work-related 31:7
work-relatedness
36:13 37:5
works 49:21 51:5
57:11, 12 62:3
64:24 69:16 85:20
world 49:13 50:14,
17, 18 56:10, 11, 15
86:8 99:3 108:4
worse 44:21 143:2
worsen 41:9 47:16
126:3
worsened 62:19
126:6, 7
worsening 91:18
92:19 125:17, 19
write 25:1, 2
writing 33:1
written 24:2 25:10
wrong 100:21, 22,
23 101:13 102:5,
15, 19 103:10
128:1, 7 142:18

< Y >
Yeah 10:15 14:12
29:10 53:25 68:20
76:25 87:11 91:1
93:25 107:3
109:15 111:22
112:22 116:17
126:25 128:18
129:11 134:7
year 9:19, 21, 22
10:1, 12, 13, 16, 22
11:19 82:21

years 6:18 13:2
21:22, 23, 24 37:1,
8, 9 39:19 45:11
114:5, 16 115:14
124:10, 13 126:14,
18 127:2
yesterday 120:15
young 44:17

2

1           PAMELA BROOKS VS. UNITED STATES OF AMERICA

2

3               Deposition of DR. KEVIN WATSON

4                   Taken on August 15, 2019

5

6

7                       EXHIBIT INDEX

8    1.    Curriculum vitae.

9    2.    Fee schedule.

10   3.    Articles.

11   4.    July 18, 2019, report.

12

13        (Exhibits 2 and 3 were not provided to the

14        court reporter.)

15

16

17

18

19

20

21

22

23

24

25

Watson #1



**ORTHOPAEDIC
ASSOCIATES
OF NEW ORLEANS**

J. Monroe Laborde, M.D.

Lance S. Estrada, M.D.

Kevin M. Watson, M.D.

Douglas N. Lurie, Jr., M.D.

Felipe Ramirez-Terrassa, M.D.

George R. Cary, Jr., M.D.
(RET. 2007)

# Kevin Matthew Watson, M.D.

## EDUCATION:

**Residency:** Orthopaedic Surgery, University of Alabama at Birmingham 2002-2007

**Medical School:** MD., Tulane University; New Orleans, Louisiana 1998-2002

**College:** B.S. Biology, Vanderbilt University; Nashville, Tennessee 1994-1998  *Magna cum laude*

**High School:** Holy Cross High School; New Orleans, Louisiana 1990-1994   *summa cum laude*

**LICENSURE/
MEMBERSHIPS** Greater New Orleans Orthopaedic Society
November 2007
American Academy of Orthopaedic Surgeons 2009
Recertified 2017
Fellow February 2011
Southern Orthopaedic Association,
Member

**HONORS**

Vanderbilt University

Dean's List 1995, 1996, 1997 & 1998
Phi Eta Sigma Freshman Honor Society-1995
Alpha Lambda Delta Freshman Honor Society-1995
Risk Management Chairman-Lambda Chi Alpha Fraternity 1996
Social Events Chairman-Lambda Chi Alpha Fraternity-1997

Tulane University

Chairman Medical School Freshman Orientation Comm. 1999
Treasurer-Rudolph Matas Surgical Society-2000
*Alpha Omega Alpha* Honor Medical Society-2001

3434 Prytania Street Suite 430
New Orleans, Louisiana 70115
P 504 899 6391  F 504 899 4933
oano@oano.com  www.oano.com

EXHIBIT
1

Kevin Matthew Watson
Page 2

WORK HISTORY:

Orthopaedic Associates of New Orleans July 2007-present

COMMUNITY:

Team Physician Holy Cross Football July 2007-present

CURRENT RESEARCH:

Volgas DA, Emblom B, Watson KM, Stannard JP. *A Randomized Controlled Prospective Trial of Autologous Bone Graft versus Iliac Crest Bone Graft for Non-unions and Delayed Unions.*  Presented at Orthopaedic Trauma Association Meeting, 2004.

Seigel HJ,  Watson KM, Long J, Said-Al-Naief N. Giant Benign *Eccrine Spiroadenoma of the Hand.*  Presented at Alabama Orthopaedic Society, 2005.

Seigel, HJ, Watson KM. *Vacuum Assisted Closure for Radiation Induced Complications Following Sacroma Resection.*  Journal of Surgical Oncology, December 2007, Vol 96 (7) pp 575-82.



**ORTHOPAEDIC**
**ASSOCIATES**
**OF NEW ORLEANS**

Watson #4

J Monroe Laborde, M.D.

Lance S. Estrada, M.D.

Kevin M. Watson, M.D.

Douglas N. Lurie, Jr., M.D.

L.C. Schlesinger, M.D.
(1912-1954)

H.R. Soboloff, M.D.
(1915-1987)

Russsell C. Grunsten, M.D.
(RET. 1991)

George R. Cary, Jr., M.D.
(RET. 2007)

July 18, 2019

Ms. Elizabeth Chickering
Attorney at Law
650 Poydras Street, Suite 1600
New Orleans, La. 70130

RE: Pamela Brooks

Dear Ms. Chickering

**HISTORY OF PRESENT ILLNESS:** Ms. Brooks is a 58-year-old female who was involved in an MVC on 10/31/2016. She was merging off of Veterans to get onto the interstate near Troop B. She says both hands were on the steering wheel. She was looking left. She said there was a car in front of her and traffic was heavy. She said that a Post Office van hit her in the back. She does not know how fast the van was going. Her seatbelt was on. Her airbags did not deploy. Her seat did not break. Her windshield did not break. She does not know if she struck anything in the vehicle. The police did come out. She was on her way to an assignment and she was able to do that. She said later she started having pains.

She treated at Shore Physicians Group where she was given medicines and eventually had multiple MRIs.

She said she had injections in her knees last year, which were cortisone shots, which helped temporarily. She also said she had a cortisone injection in her neck, which only helped for a day or two. She has never had injections in the low back. She said she last had a shot and burning on 05/09/2019 to her neck. She said her pain used to be 8-9, but now it is around 2-3. She says it is easier to turn to the right. She did have an injection in her right shoulder, which lasted about 2 months.

**CURRENT SYMPTOMS:** Ms. Brooks feels constant pressure in her neck. She has pain on the front of her right shoulder and has pain with use. She has right worse than left knee pain. She reports a nagging pain in her low back above her buttocks.

**CURRENT MEDICATIONS:** She currently takes Aleve daily one time in the midmorning, one time at night.

3434 Prytania Street Suite 430
New Orleans, Louisiana 70115
P 504 899 6391  F 504 899 4933
oano@oano.com  www.oano.com



EXHIBIT
4

RE: Pamela Brooks
July 18, 2019
Page 2

**PREVIOUS HISTORY:** She has had a history of two MVCs, one in 1987 and one in 1988, where she had a neck and back problem and she went to therapy and she said it eventually went away. She also slipped in the shower in 1998 and had head, neck, back, and left knee pain. She denies previous trouble to her right knee.

**WORK HISTORY:** She is currently working as an HR manager for a security company. She also works for the Orleans Parish Sheriff's Department as a deputy sheriff.

**PHYSICAL EXAMINATION:** Ms. Brooks presents today by herself. She is an obese African American female in no acute distress. She walks with a marked valgus deformity to both knees and hyperextends both knees.

Physical examination of the cervical spine. She reports some sensitivity around the bilateral paraspinal muscles, which is mild. She has full flexion, extension of the cervical spine as well as side bend. She has 5/5 strength in bilateral upper extremities, 1+ symmetric reflexes.

Physical exam of the thoracic and lumbar spine shows no tenderness to palpation of the thoracic spine. She has some mild tenderness to palpation in the lower lumbar spine centrally, but none in the paraspinal muscles. She is able to flex and extend and touch the floor. She has full extension to 20-30 degrees without pain. She has full rotation without pain as well. There were no nonorganic signs seen. She is able to heel and toe walk. She has 5/5 strength in bilateral lower extremities, 1+ symmetric reflexes. Negative straight leg raises.

Physical exam of both knees shows marked valgus deformity, left worse than right, in both knees. She is tender to palpation both medial and lateral joint lines in her knees. There is no locking. She has 1+ laxity in both knees to Lachman's. Her range of motion is -5 to 110 bilaterally.

Physical exam of both shoulders shows good active and passive range of motion of both shoulders. She has 5/5 rotator cuff strength. She reports some anterior shoulder pain with palpation.

**MEDICAL RECORDS REVIEWED:**

1. Motor Vehicle Traffic Crash Report with photographs of vehicles involved
2. South Shore Physician Group.
3. Magnolia Diagnostics, MRI of the left knee, right knee and right shoulder.
4. Metairie Imaging, MRI of the cervical spine.
5. Southern Brain and Spine, Dr. Rand Voorhees.
6. Diagnostic Imaging Services, nuclear SPECT scan and CT scan of the cervical spine.
7. LA Health Solutions.
8. Southern Orthopedic Specialists, Dr. Timothy Finney.
9. Metairie Imaging, MRI of the lumbar spine.
10. Interventional Spine Specialists (ISS).

**10/31/2016:** Motor Vehicle Traffic Crash Report: Ms. Brooks was the driver of a 2010 Nissan Altima License plate (TJE586). She was rear-ended by a 2005 Dodge Caravan as they were both merging into traffic. The estimated speed of the Caravan was 10mph. Very minor damage is reported to the rear bumper of Ms. Brooks' vehicle and the Dodge Caravan. No injuries are reported.

Written statements from Ms. Brooks and the other driver. No injuries are documented. The other driver reported that there were no signs of injury, no visible trauma or distress.

Vehicle photos: Photos of a Nissan (License plate TJE586) with no visible damage to the rear bumper. There is some slight widening at the junction between the bumper and right rear panel.

RE: Pamela Brooks
July 18, 2019
Page 3

**11/03/2016:** Ms. Brooks presents to South Shore Physician Group and sees Dr. Irra. She reports that she was in an MVC on 10/31/2016. She was a restrained driver at a complete stop when another vehicle rear-ended her vehicle. She said her body jerked front to back. She was not seen in any medical facility. **She complains of headaches, pain in her knees, right shoulder and back. It should be noted that there was no neck pain, no left shoulder pain and no upper back pain on this visit.**

Past medical history is significant for injury to her left knee in a slip and fall accident in 2004. She has reported weight her weight as 280 pounds.

**This is an exam by Dr. French, which shows the cervical spine was within normal limits.** (This would indicate no injury to the cervical spine.) Lumbar spine showed 90 degrees of flexion with pain, extension to 30, lateral flexion of 50 and rotation of 30. There is 1+ paraspinal muscles L1 through L5. Both shoulders had abduction of 180, with pain and tenderness over the trapezius, deltoid and sternocleidomastoid muscles, greater on the right than the left. **Both knees had pain with history of swelling. No tenderness or limitation of motion.** Neurologic exam was normal.

**11/17/2016:** Ms. Brooks returns to South Shore Physician Group to see Dr. Irra. **She now reports new complaints of neck pain, both shoulders, which would include new left shoulder pain and upper back pain.** Her low back and both knee pain is the same and continuous.

Physical exam showed cervical spine had flexion of 30-40 degrees, extension 10-20, lateral flexion 20-30, rotation 70-80 with tenderness over the cervical spine and base of the supraclavicular region extending to the bilateral trapezius levels. The knees show tenderness over the medial joint line and infrapatellar region with painless clicking. No shoulder exams were done.

**12/12/2016:** Ms. Brooks returns to see Dr. Irra. Neck and shoulders were the same. Upper back is the same, low back is the same. Knee pain is the same. Exam of both knees was unremarkable except for pain and tenderness over the anterior knee.

**01/03/2017:** Ms. Brooks returns to see Dr. Irra. She reports the neck, shoulders and upper back are better. Pain in the low back is better. The knee pain is better with no weakness, locking, buckling, swelling, catching, giving out or falling. She had a normal gait.

**01/24/2017:** Ms. Brooks returns.. She reports her neck, both shoulders, upper back, low back is better and intermittent. Pain in both knees is the same.

**02/14/2017:** Ms. Brooks returns to see Dr. Irra. She reports neck pain, both shoulder pain, upper back pain, low back pain and knee pains.

**03/07/2017:** Ms. Brooks returns to see Dr. Irra with similar complaints. Her neck pain is the same, pain in both shoulders is the same, right worse than left. Upper back and knee pain is the same, but **her low back has been back to normal for several days.** Left shoulder exam showed within normal limits. Right shoulder had abduction to 140 with onset of pain and no new findings. The lumbar spine was within normal limits.

**03/09/2017:** MRI of the right shoulder from Magnolia Diagnostics: The report lists attenuation of the distal supraspinatus tendon felt to represent a supraspinatus tendon tear. There is evidence of a small, rather loculated fluid collection within the subscapularis muscle, felt to represent a small hematoma. It is adjacent to the proximal edge of the subscapularis tendon; however, the tendon appears intact.

**03/09/2017:** MRI of the left knee: The report lists evidence of moderately advanced osteoarthritic change consisting primarily of osteophyte formation with much less impressive joint narrowing. Small

RE: Pamela Brooks
July 18, 2019
Page 4

osteochondral defects involving the lateral femoral condyle and lateral tibial plateau with small amount of bone marrow edema surrounding both defects. There is a suspicion of a small loose body in the joint. Small bony erosions in the lateral patellar facet. It was felt to represent mild changes of chondromalacia. There is a moderate-sized joint effusion. There is maceration and destruction of the lateral meniscus with small remnant of tissue anteriorly and posteriorly. "Fluid from the joint effusion fills the joint space laterally without significant joint space narrowing. These findings suggest acute injury and worsening of already existing lateral meniscus pathology." There is degenerative change involving the posterior horn of the medial meniscus. The ACL is poorly defined. It does not appear to be intact. There is a small amount of fluid within the fibers of the MCL. This would suggest sprain of the MCL by report.

**03/09/2017:** <u>MRI of the right knee</u>: The report lists moderately advanced osteoarthritic change, predominantly consisting of osteophyte formation. The degree of joint space narrowing is much less impressive. There is a very small osteochondral defect involving the lateral femoral condyle with mild surrounding bone marrow edema. There is a large osteochondral defect involving much of the lateral tibial plateau. There is maceration and destruction of the lateral meniscus with small retained fragments anteriorly and posteriorly. There is a similar statement about joint fluid in the space narrowing, suggesting acute injury as well as ACL, MCL diagnoses. There is an oblique tear of the posterior horn of the medial meniscus noted.

**03/14/2017:** Ms. Brooks returns to see Dr. Irra. Her neck pain is worse on the right side. Pain in both shoulders is worse. Right side of upper back is worse. Intermittent pain in the low back is better. The knees are the same. Shoulder exam showed abduction to 160-180 degrees with full range of motion.

**03/20/2017:** <u>Claim for Damage, Injury, or Death form</u>: The form documents the rear-end collision. In the extent of injury section it states, "Pamela Brooks sustained an injury to her knees, both shoulders, back, and reported headaches."
    (There is no mention of any neck injury).

**03/28/2017:** Ms. Brooks returns to see Dr. Irra. Neck pain is better and intermittent. Shoulder pain is intermittent. Upper back has a little bit better. **Low back is back to normal.** Knees are a little bit better with occasional locking of the left knee and giving out on her right knee.

**04/19/2017:** Ms. Brooks returns to see now Dr. Qureshi, a new physician. She reports neck is getting better. **Low back is back to normal.**

**05/09/2017:** <u>MRI of the cervical spine at Metairie Imaging</u>: The report lists C3-C4 concentric disc bulge producing neural foraminal narrowing bilaterally with facet hypertrophy bilaterally. The disc is desiccated. C2-C3 shows disc desiccation. C4-C5 shows subligamentous disc herniation measuring 3.9 mm, mild-to-moderate neuroforaminal narrowing bilaterally. Disc is desiccated. Facet hypertrophy is appreciated. C5-C6 concentric disc bulge is identified producing mild-to-moderate neural foraminal narrowing bilaterally. The disc appears desiccated. Facet hypertrophy is appreciated bilaterally. C6-C7 shows left paracentral subligamentous disc herniation identified measuring 5.3 mm. There is moderate-to-severe neural foraminal narrowing identified on the left. Mild neural foraminal narrowing identified on the right. The disc is desiccated. C7-T1 disc is desiccated.
    Impression shows multilevel disc desiccation is identified throughout the cervical spine. Anterior bridging osteophytes are appreciated at C3-C4, C4-C5, C5-C6, and C6-C7 consistent with cervical spondylosis. Also in the impression section, it says that there is contact on the exiting left C7 nerve root due to the C6-C7 disc as well as facet hypertrophy at C3-C4, C4-C5 and C5-C6. They recommended a

RE: Pamela Brooks
July 18, 2019
Page 5

SPECT scan to confirm acuity. This was later done.

**05/10/2017:** Ms. Brooks returns to see Dr. Qureshi. Neck pain is worse at 4/10. No radiating pain, tingling or numbness. Shoulders are 4/10. Low back is 2/10. Knees are 4/10.

**05/31/2017:** Ms. Brooks returns to see Dr. Qureshi. Neck is the same on both sides. Pain in both shoulders are the same. **Upper back and mid back are back to normal.** Low back is better. Knees are the same.

**06/21/2017: Ms. Brooks sees Dr. Qureshi. Her headaches, mid back, low back are back to normal.** Neck is better. The shoulders are getting better at 2/10. Upper back is at 2/10.

**08/28/2017:** Ms. Brooks sees Dr. Voorhies at Southern Brain and Spine. He reports a history of the motor vehicle accident. She said that later that night after the accident, she developed symptomatology.

In regard to past history, she does recollect a motor vehicle accident about 20 years ago where she had low back symptoms at that time. In the 1980s she saw a physician a couple of times and had some conservative treatment. She says her symptoms resolved. She also remembers a slip and fall at home in the shower in 2004 with left knee injury.

He reviewed some records. **His review of images on the MRI of the cervical spine revealed cervical spondylosis with varying degrees of disc osteophyte complex C3-C4, C4-C5, C5-C6, and C6-C7. He also notes Modic endplate changes in the cervical spine.**

Review of systems is positive for joint problems. **Positive for tobacco.** She is 5 feet 7 inches and 273 pounds.

Physical exam showed strength testing seems preserved, although it was difficult in the right upper extremity because of shoulder pain. He recommended cervical flexion and extension views and cervical SPECT scan.

**09/12/2017:** Nuclear medicine SPECT imaging: The report lists focal regions of abnormal increased radiotracer activity involving the C4 and C5 vertebral bodies with sparing of the posterior elements. There is later an addendum dome 2 months later which adds mild increased activity of the right C1-2 articulation, right C2-3 facet joint, C5 vertebral body, and anterior superior endplate of C7.

**There is no increased activity around the C3-4, C4-5, C5-6 facet joints.**

Cervical spine x-rays from the same date show disc space narrowing at C3-C4, C4-C5, C5-C6, C6-C7. There is multilevel osteophyte formation from C3-C7 anteriorly. There is mild osseus foraminal restriction at C4-C5 bilaterally and C5-C6 on the left secondary to uncovertebral and facet hypertrophy.

**09/26/2017:** Ms. Brooks now sees Marco Rodriguez at LA Health Solutions denoting history of motor vehicle accident. On this reports she says that her knees hit the dashboard, which is a new complaint. She complains of 7/10 neck pain, but no arm pains and 6/10 low back pain, but no leg pains.

Physical exam of the cervical and lumbar spine shows tenderness in the bilateral lower facet joints, right worse than left in the neck and lumbar spine. All other exam findings are negative. Dr. Rodriguez recommended anti-inflammatory medicines and facet injections.

**10/13/2017:** There is a letter to Dr. Finney from Dr. Voorhies regarding Ms. Brooks. He reports review of the cervical x-rays which show spondylosis in the cervical SPECT scan, shows increased activity in the vicinity of C4 and C5. They are going to recommend a CT scan.

**11/06/2017:** Ms. Brooks sees Dr. Finney regarding right shoulder and bilateral knee pain. She reports

RE: Pamela Brooks
July 18, 2019
Page 6

that she may have struck both knees on the steering column or dash and also suffered a "compression type injury to her right shoulder." Dr. Finney thought the MRI of the right shoulder showed some rotator cuff pathology and both knees showed significant osteoarthritis with multiple soft tissue changes. **Ms. Brooks does have a history of bilateral knee osteoarthritis with valgus alignment. She reports to Dr. Finney that her knees have become knock-kneed over the last 10 years.**

Physical exam shows she is 5 feet 7 inches, 280 pounds. The right shoulder showed full range of motion with mild impingement with cross-body adduction in the Jobe maneuver. She has a half grade weakness to abduction and external rotation on the right.

She had an antalgic gait with severe valgus alignment of the knees.

**X-rays of the knees show severe osteoarthritis in both knees with bone-on-bone in the lateral compartment and valgus alignment of 20 degrees bilaterally.** MRIs were reviewed. MRI of the right shoulder shows partial-thickness rotator cuff fraying. There is some mild AC arthritis. Bilateral knee MRIs showed knee effusions with significant osteoarthritis. Some degenerative change of the medial meniscus with possible loose body in the left knee.

**Dr. Finney thought she had preexisting osteoarthritis with significant valgus alignment.** Dr. Finney recommended conservative treatment of the right shoulder and thought she would be a candidate for bilateral knee replacements. **Dr. Finney thought she certainly had preexisting osteoarthritis and that is the main reason for any knee replacement surgery.** He then said she did exacerbate her pain and accelerate the knee and maybe speed up the need for bilateral knee replacements.

**12/07/2017:** MRI of the lumbar spine from Metairie Imaging: The report lists L4-L5 central disc herniation measuring 6.6 mm. Moderate neural foraminal narrowing is identified bilaterally. Moderate spinal stenosis is appreciated. Facet hypertrophy is appreciated bilaterally. Fluid is identified within the right and left facet joints. L5-S1 shows right paracentral disc herniation identified measuring 5.0 mm. Severe neural foraminal narrowing is appreciated on the right with contact of the exiting right L5 nerve root. No narrowing on the left. Annular tear of the disc is identified. Facet hypertrophy is identified bilaterally. Fluid is identified within the right and left facet joints.

**11/14/2017:** Ms. Brooks sees Amy Sabin at LA Health Solutions. Continue with axial neck and low back pain. Cervical injections are pending.

**11/13/2017:** CT scan of the cervical spine from Diagnostic Imaging: The report lists disc space narrowing at C3-C4, C4-C5, C5-C6 and C6-C7 with anterior osteophyte formation. C2-C3 demonstrates central disc herniation extending 3 mm posterior to the vertebral column. There is mildly increased activity involving the right C2-C3 facet joint. There is increased activity involving the right C1-C2 articulation. C3-C4 demonstrates disc space narrowing with disc herniation extending 2 mm posteriorly. Bilateral mild foraminal narrowing is present, left greater than right. There is marked abnormal radiotracer activity involving the C3 and C4 vertebral bodies. Activity abuts the C3-C4 disc. No facet joint signal. C4-C5 shows disc space narrowing and disc herniation extending 2 mm posterior to the vertebral column. There is moderate bilateral foraminal restriction secondary to uncovertebral and facet hypertrophy, but there is no increased signal in the facet joints. C5-C6 demonstrates disc herniation extending 2 mm posterior to the vertebral column with minimal osteophyte formation. Moderate left and mild right foraminal restriction secondary to uncovertebral and facet arthropathy. There is mild increased activity involving the C5 vertebral body with activity, abutting both the C4-C5 and C5-C6 disc spaces. However, there is no facet signal. C6-C7 demonstrates disc space narrowing without significant central vertebral canal stenosis. Severe left and mild right foraminal restriction secondary to uncovertebral and facet hypertrophy. C7-T1 reveals no abnormality. There is increased activity involving the anterior and superior endplate of C7.

RE: Pamela Brooks
July 18, 2019
Page 7

I have reviewed the cervical CT which shows multilevel arthritis changes as described above. There is no activity around the C3-4, C4-5, C5-6 facet joints.

**11/27/2017:** A note from Dr. Voorhies which reports there is increased metabolic activity anterior column of the C3-C4 endplates. They recommended cervical epidural steroid injection. (This would be different than the recommendations done by Dr. Rodriguez and later the Interventional Spine specialists. )

**12/26/2017:** Ms. Brooks returns to LA Health Solutions with neck pain and some right shoulder pain and low back pain. Continued to facet injections were recommended.

**03/08/2018:** Ms. Brooks now presents to see Dr. Defrancesch. She is here for chief complaint of neck and shoulder. She is having neck pain, low back pain, right shoulder pain as well as bilateral knee pain. Predominant complaint is low neck, right greater than left. Pain scale was 53/100 ranging from 68/100.
    Physical exam was normal except for tenderness in the paraspinals in the mid-cervical range. Tenderness over the right C4, C4-C5 and C5-C6 facets. MRI reviewed ,shows cervical spine shows multilevel disc disorder without impingement of the cord or severe stenosis noted.
    **She was given cervical facet injections with cortisone and Marcaine at the right C4-C5 and C5-C6, which they reported 100% relief of pain.**

**05/03/2018:** Ms. Brooks sees Dr. Bostick for right shoulder and bilateral knee pain. She now reports that her right arm was up on the steering wheel as she was driving and she was twisting her body to look left at the impact. She struck her bilateral knees on the steering column.
    **Review of systems is significant for prior left knee meniscus tear that was diagnosed around the year 2000. She was treated by a physician on Canal Street in a clinic that no longer exists. She also self-treated for arthritis with aspirin and warm baths over the last several years.**
    Dr. Bostick thought that her flared-up knee symptoms were related to the motor vehicle accident and right shoulder injury and complaints to the motor vehicle accident. Dr. Bostick thought she could benefit from viscosupplementation. He thought the ACL injuries may be related to this accident and her meniscus pathology is likely a combination of pre-existing degenerative meniscus tears and acute trauma.
    He has recommended ultrasound-guided Euflexxa injections.

**LARGE GAP IN TREATMENT**

**12/17/2018:** Ms. Brooks returns to Interventional Spine Specialists. She says the cervical pain continues in the right greater than left and lumbosacral pain as well. Cervical pain is now 60/100, lumbar pain 50/100. Physical exam is otherwise unremarkable except for right C4-C5-C6 tenderness. They recommended a medial branch blockade.

**01/22/2019:** Ms. Brooks returns to see Dr. Bostick. They recommended a right shoulder cortisone injection, which was given. Euflexxa injection was recommended for the knees.

**ANOTHER GAP IN TREATMENT**

**05/09/2019:** Ms. Brooks returns to ISS. She undergoes right-sided medial branch block at C4, C5, C6 and then immediate radiofrequency ablation at that level.**

**06/06/2019:** Ms. Brooks returns to see Dr. Bostick. Right shoulder is better following her right shoulder

RE: Pamela Brooks
July 18, 2019
Page 8

injection. She is awaiting viscosupplementation for her knees.

**07/18/2019:** Ms. Brooks returns to ISS. She is having left sided neck and back pain. They have recommended muscle relaxer and palpation of the lumbar facet joints under fluoroscopy.

**DISCUSSION:** Ms. Brooks was involved in a rear-end MVC on 10/31/2016.

In performing causation analysis, the AMA and the AAOS endorse a professional and objective method. These methods are published in guidelines by the AMA and the AAOS. Robert Barth, Ph.D. details the standard causation method in the AMA Guides Newsletter May/June 2012. The first step in the method is confirming an explanatory diagnosis for the relevant clinical presentation based primarily on objective findings. In the AMA Guides to the Evaluation of Disease and Injury Causation (and documented in this Newsletter), the authors specifically point out the fallacy and unreliability of utilizing pre versus post (accident) complaints as a method for determining causation. Because of this, pre versus post (accident) complaints are not a part of the standard method of justifying causation claims. Step two involves applying scientific studies to the causation issue at hand to see if a possible causation-link exists for that diagnosis. The third step is evaluating the magnitude and temporal relationship of the causation-link and the diagnosis. The fourth step involves considering other relevant risk factors for the potential diagnosis. Step five involves scrutinizing the medical record for inconsistencies or conflicting information. Step six is arriving at a conclusion. If one of the steps fails the analysis, then a causation claim is not justified.

As far as the subjective complaints by Ms. Brooks, she presented to Southshore Physician Group three days after the accident with headaches, bilateral knee pain, right shoulder pain and back pain. There was no radiating pain and no numbness or tingling. There was no weakness. **There was no neck pain or left shoulder pain reported.** Her exam of the cervical spine was normal. Two weeks later, she presented with new neck pain and left shoulder pain. This would not be consistent with an acute, traumatic origin of radicular symptoms, neck pain or left shoulder pain. There was no mention of any injuries at the scene. She did not present for immediate treatment and continued her job that day. This is not consistent with an acute, traumatic injury. (Step 3)

In causation analysis of the cervical spine, Ms. Brooks did not present with any neck pain at the time of the accident, or even 3 days after her accident. The first report of pain in her neck was over two weeks after her accident. This is not consistent with an acute, traumatic injury. (Step 3) Furthermore, the claim for damage form completed on 3/20/17 does not list any injury to the cervical spine/neck. The accident photos and traffic crash report denote a low speed rear-end MVC with minimal damage to either vehicle. The AMA Guides Newsletter November/December 2018 report that vehicles that sustain little or no damage are typical of minor/low-speed collisions, generally with delta-Vs (change in velocity) less than 10mph. The low change in velocity is also not consistent with causing injury according to the medical literature. (Steps 2 and 3)

The diagnosis (Step 1) based off of objective studies (MRI) would be cervical disc degeneration, cervical arthritis, and disc bulges/protrusions. These diagnoses are not traumatic related and found in the normal aging population without injury. There is no objective evidence of any cervical radiculopathy on any physical exam ever performed in the medical record.

Ms. Brooks has had an MRI study of her cervical spine after the accident. The cervical spine MRI shows disc dessication, facet arthritis, and disc bulges/protrusions. These are consistently found in the asymptomatic population and do not signify a pain-generating source or trauma. There are no radicular symptoms currently.

Daimon et. al in JBJS 2018 report that patients in their 50s have an over 85% incidence of cervical disc dessication, over 80% incidence of anterior compression of the dura and spinal cord, and over 85% incidence of cervical disc protrusion. They found that these findings naturally worsen with aging.

RE: Pamela Brooks
July 18, 2019
Page 9

Furthermore, Nordin et. al. in Spine 2008 report that common degenerative findings on MRI cannot be assumed to be the primary cause of symptoms in adults with neck pain. They found that neck pain without clear radiculopathy is not reasonably ascribed to common degenerative changes seen on MRI. They found that the high prevalence of positive findings on MRI of asymptomatic individuals (disc degeneration, protrusion) show that they cannot be assumed to be the primary cause of symptoms in adults with neck pain.

Nakashima et al in Spine 2015 report that posterior disc protrusion and disc degeneration was seen in healthy subjects in their 20s and deteriorated with age. They also report that posterior disc protrusion was seen in over 80% of all individuals over the age of 40 on MRI studies. They concluded that disc degeneration, "annular tear" and disc protrusions found on MRI are not associated with the development of clinical symptoms.

As for mechanism of injury (Step 2 and 3), low change in velocity rear end impacts have not been shown to generate cervical injury. Cormier et. al. in Spine 2018 report that the risk of injury beyond neck strain in low change in velocity rear end collisions is essentially zero. There is general acceptance that volunteers can be safely exposed to rear impacts of less than 18 km per hour (11 mph) without a meaningful risk of injury.

Ms. Brooks also has a history of a previous MVC and previous treatment for neck, back, and left knee pain. This would denote the presence of pre-existing conditions to the neck, back, and left knee.

Mr. Brooks has also had cervical facet joint injections. On 03/08/2018, over a year after her accident, she underwent right C4-5 and C5-6 facet cortisone injection with Marcaine. The International Spine Intervention Society Guidelines, Second Edition, report that "for lack of validity, there is no defendable role for diagnostic intra-articular blocks of the cervical "facet" joints." They also report that mixing cortisone with an anesthetic confounds the diagnostics of this procedure.

Nordin et. al. in Spine 2008 report that diagnostic facet joint injections have not been validated to identify facet joint pain as the primary cause of pain in patients with serious neck pain illness. Nor do these injections seem to have acceptable reliability. They report that in no study has the utility of these injections been established based on improved outcomes.

Carragee et. al. in Spine 2008 also report that facet joint injection and radiofrequency neurotomy for neck pain showed no clear advantage compared to sham or placebo procedures. They report that the evidence does not support intra-articular steroid injections or radiofrequency neurotomy for neck pain.

Furthermore, Falco et. al. in Pain Physician 2012 report that the false positive rate of cervical facet injections ranges from 27% to 63%.

Ms. Brooks also underwent right sided medial branch blocks on 5/9/2019 at C4,C5,C6. There were no controls. She then immediately undergoes radiofrequency ablation at the same levels. This was based off of a single, uncontrolled block; which has been shown to produce significant false positive results.

Barnsley et. al. in Clin J Pain 1993 report that uncontrolled diagnostic blocks are compromised by a significant false positive rate that seriously detracts from the specificity of the test. This would indicate that single, uncontrolled injections are not predictive of facet joint pain. The International Spine Intervention Society Guidelines also state, "A diagnosis based on a single block, therefore, could not be relied upon to secure a correct diagnosis." The Guidelines recommend comparative local anesthetic blocks with consideration for placebo-controlled blocks for maximum diagnostic confidence.

The Guidelines go on to state that "unless a diagnostic block is performed under double-blind conditions, the risks of response bias, observer bias, and reporting bias remain eminent, regardless of how honest and objective a doctor claims to be."

In this case, a single, uncontrolled, unblinded injection was given with immediate evaluation and progression to radiofrequency ablation. This would not be supported by the Guidelines.

As for radiofrequency ablations, the Carragee study previously cited does not support the use of radiofrequency ablation. The Spine Intervention Society Guidelines also state that meticulous selection

of patients is necessary for a successful result. The successful studies in the Guidelines support radiofrequency ablation only for those patients selected with controlled, comparative local anesthetic blocks with complete relief of the pain. The Guidelines state, "There is no evidence of efficacy or effectiveness of any other variant of the procedure( RFA), or for patients selected according to less stringent criteria." In this case, the stringent criteria set forth by the International Spine Intervention Society was not used. (Dr. deFrancesch cites these guidelines on the performance of cervical RFA).

In summary for the cervical spine, Ms. Brooks did not have any neck pain immediately after the accident or even days later. The first report of neck pain was over two week after the accident. This is not consistent with an acute, traumatic injury to the cervical spine. The cervical spine MRI show degenerative findings including disc dessication, spurs and disc bulges/protrusions. There is no objective evidence of trauma to the cervical spine. The low change in velocity mechanism of injury has not been shown to generate cervical disc injury or generate forces that cause neck injury beyond a strain. There is no objective justification for a causation claim that the incident generated the changes seen on Ms. Baker's cervical MRI or ongoing neck complaints. She has had facet joint injections and medial branch blocks in a nondiagnostic manner. Any cervical facet injections or radiofrequency ablation would not be related to the accident in the past or future. There is no medical evidence which shows the efficacy of repeating radiofrequency ablation beyond 5-7 years at this point; even under stringent controlled block criteria.

In causation analysis for the lumbar spine, Mr. Brooks presented with axial back pain three days after the accident. There were no radicular complaints or leg numbness/weakness after the accident. There was no immediate reports of pain at the accident, and she was able to continue her job. This would not be consistent with an acute, traumatic origin of low back pain, radiculopathy or radicular symptoms/signs. The diagnosis (Step one) based off of objective studies (MRI) would be lumbar disc degeneration, lumbar facet arthritis, and disc protrusions. These diagnoses are not traumatic related and found in the normal aging population without injury. She has also reported that her midback and low back pain returned back to normal after the injury.

Mr. Brooks has had a lumbar MRI study over a year after the incident. The MRI study show disc dessication, protruding discs, and some facet arthritis. These are all consistent with the aging process. There is no objective evidence of acute injury on the lumbar MRI.

Like the cervical spine, numerous studies have shown the common appearance of degenerative findings seen on lumbar MRI and their lack of association with clinical symptoms.

Brinjikji et. al. in AJNR 2015 report that in asymptomatic patients in their 50s, the incidence of lumbar disc degeneration is 80%, disc bulge is 60%, and disc protrusion is 36%. They report that these findings are common, increase with age, and are not associated with the development of symptoms.

Kalichman et. al. in Spine J 2008 and 2010 report that over 76% of individuals in their 50s have evidence of facet degeneration of the lumbar spine. They also found that there was no association between facet joint arthritis at any spinal level and the development of low back pain. Facet joint arthritis is a universal finding in the lumbar spine, particularly over the age of 30.

Fardon et. al. in Spine J 2014 (Based off of recommendation of the North American Spine Society, American Society of Spine Radiology, and the American Society of Neuroradiology) report that in the absence of imaging evidence of fracture or dislocation; degenerative changes in the spine, including discs, should be classified as degenerative rather than traumatic in nature.

Included in this study is a discussion on the term "annular tear". In the MRI report, there is mention of an annular tear. However, these societies believe that the use of the term "tear" is nonstandard. The correct term is annular fissure. The term "fissure" describes the spectrum of these lesions and does not imply that the lesion is a consequence of injury. Fissures appear in nearly all degenerated discs. They report that imaging observation of an annular fissure does not imply an injury or related symptoms, but simply defines the morphologic change in the annulus.

Hartvigsen et. al. in Lancet 2018 report that no investigation has accurately identified a disc

RE: Pamela Brooks
July 18, 2019
Page 11

problem as contributing to an individual's pain; there is no widely accepted reference standard for discogenic pain. Furthermore, they also found that there is no association between radiological osteoarthritis of facet joints and the presence of low back pain. Clinical identification of individuals whose facet joints are contributing to their pain is not possible.

As for mechanism of injury (Step 2 and 3), Carragee et. al in Spine 2006 report that there is no association between minor trauma and adverse, chronic low back pain events. Serious low back pain was not more common in subjects with baseline disc degeneration, disc protrusion, or annular disruption. If trauma did not cause serious visceral injury, pelvis fracture, or long bone fracture, then no minor trauma in their study was found to cause chronic low back pain outside of a compensation/litigation setting.

Furthermore, in this accident, it is unclear how a cervical or lumbar injury would occur. Disc injury is typically a combination of flexion and compression with force. Facet injury could occur with hyperflexion or extension. These forces would not be expected to have occurred in this case, especially at a low change in velocity. Wood et. al. in the AMA Guides Newsletter November/December 2018, specifically report that "the motions, forces, and accelerations generated in low-speed (low change in velocity) collisions are less than those encountered in activities of daily living. The scientific process of injury causation analysis leads to the conclusion that disc degeneration and disc herniations are preexisting and not caused by low-speed vehicle collisions. "

Lee et. al. in Annals of Orthopedics & Rheumatology report that low change in velocity rear end vehicular collisions produce limited impact forces, limited lumbar range of motion, and a general lack of injury mechanism. They say, "The evidence for the occurrence of lumbar disc injury after these collisions is not compelling."

According to the International Spine Intervention Society Guidelines, Second Edition, the prevalence of lumbar facet joint pain is low, except in the elderly population (over 65 years of age). Prevalence studies have found lumbar facet joint pain in less than 10% of patients based on a response to single diagnostic blocks. When controlled, blinded, double blocks are used, the prevalence would be even less. The prevalence is so rare that the Society recommends that in every case that placebo-controlled blinded blocks be used for diagnosis. They state, "Physicians who adopt any other criteria should understand that their blocks will lack validity. Because of the inherent false-positive rate, any diagnosis made cannot be deemed to be true."

In the literature, there is little support for lumbar facet injections and radiofrequency ablation. Chou et. al in Spine in 2009 established clinical practice guidelines for the American Pain Society. In these guidelines, the latest set forth by the American Pain Society, facet joint corticosteroid injections are not recommended for persistent nonradicular low back pain. These guidelines are published on the American Pain Society website.

To followup this study, Chou et. al in 2015 (AHRQ) report that limited evidence (13 trials) suggested that facet joint corticosteroid injections are not effective for presumed facet joint pain. Studies found no clear difference between various facet joint injections and placebo interventions.

Staal et. al in Spine in 2008 report that there is insufficient evidence to support the use of injection therapy in subacute and chronic low back pain. They found that corticosteroid facet joint injections are not significantly different from placebo injections for pain relief and improvement of disability.

Like the cervical spine, there is significant false-positive rate with single facet blocks. Manchukonda et. al. in J Spinal Disord Tech 2007 report that the false positive rate of a single cervical block was 45%, the same rate was seen in the lumbar spine. Schwarzer et. al. in Pain 1994 report that uncontrolled diagnostic blocks are unreliable for the diagnosis of lumbar zygoapophysial joint pain, not only in epidemiologic studies but also in any given patient.

Jonas et. al. in Pain Medicine 2018 report that a moderate amount of evidence does not support the use of invasive procedures as compared with sham procedures for patients with chronic back pain.

RE: Pamela Brooks
July 18, 2019
Page 12

Foster et. al. in Lancet 2018 report that recent guidelines do not recommend facet joint injections for low back pain alone.

As for radiofrequency ablation, a Cochrane database review in 2015 found that there is no high-quality evidence suggesting that radiofrequency denervation provides pain relief for patients with chronic low back pain nor does it improve function.

In addition, Juch et. al in JAMA in 2017 reported on the efficacy of radiofrequency ablations. In 3 randomized clinical trials of participants with chronic low back pain originating in the façet joints, sacroiliac joints, or a combination of facet joints, sacroiliac joints, or intervertebral discs; radiofrequency denervation combined with a standardized exercise program resulted in either no improvement or no clinically important improvement in chronic low back pain compared with a standardized exercise program alone. The findings do not support the use of radiofrequency denervation to treat chronic low back pain from facet joints, sacroiliac joints or intervertebral discs.

Ms. Brooks has also had previous MVC with treatment for back pain.  This would denote pre-existing conditions to the lumbar spine.

In summary for the lumbar spine, Ms. Brooks did not report any immediate low back pain after the accident. She reported three days later with back pain. The lumbar spine MRI shows degenerative findings including disc dessication, facet arthritis, and disc protrusions. There is no objective evidence of trauma to the lumbar spine. The low-speed change in velocity mechanism of injury has not been shown to generate disc injury or serious back issues. There is no objective justification for a causation claim that the incident generated the changes seen on Ms. Brooks' lumbar MRI or ongoing back complaints. The literature does not support continued radiofrequency denervation and has shown a high false-positive response of facet joint blocks. She also reported that her mid back and low back were back to normal after the accident.

As for recovery time after blocks and injections, Ms. Brooks should be able to return to regular duty the following day. There is no need for further time off than that. As for radiofrequency ablation, a day off from regular duty is reasonable.

In causation analysis for the knees, Ms. Brooks had significant pre-existing osteoarthritis to the knees. She admits to worsening "knocked" knees deformity prior to the accident. She admits to taking aspirin and soaking her knees prior to the accident. As for causation and mechanism of injury, there is no clear mechanism by which a low speed rear-end collision would generate arthritis in the knee. Furthermore, there is no clear mechanism by which a low speed rear-end collision would exacerbate or aggravate a pre-existing condition to any significant degree.   Orthopedic literature (and other publications) has shown that in a rear-end collision, the driver would move rearward in the seat. The seat would absorb energy from the impact and then the driver would rebound forward. However, the rebound would be dissipated and also restrained by the shoulder and lap belt. This type of motion would not be consistent with the generation of a meniscus tear, ligament tear, arthritis, or an aggravation of a pre-existing condition.

As for meniscus tears on the MRI, studies have shown the common appearance of meniscus tears; especially with aging and arthritis. Meniscus tearing is a part of the natural arthritis process. Ms. Brooks has said she had a history of a meniscus tear as well.

T Bhattacharyya et al. in JBJS report that meniscal tears are common in the asymptomatic, aging population.  67% of asymptomatic females over the age of 50 had evidence of meniscus tears on MRI.

RE: Pamela Brooks
July 18, 2019
Page 13

They found that if x-rays showed slight narrowing of the joint, a meniscus tear was evident on MRI about 90% of the time. (Ms. Brooks has severe, advanced joint narrowing)

Englund et. al. in NEJM report that incidental meniscal findings on MRI of the knee are common in the general population and increase with increasing age. They do not indicate a traumatic origin or even a pain-generating source.

In summary for the knees, Ms. Brooks had significant pre-existing arthritis to her knees. She was treating her knees with aspirin and soaks prior the accident. She had meniscus tear in her knee prior the accident. She had worsening knocked-knees prior to the accident. The recommended treatment for knee arthritis which is severe would be knee replacement. This would be due to her pre-existing condition and not due to the accident. There is no objective evidence of any exacerbation or aggravation of her pre-existing condition. The mechanism of injury is not consistent with an exacerbation or aggravation. There is no evidence that the accident has objectively accelerated her need for knee replacement.

In causation analysis for the shoulders, Ms. Brooks did not have any left shoulder pain after the accident or three days after the accident. Her first left shoulder complaints were two weeks after the accident. This is not consistent with an acute, traumatic origin of her left shoulder pain. There are no current left shoulder complaints. She did complain of right shoulder pain three days after the accident, but no injuries were reported at the scene. The MRI of the right shoulder shows minimal changes in the supraspinatus tendon. Dr. Finney has recommended conservative treatment.

Brooks et. al. in the AMA Guides Newsletter January/February 2014 report that MRIs identify a high prevalence of rotator cuff tears in asymptomatic individuals. They also report that the "biomechanical literature contains no reports of human volunteers sustaining cuff tears or other shoulder injury in staged rear-end collisions despite the fact that several hundred such tests have been conducted." In the conclusion they state that there is "insufficient evidence in the medical literature to conclude that rear-end MVCs cause rotator cuff tears and compelling evidence in the biomechanical literature that low-speed rear-end collisions do not. " They also note that the forces in a low-speed rear impact are insufficient to even propagate a pre-existing partial tear, much less cause a new tear.

In summary for the shoulders, Ms. Brooks had no left shoulder pain after the accident. Two weeks later, she presented with left shoulder pain. This is not consistent with an acute, traumatic injury. She currently has no left shoulder pain. As for the right shoulder, there is a high prevalence of partial rotator cuff tears in the aging population. The presence of partial tearing does not signify trauma or an acute traumatic origin. The mechanism of injury is not consistent with the generation of a rotator cuff tear according to the medical and biomechanical literature cited by the AMA.

Robert Barth, Ph.D. has written extensively about chronic pain for the AMA and the AAOS. His article in the AMA Guides Newsletter January/February 2013 summarizes many significant risk factors for the development of chronic pain, not explained by general medical findings. Barth reports "several studies that have shown that eligibility for compensation is a dominant factor for chronic pain claims." (The Carragee study previously cited is one of those studies). The MRI changes seen on Ms. Brooks' studies have not been shown to be contributors to chronic pain. Using the causation method, however, a significant risk factor for the development of chronic pain is compensation issues.

Finally, there appears to be a large gap in the treatment record from May of 2018 to December of

RE: Pamela Brooks
July 18, 2019
Page 14

2018. This would not be consistent with significant, chronic, ongoing pain or disability.

In summary, Ms. Brooks was involved in a rear end motor vehicle collision. She did not report any neck pain for over two weeks after the accident. Later she developed new symptoms of neck pain and left shoulder pain. This is inconsistent with an acute, traumatic origin (step 5). The objective studies show common degenerative findings that have been shown to not be associated with injury and to not be associated with the development of symptoms. The mechanism of injury would not be expected to generate cervical or lumbar disc/spine injury. She had a history of previous neck, back, and knee issues. The literature does not support continued radiofrequency ablation or uncontrolled diagnostic blocks. She had severe, pre-existing knee arthritis. There is no objective evidence of aggravation of her pre-existing arthritis. The mechanism of injury is not consistent with the generation of a rotator cuff tear per the medical literature.

This medical evaluation encompasses the subjective complaints and history as given by the examinee as well as the medical records provided for my review. My opinions are based upon reasonable medical probability, supported by medical literature, assuming the materials are true and correct. Standard causation analysis protocol was used as endorsed by the AMA and AAOS. If more information becomes available, such information may or may not change my opinion. My opinions do no constitute per se any recommendation for specific claims or administrative functions/decisions to be made or enforced.

Barth. Determining Injury-Relatedness, Work-Relatedness, and Claim-Relatedness. *AMA Guides Newsletter*. May/June 2012.

Daimon et. al. A 20-Year Prospective Longitudinal Study of Degeneration of the Cervical Spine in a Volunteer Cohort Assessed Using MRI. *JBJS* 2018. 100:843-9.

Nordin et. al. Assessment of Neck Pain and Its Associated Disorders. Results of the Bone and Joint Decade 2000-2010 Task Force on Neck Pain and Its Associated Disorders. *Spine* 2008. 33(45): S101-S122.

Nakashima et. al. Cervical Disc Protrusion Correlates with the Severity of Cervical Disc Degeneration. *Spine 2015.* 40(13): E774-779.

Nordin et. al. Assessment of Neck Pain and Its Associated Disorders. *Spine* 2008. (33)45: S101-S122.

Cormier et. al. A Comprehensive Review of Low-Speed Rear Impact Volunteer Studies and Comparison to Real-World Outcomes. *Spine 2018.* 43(18): 1250-1258.

Brinjikji et al. Systematic Literature Review of Imaging Features of Spinal Degeneration in Asymptomatic Populations. *AJNR. 2015, 36:811-816.*

Kalichman et. al. Facet joint osteoarthritis and low back pain in the community-based population. *Spine* 2008. 33(23): 2560-2565.

Kalichman et. al. Computed tomography-evaluated features of spinal degeneration: prevalence, intercorrelation, and association with self-reported low back pain. *Spine J.* 2010. 10(3): 200-208.

Hartvigsen et. al. Low back pain. *Lancet* 2018. 391:2356-67.

Carragee et. al. Does Minor Trauma Cause Serious Low Back Illness? *Spine* 2006. 31(25): 2942-2949.

Wood et. al. Do Low-Speed Vehicle Collisions Cause Intervertebral Disc Degeneration or Herniation? *AMA Guides Newsletter.* November/December 2018. 3-8.

Lee et. al. Lumbar Intervertebral Disc Injuries in Low Velocity Rear End Vehicular Collisions: The Current Evidence. *Annals of Orthopedics and Rheumatology.* 2014. 2(4): 1-10.

RE: Pamela Brooks
July 18, 2019
Page 15

Benzel. The Cervical Spine Fifth Edition textbook.

Barth. Chronic Pain: Fundamental Scientific Considerations, Specifically for Legal Claims. *AMA Guides Newsletter* January/February 2013. 1-19.

Nordin et. al. Assessment of Neck pain and Its Associated Disorders. Results of the Bone and Joint Decade 2000-2010 Task Force on Neck Pain and Its Associated Disorders. *Spine* 2008 (33):45:S101-S122

Carragee et. al. Treatment of Neck Pain. Injections and Surgical Interventions: Results of the Bone and Joint Decade 2000-2010 Task Force on Neck Pain and Its Associated Disorders. *Spine* 2008; 33(45):S153-S169

Falco et. al. Systematic Review of Therapeutic Effectiveness of Cervical Facet Joint Interventions: An Update. *Pain Physician* 2012.; 15: E839-868.

Barnsley et. al. False-positive rates of cervical zygapophysial joint blocks. *Clin J Pain*. 1993. 9(2): 124-130.

Chou R. et. al. Interventional Therapies, Surgery, and Interdisciplinary Rehabilitation for Low Back Pain. An Evidence Based Clinical Practice Guideline from the American Pain Society. *Spine* 2009. 34(10): 1066-1077.

Chou R et. al. Pain Management Injection Therapies for Low Back Pain. AHRQ Technology Assessments. 2015. Agency for Healthcare Research and Quality.

Staal et. al. Injection Therapy for Subacute and Chronic Low Back Pain. *Spine* 2008. 34(I): 49-59.

Manchukonda et. al. Facet Joint Pain in Chronic Spinal Pain: an Evaluation of Prevalence and False-Positive Rate of Diagnostic Blocks. *J Spinal Disord Tech*. 2007; 20(7): 539-545.

Schwarzer et. al. The false-positive rate of uncontrolled diagnostic blocks of the lumbar zygoapophysial joints. *Pain*. 1994: 58: 195-200.

Jonas et. al. Are Invasive Procedures Effective for Chronic Pain? A Systematic Review. *Pain Medicine*. 2018. 0(0):1-13.

Foster et. al. Low back pain. Prevention and treatment of low back pain: evidence, challenges, and promising directions. *Lancet* 2018. 391: 2368-2383

Juch JN et. al. Effect of Radiofrequency Denervation on Pain Intensity Among Patients with Chronic Low Back Pain. The Mint Randomized Clinical Trials. *JAMA*. 2017; 318(1):68-81.

Cohen et. al. The effect of sedation on the accuracy and treatment outcomes for diagnostic injections: A randomized, controlled, crossover study. *Pain Medicine* 2014. 15: 588-602.

Maas et. al. Radiofrequency denervation for chronic low back pain. *Cochrane Database Systematic Reviews*. 2015, Issue 10.

International Spine Intervention Society, Second Edition.

T Bhattacharyya et al. The Clinical Importance of meniscal tears demonstrated by MRI in OA of the knee. *JBJS* 2003: 85-A: 4-9.

Englund et al. Incidental Meniscal findings in middle-aged and elderly persons. *NEJM* 2008; 359: 1108-1115.

Brooks et. al. Do Rear End Collisions Cause Rotator Cuff Tears? *AMA Guides Newsletter* January/February 2014. 3-7.

Kevin M. Watson, M.D.