# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PAMELA BROOKS,** | **CIVIL ACTION** |
| **Plaintiff** | |
| | |
| **VERSUS** | **NO. 18-7736** |
| | |
| **UNITED STATES OF AMERICA,** | **SECTION: "E" (2)** |
| **Defendant** | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a negligence action involving a rear-end collision. Plaintiff Pamela Brooks alleges she sustained personal injuries when her car was rear-ended by a vehicle operated by United States Postal Service employee Christine Watler. Plaintiff seeks an award of damages for past medical expenses, future medical expenses, future lost wages, and past and future physical and mental pain and suffering and loss of enjoyment of life.

The matter was tried before the Court, sitting without a jury, on November 4-5, 2019.[1] The Court heard testimony from Pamela Brooks, Dr. Marco Rodriguez, Christine Watler, Dr. Fred DeFrancesch, Dr. Timothy Finney, Dr. Robert Bostick, and Dr. Kevin Watson.[2] The Court admitted into evidence Exhibits 1-34 and 36.[3] The parties stipulated that, if called at trial, the following experts would testify consistent with their reports: Elizabeth Martina,[4] Dr. Kenneth Boudreaux,[5] Stephanie Haupt,[6] and Jeffrey Meyers.[7,8]

Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and

---

[1] R. Docs. 81 and 82 (minute entries).
[2] *Id.*
[3] *Id.*; R. Doc. 83 (trial exhibit list).
[4] Trial Exhibits 16 and 25 (expert reports).
[5] Trial Exhibits 18 and 25 (expert reports).
[6] Trial Exhibit 32 (expert report).
[7] Trial Exhibit 34 (expert report).
[8] R. Doc. 81-1 (joint stipulation).

Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. To the extent any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent any conclusions of law may be construed as findings of fact, the Court adopts them as such.

## FINDINGS OF FACT

### I. The Plaintiff's Education and Work History

The facts found by the Court are largely not in dispute. Plaintiff Pamela Brooks is a 59 year old resident of Marrero, Louisiana. She graduated from John Ehret High School in 1978 and obtained a bachelor's degree in psychology with a minor in computer science from Xavier University in 1982. She also attended University of New Orleans, obtaining a master's degree in public administration in 1986 and a master's degree in divinity in 2009.

When Plaintiff first graduated from college, she worked as a mathematics instructor in the Jefferson Parish Public School System. Plaintiff then worked for Morris Bart, LLC, and two other personal injury law firms, as a paralegal. Plaintiff later worked for the Road Home Program as a housing advisor. In 2008, Plaintiff began her current job with Securitas Security Services, previously known as Pinkerton Government Services, Inc., where she works as a human resources manager. As a human resources manager, Plaintiff performs tasks including recruiting, hiring, training, and terminations. She earns an annual income between roughly $43,000 and $50,000.[9] In addition to her full-time employment, Plaintiff volunteers with the Orleans Parish Sheriff's Office and serves as an unpaid minister at her church.

---

[9] Trial Exhibit 17 (2014-2018 Individual Tax Returns for Pamela Brooks).

## II.     Prior Injuries

Plaintiff has been involved in two prior automobile accidents, sustaining injuries to her neck and back in both. The first accident occurred around 1986, and the second occurred around 1987. In both instances, Plaintiff filed personal injury lawsuits, and was awarded compensation. Plaintiff received treatment for injuries incurred in both accidents, and fully recovered within several months of treatment.

In addition to the prior automobile accidents, Plaintiff slipped and fell in her shower in 2004, resulting in a torn meniscus in her left knee. Plaintiff received medical treatment for this injury for several months. Following this incident, Plaintiff did not seek treatment for her knees until after the automobile accident at issue in this case. Plaintiff has severe osteoarthritis in both knees. Plaintiff testified she experienced some soreness in her knees prior to the accident and took over-the-counter medication and soaked her knees in hot water to alleviate the pain. Medical testimony and medical records admitted at trial show long-standing degenerative damage to joints in Plaintiff's knees, establishing this condition pre-existed the automobile accident at issue.[10]

For the twelve years following Plaintiff's slip in the shower before the October 31, 2016 accident, Plaintiff sought no medical treatment for any orthopedic condition.

## III.     The Accident

On October 31, 2016 around 5:00 p.m., Plaintiff was operating her 2010 Nissan Altima at the intersection of Veterans Memorial Boulevard and Pontchartrain Boulevard in New Orleans, Louisiana, waiting to merge onto the I-10 ramp. United States Postal Service ("USPS") employee Christine Watler was traveling directly behind Plaintiff in a

---

[10] Testimony of Dr. Timothy Finney and Dr. Robert Bostick; Trial Exhibits 7, 11, and 12.

2005 Dodge Caravan USPS vehicle. Plaintiff came to a stop as she waited to merge into traffic. Watler lifted her foot from her brake, expecting Plaintiff to move forward and merge into traffic. When Plaintiff was unable to merge into traffic, Watler's vehicle rolled forward into the back of Plaintiff's car. Watler did not depress her accelerator immediately prior to the accident and was traveling no faster than five miles per hour when she hit Plaintiff's car. Watler was looking straight ahead at Plaintiff's car for four seconds before her vehicle touched Plaintiff's rear bumper. Watler admitted the collision occurred because she was traveling too closely behind Plaintiff's vehicle.

At the time of impact, Plaintiff's arms were extended forward, holding her steering wheel. Plaintiff's knees hit her steering column, and her head hit her headrest. Plaintiff's airbags did not deploy. Plaintiff's rear bumper suffered no damage in the collision,[11] and there was only minor damage to the passenger-side rear quarter panel of the vehicle.[12] The amount required to repair Plaintiff's car cannot be determined, as Plaintiff traded-in her car soon after the accident without repairing it.[13] There was no physical damage to the USPS vehicle.[14] Watler testified any scratches on the front of the USPS vehicle predated the accident.[15] Neither Plaintiff nor Watler requested or received any medical assistance at the scene of the incident. Plaintiff and Watler each drove their vehicles away from the incident. At trial, Plaintiff testified she immediately felt pain in her head, neck, back, and knees as she drove away from the accident scene.[16] Plaintiff drove to her volunteer job for the Orleans Parish Sheriff's Office and completed her responsibilities that evening.

---

[11] Trial Exhibit 4 at 14; Trial Exhibit 29 at 22, 25. The Court uses the exhibit Bates numbers to refer to exhibit pagination.
[12] Trial Exhibit 4 at 15; Trial Exhibit 29 at 26.
[13] Plaintiff does not seek to recover any property damages to her vehicle.
[14] Trial Exhibit 4 at 13; Trial Exhibit 29 at 24.
[15] Testimony of Christine Watler.
[16] Testimony of Pamela Brooks.

Plaintiff has not missed any work because of her injuries or to receive medical treatment following the accident. At trial, she testified she scheduled her medical procedures to be done during her lunchtime and did not miss any work as a result.[17]

## IV. Injuries

### A. Left and Right Knees

Shortly after the October 31, 2016 accident, Plaintiff's attorney referred her to SouthShore Physician Group, where she saw Dr. Theodore Irra three days after the accident. On that day, Plaintiff reported experiencing pain in both knees.[18] On November 17, 2016, Plaintiff returned to SouthShore Physician Group, where she again reported pain in both knees.[19] A physical exam revealed tenderness in the knees and painless clicking.[20] On December 12, 2016, Plaintiff returned to see Dr. Irra and reported the same knee pain.[21] On January 3, 2017, Plaintiff returned to see Dr. Irra, and reported her knee pain was better, with no weakness, locking, buckling, swelling, catching, giving out or falling.[22] Physical examination revealed Plaintiff had a normal gait.[23] On January 24, 2017, Plaintiff returned to see Dr. Irra, and reported no change in the pain in her knees.[24] On February 14, 2017, Plaintiff returned to see Dr. Irra and reported pain in both knees.[25] On March 7, 2017, Plaintiff returned to Dr. Irra, and reported no change in her knee pain.[26]

---

[17] *Id.*
[18] Trial Exhibit 6 at 85.
[19] *Id.* at 86.
[20] *Id.*
[21] *Id.* at 74, 82-84.
[22] *Id.* at 74.
[23] *Id.*
[24] *Id.* at 74-75.
[25] *Id.* at 48, 69-73.
[26] *Id.* at 48, 65-68.

On March 9, 2017, over four months after the accident, magnetic resonance images ("MRIs") were taken of Plaintiff's left and right knees by Magnolia Diagnostics, Inc.[27] The MRI reports reflect there is evidence of moderately advanced osteoarthritic changes in both knees.[28] The reports also provide evidence of injury to Plaintiff's lateral meniscuses, medial collateral ligaments ("MCLs"), and anterior cruciate ligaments ("ACLs").[29]

On March 14, 2017, Plaintiff returned to see Dr. Irra and reported no change in her knee pain.[30] On March 28, 2017, Plaintiff returned to see Dr. Irra and reported pain in her knees was a little better, with occasional locking of the left knee and giving out of the right knee.[31] On April 19, 2017, Plaintiff returned to SouthShore Physician Group, but this time saw Dr. Ashfaq Qureshi.[32] She reported no change in her knee pain.[33] On May 10, 2017, Plaintiff returned to see Dr. Qureshi and reported a knee pain rating of 4 out of a scale of 10.[34] On May 31, 2017, Plaintiff returned to see Dr. Qureshi and reported no change in her knee pain.[35] On June 21, 2017, Plaintiff returned to see Dr. Qureshi and reported the pain in her knees was slightly better.[36,37]

On September 26, 2017, Plaintiff visited LA Health Solutions, where she saw Dr. Marco Rodriguez.[38] Dr. Rodriguez referred Plaintiff to an orthopedic extremity specialist

---

[27] Trial Exhibit 7.
[28] *Id.* at 106-07, 109-10.
[29] *Id.*
[30] Trial Exhibit 6.
[31] *Id.* at 49, 55-58.
[32] *Id.* at 49, 51-54.
[33] *Id.*
[34] *Id.* at 27, 45-47.
[35] *Id.* at 27-28, 42-45.
[36] *Id.* at 28, 32-35.
[37] The treatments Plaintiff received at SouthShore Physician Group include treatments such as "Hot/Cold: Thermal Moist Packs," "Transcutaneous Electrical Nerve Simulation," "Ultrasound," and "Deep Tissue Massage." Trial Exhibit 6 at 23-26. It is unclear what eight months of "treatment" at SouthShore Physician Group accomplished, if anything.
[38] Trial Exhibit 11 at 308-10.

to evaluate and treat her right shoulder and bilateral knee pain.[39] Over one year after the accident, on November 6, 2017, Plaintiff saw Dr. Timothy Finney at Southern Orthopedic Specialists.[40] She reported to Dr. Finney that she had become knock-kneed over the last ten years and that after the accident her pain in both knees became somewhat more severe.[41] Dr. Finney reviewed the MRI of Plaintiff's knees and noted the MRIs of both knees showed significant osteoarthritis with multiple soft tissue changes.[42] Upon physical examination, Plaintiff exhibited an antalgic gait with severe valgus alignment of the knees.[43] Dr. Finney took x-rays of Plaintiff's knees and noted the x-rays showed severe osteoarthritis in both knees with bone-on-bone in the lateral compartment and valgus alignment of 20 degrees bilaterally.[44] He also noted, that, at some point in the future, it is likely Plaintiff will be a candidate for bilateral knee replacements.[45] With respect to the cause of Plaintiff's knee symptoms, Dr. Finney noted Plaintiff's pre-existing osteoarthritis in her knees would be the main reason for any future knee replacement surgery.[46] He also noted Plaintiff "is certainly heading towards the knee replacement surgeries."[47] However, Dr. Finney also opined the accident may have exacerbated Plaintiff's knee pain and accelerated her need for knee replacement surgeries.[48] Dr. Finney administered injections to both Plaintiff's knees.[49] Plaintiff did not see Dr. Finney again.

---

[39] *Id.*
[40] Trial Exhibit 12.
[41] *Id.* at 477.
[42] *Id.* at 478.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*

Six months later, on May 3, 2018, Plaintiff saw Dr. Robert Douglas Bostick.[50] Upon physical examination, Plaintiff was able to fully extend and flex her knees 115 degrees.[51] Dr. Bostick noted Plaintiff had osteoarthritis in both knees and issues with her left knee meniscus prior to the accident.[52] Dr. Bostick further noted he would causally relate Plaintiff's flared up symptoms in her knees to the accident.[53] He recommended visco supplementation injections in both knees.[54] Plaintiff did not see any treating physicians from May 3, 2018 to December 17, 2018, a gap of over nine months in treatment. On January 22, 2019, Plaintiff returned to see Dr. Bostick, who again recommended an Euflexxa injection for both knees.[55] On June 6, 2019, Plaintiff returned to see Dr. Bostick, and reported no change in her knee pain.[56] On July 30, 2019, Plaintiff returned to see Dr. Bostick, and reported flareups of her bilateral knee pain.[57] Dr. Bostick administered injections with Celestone and lidocaine to both knees.[58]

Defendant's expert witness, Dr. Kevin Watson, reviewed Plaintiff's medical records and, on July 18, 2019, examined Plaintiff.[59] Upon physical examination, Plaintiff presented with some tenderness and laxity in her knees.[60] Dr. Watson observed Plaintiff did not have any locking of her knees, and her range of motion in both knees was 110 degrees.[61] At trial, Dr. Watson clarified 120 degrees would be normal.[62] Dr. Watson

---

[50] Trial Exhibit 11 at 300-01.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.* To date, Plaintiff has not received visco supplementation injections in her knees.
[55] *Id.* at 298-99.
[56] *Id.* at 292-93.
[57] *Id.*
[58] *Id.*
[59] Trial Exhibit 36.
[60] *Id.* at p. 2.
[61] *Id.* at pp. 12-13.
[62] Testimony of Dr. Watson.

described the recommendation of knee surgery as a "severe" and a last resort in terms of treatment options.[63] He noted Plaintiff had significant pre-existing arthritis in her knees, and that the recommended treatment of knee replacement would be due to her pre-existing condition and not due to the accident.[64] He further noted there is no objective evidence of any exacerbation or aggravation of her pre-existing condition.[65]

At trial, Dr. Finney, Dr. Bostick, and Dr. Watson testified regarding Plaintiff's knees injuries. Dr. Finney testified that Plaintiff would radiographically, meaning as indicated by x-ray, be a candidate for knee replacement surgery in the future.[66] However, Dr. Finney was unable to express an opinion one way or another as to whether Plaintiff is presently a candidate for knee replacement surgery.[67] He explained that, just because someone is radiographically a candidate for knee replacement surgery, does not mean that that person requires the surgery presently. Rather, the person also must exhibit an inability to function in performing daily living activities before knee replacement surgery is required.[68] Plaintiff has not seen Dr. Finney since November 6, 2017, and as a result Dr. Finney has not recently evaluated Plaintiff's ability to function. He opined that, due to Plaintiff's pre-existing osteoarthritis, she would probably need knee replacements at some point in the future even without the trauma of the accident.[69]

Dr. Bostick testified the MRIs revealed Plaintiff's osteoarthritis pre-existed the accident.[70] He testified Plaintiff's bilateral knee replacement surgery is required as a

---

[63] Trial Exhibit 36 at pp. 12-13.
[64] *Id.*
[65] *Id.*
[66] Testimony of Dr. Finney.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] Testimony of Dr. Bostick.

result of her osteoarthritis in her knees.[71] Dr. Bostick testified it is more likely than not that Plaintiff's pre-existing osteoarthritis was aggravated by the accident.[72] In his opinion the accident contributed to Plaintiff's need for knee replacement surgery.[73]

The Defense called Dr. Watson, who testified the accident may have caused a temporary worsening of Plaintiff's knee symptoms, not a permanent worsening of her arthritic condition that would affect her pre-existing need for knee replacement surgery.[74] Dr. Watson relied on Plaintiff's January 2017 report of improvement in her knee pain to support his opinion that the accident caused only a temporary worsening of the condition.[75]

### B. Right Shoulder

On November 3, 2016, three days after the accident, Plaintiff visited SouthShore Physician Group, where she saw Dr. Irra and reported experiencing pain in her right shoulder.[76] On November 17, 2016, Plaintiff returned to SouthShore Physician Group, where she again reported pain in her right shoulder.[77] A physical exam revealed both shoulders had abduction to 180 degrees.[78] On December 12, 2016, Plaintiff returned to see Dr. Irra and reported the same shoulder pain.[79] On January 3, 2017, Plaintiff returned to see Dr. Irra, and reported her shoulder pain was better.[80] Physical examination revealed both shoulders had abduction to 160-180 degrees.[81] On January 24, 2017,

---

[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] Trial Exhibit 6 at 85.
[77] *Id.* at 86.
[78] *Id.*
[79] *Id.* at 74, 82-84.
[80] *Id.* at 74.
[81] *Id.*

Plaintiff returned to see Dr. Irra, and reported her shoulder pain was better and intermittent.[82] Upon physical examination, Plaintiff's shoulders again had abduction to 160-180 degrees.[83] On February 14, 2017, Plaintiff returned to see Dr. Irra and reported pain in her shoulder.[84] On March 7, 2017, Plaintiff returned to Dr. Irra, and reported no change in her shoulder pain.[85]

On March 9, 2017, over four months after the accident, an MRI was taken of Plaintiff's right shoulder by Magnolia Diagnostics, Inc.[86] The report indicates a supraspinatus tendon tear and a small hematoma were present.[87]

On March 14, 2017, Plaintiff returned to see Dr. Irra and reported worsening pain in her shoulder.[88] On March 28, 2017, Plaintiff returned to see Dr. Irra and reported pain her shoulder was intermittent.[89] On April 19, 2017, Plaintiff returned to SouthShore Physician Group, but this time saw Dr. Qureshi.[90] She reported her shoulder pain was the same or better.[91] On May 10, 2017, Plaintiff returned to see Dr. Qureshi and reported a shoulder pain rating of 4 out of a scale of 10.[92] On May 31, 2017, Plaintiff returned to see Dr. Qureshi and reported no change in her shoulder pain.[93] On June 21, 2017, Plaintiff returned to see Dr. Qureshi and reported her shoulder pain was improving, rating her pain a 2 out of a scale of 10.[94]

---

[82] *Id.* at 74-75.
[83] *Id.*
[84] *Id.* at 48, 69-73.
[85] *Id.* at 48, 65-68.
[86] Trial Exhibit 7.
[87] *Id.*
[88] Trial Exhibit 6.
[89] *Id.* at 49, 55-58.
[90] *Id.* at 49, 51-54.
[91] *Id.*
[92] *Id.* at 27, 45-47.
[93] *Id.* at 27-28, 42-45.
[94] *Id.* at 28, 32-35.

Over one year after the accident, on November 6, 2017, Plaintiff saw Dr. Timothy Finney.[95] Dr. Finney reviewed the MRI of Plaintiff's shoulder and opined the MRI showed some rotator cuff pathology.[96] Upon physical examination, Plaintiff exhibited a full range of shoulder motion with mild impingement.[97] Dr. Finney recommended conservative treatment of Plaintiff's right shoulder with physical therapy and oral anti-inflammatory medication.[98] Plaintiff did not see Dr. Finney again.

On May 3, 2018, Plaintiff saw Dr. Bostick.[99] Dr. Bostick reviewed the MRI of Plaintiff's right shoulder and noted there is likely a partial rotator cuff tear.[100] Upon physical examination, Plaintiff's right shoulder exhibited some mild impingement but intact strength.[101] Dr. Bostick did not recommend any treatment for Plaintiff's right shoulder at that time.[102] On January 22, 2019, Plaintiff returned to see Dr. Bostick, who administered a cortisone injection to Plaintiff's right shoulder.[103] On June 6, 2019, Plaintiff returned to see Dr. Bostick, and reported her right shoulder was better following the cortisone injection.[104]

On July 18, 2019, Defendant's expert witness, Dr. Watson, examined Plaintiff.[105] Upon physical examination, Plaintiff exhibited good active and passive range of motion in her shoulders and 5 out of 5 rotator cuff strength.[106] She reported some pain in her

---

[95] Trial Exhibit 12.
[96] *Id.* at 478.
[97] *Id.*
[98] *Id.*
[99] Trial Exhibit 11 at 300-01.
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.* at 298-99.
[104] *Id.* at 292-93.
[105] Trial Exhibit 36.
[106] *Id.* at p. 2.

shoulder.[107] Dr. Watson noted that there is a high prevalence of partial rotator cuff tears in the aging population and the presence of partial tearing in Plaintiff's shoulder does not signify trauma or an acute traumatic origin.[108]

On July 30, 2019, Plaintiff returned to see Dr. Bostick, and reported her shoulder was doing well.[109]

At trial, Dr. Finney, Dr. Bostick, and Dr. Watson testified regarding Plaintiff's right shoulder injury, namely, the partial rotator cuff tear. Dr. Finney testified it is possible the gripping of a steering wheel during a collision would result in loading the shoulder and compressing the shoulder causing her rotator cuff to tear.[110] He testified that, in this case, he would relate Plaintiff's shoulder injuries to the accident.[111] He further testified the injury to Plaintiff's right shoulder can be treated non-surgically with physical therapy and injections.[112]

Similarly, Dr. Bostick testified Plaintiff's right shoulder injury is consistent with Plaintiff having her hands placed on the steering wheel at the time of the rear-ending.[113] Dr. Bostick testified he related Plaintiff's shoulder injury to the accident.[114] On May 31, 2019, Dr. Bostick was contacted by Plaintiff's expert life care planner, Elizabeth Martina.[115] Based on their conversation, Martina recited in her life care plan that Dr. Bostick believed it was more probable than not that Plaintiff would require shoulder surgery in the future, as a result of the accident.[116] At trial, Dr. Bostick clarified that, at

---

[107] *Id.*
[108] *Id.* at p. 13.
[109] Trial Exhibit 11 at 283-84.
[110] Testimony of Dr. Finney.
[111] *Id.*
[112] *Id.*
[113] Testimony of Dr. Bostick.
[114] *Id.*
[115] Trial Exhibit 16.
[116] *Id.*

the time he spoke with Martina, he had not seen Plaintiff since he injected Plaintiff's right shoulder on January 22, 2019.[117] Thus, when Dr. Bostick spoke with Martina, he did not know whether the injection had provided Plaintiff relief. After Dr. Bostick spoke with Martina, Plaintiff returned to see him on June 6, 2019.[118] Dr. Bostick opined Plaintiff's right shoulder exhibited improvement.[119] Specifically, her right shoulder revealed excellent range of motion, very little discomfort with impingement testing, and no mechanical issues on a rotational test.[120] Accordingly, Dr. Bostick testified at trial he does not recommend shoulder surgery because Plaintiff responded to conservative treatment.[121]

Dr. Watson testified he agreed with Dr. Finney and Dr. Bostick's conservative treatment of Plaintiff's right shoulder injury.[122] However, Dr. Watson testified he believed it was more likely than not that Plaintiff's partial rotator cuff tear pre-existed the accident and was an incidental finding seen on the MRI of Plaintiff's right shoulder.[123] He testified it is common to see partial rotator cuff tears in middle-aged patients without any symptoms, which tears are caused by normal use of the shoulders.[124]

The record is devoid of evidence of any other incidents that may have caused the partial tearing in Plaintiff's right shoulder rotator cuff. Plaintiff testified she did not experience any pain or symptoms in her right shoulder prior to the accident.[125] There is no evidence Plaintiff received medical treatment for her shoulder prior to the accident.

---

[117] Testimony of Dr. Bostick.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] Testimony of Dr. Watson.
[123] *Id.*
[124] *Id.*
[125] Testimony of Pamela Brooks.

While it is possible Plaintiff's right shoulder injury is the product of normal wear-and-tear brought on by aging, Plaintiff produced the medical testimony of two treating physicians who related her right shoulder injury to the accident.

### C.    Cervical and Lumbar Spine

On November 3, 2016, three days after the accident, Plaintiff visited SouthShore Physician Group, where she saw Dr. Irra and complained of headaches and pain in her back.[126] She did not complain of neck pain or upper back pain.[127] On November 17, 2016, two and a half weeks after the accident, Plaintiff returned to SouthShore Physician Group, where she reported the same lower back pain and reported for the first time pain in her beck and upper back.[128] On December 12, 2016, Plaintiff returned to see Dr. Irra and reported the same neck, lower back, and upper back pain.[129] On January 3, 2017, Plaintiff returned to see Dr. Irra, and reported her neck, lower back, and upper back pain was better.[130] On January 24, 2017, Plaintiff returned to see Dr. Irra, and reported her neck, lower back, and upper back pain was better and intermittent.[131] On February 14, 2017, Plaintiff returned to see Dr. Irra and reported pain in her neck, lower back, and upper back.[132] On March 7, 2017, Plaintiff returned to Dr. Irra, and reported no change in her neck and upper back pain.[133] However, she reported her lower back had felt normal for several days.[134] On March 14, 2017, Plaintiff returned to see Dr. Irra and reported worsening pain in her neck and upper back.[135] However, she reported the intermittent

---

[126] Trial Exhibit 6.
[127] *Id.* at 85.
[128] *Id.* 86.
[129] *Id.* at 74, 82-84.
[130] *Id.* at 74.
[131] *Id.* at 74-75.
[132] *Id.* 48, 69-73.
[133] *Id.* at 48, 65-68.
[134] *Id.*
[135] Trial Exhibit 6.

pain in her lower back was better.[136] On March 28, 2017, Plaintiff returned to see Dr. Irra and reported her neck pain was better and intermittent.[137] She reported her upper back was a little better and her lower back was back to normal.[138] On April 19, 2017, Plaintiff returned to SouthShore Physician Group, but this time saw Dr. Qureshi.[139] She reported her neck was getting better and her lower back was back to normal.[140]

On May 9, 2017, an MRI of Plaintiff's cervical spine was taken by Metairie Imaging.[141] The report lists: C2-C3 shows disc desiccation; C3-C4 shows concentric disc bulge producing neural foraminal narrowing bilaterally with facet hypertrophy bilaterally and the disc is desiccated; C4-C5 shows subligamentous disc herniation measuring 3.9 millimeters, mild-to-moderate neuroforaminal narrowing bilaterally, the disc is desiccated, and facet hypertrophy is appreciated; C5-C6 shows a concentric disc bulge producing mild-to-moderate neural foraminal narrowing bilaterally, the disc appears desiccated, and facet hypertrophy is appreciated bilaterally; C6-C7 shows left paracentral subligamentous disc herniation measuring 5.3 millimeters, there is moderate-to-severe neural foraminal narrowing identified on the left, mild neural foraminal narrowing is identified on the right, and the disc is desiccated; and the C7-Tl disc is desiccated.

On May 10, 2017, Plaintiff returned to see Dr. Qureshi and reported her neck pain at its worst was a 4 on a scale of 10.[142] She rated her lower back pain at its worst a 2 out 10.[143] On May 31, 2017, Plaintiff returned to see Dr. Qureshi and reported no change in

---

[136] *Id.*
[137] *Id.* at 49, 55-58.
[138] *Id.*
[139] *Id.* at 49, 51-54.
[140] *Id.*
[141] Trial Exhibit 8.
[142] Trial Exhibit 6 at 27, 45-47.
[143] *Id.*

her neck pain.[144] She reported her lower back was better and her upper and midback were back to normal.[145] On June 21, 2017, Plaintiff returned to see Dr. Qureshi and reported her headaches, lower back, and mid-back were back to normal.[146] She reported her neck was better, and she rated her upper back pain a 2 out of 10.[147]

On August 28, 2017, Plaintiff saw Dr. Rand Voorhies at Southern Brain & Spine.[148] His review of the MRI of Plaintiff's cervical spine revealed cervical spondylosis with varying degrees of disc osteophyte complex C3-C4, C4-C5, C5-C6, and C6-C7.[149] Dr. Voorhies noted Modic endplate changes in the cervical spine.[150] He recommended cervical flexion and extension views and a cervical SPECT scan.[151]

On September 26, 2017, Plaintiff saw Dr. Rodriguez at LA Health Solutions.[152] She reported 7 out of 10 neck pain and 6 out of 10 lower back pain.[153] Upon physical exam, Plaintiff exhibited tenderness in the bilateral lower facet joints.[154] Dr. Rodriguez took x-rays of Plaintiff's cervical and lumbar spine.[155] He noted the cervical x-rays showed no instability, fractures, or deformities and showed decreased disc height and osteophyte formation from C3-C7.[156] He noted the lumbar x-rays showed no fractures or deformities, showed grade 1 mobile spondylolisthesis at L4-5, and showed decreased disc height and

---

[144] *Id.* at 27-28, 42-45.
[145] *Id.* at 28, 32-35.
[146] *Id.*
[147] *Id.*
[148] Trial Exhibit 10 at 196-200.
[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] Trial Exhibit 11 at 308-10.
[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] *Id.*

osteophyte formation at L5-S1.[157] Dr. Rodriguez recommended anti-inflammatory medicines and facet injections.[158]

On November 7, 2017, over one year after the accident, an MRI of Plaintiff's lumbar spine was taken by Metairie Imaging.[159] The report lists: no significant disc bulge in L1-2, L2-3, or L3-4; L4-L5 shows central disc herniation measuring 6.6 millimeters, moderate neural foraminal narrowing bilaterally, moderate spinal stenosis, facet hypertrophy bilaterally, and fluid within the right and left facet joints; L5-S 1 shows right paracentral disc herniation identified measuring 5.0 millimeters, severe neural foraminal narrowing in the right with contact of the exiting right L5 nerve root, no narrowing on the left, annular tear of the disc, facet hypertrophy bilaterally, and fluid within the right and left facet joints.[160]

On November 13, 2017, a computerized tomography scan ("CT scan") of Plaintiff's cervical spine was taken by Diagnostic Imaging Services.[161] The report lists: disc space narrowing at C3-C4, C4-C5, C5-C6, and C6-C7 with anterior osteophyte formation; C2-C3 demonstrates central disc herniation extending 3 millimeters posterior to the vertebral column; mildly increased activity involving the right C2-C3 facet joint; increased activity involving the right Cl-C2 articulation; C3-C4 demonstrates disc space narrowing with disc herniation extending 2 millimeters posteriorly; C4-C5 shows disc space narrowing and disc herniation extending 2 millimeters posterior to the vertebral column and there is no increased signal in the facet joints; C5-C6 demonstrates disc herniation extending 2 millimeters posterior to the vertebral column with minimal osteophyte formation and

---

[157] *Id.*
[158] *Id.*
[159] Trial Exhibit 8.
[160] *Id.*
[161] Trial Exhibit 9 at 140-45.

there is no facet signal; and C6-C7 demonstrates disc space narrowing with severe left and mild right foraminal restriction.[162]

On November 14, 2017, Plaintiff returned to see Dr. Rodriguez.[163] She reported experiencing constant neck pain and experiencing lower back pain intermittently.[164] Dr. Rodriguez diagnosed Plaintiff with, among other things, cervical facet syndrome and lumbosacral facet joint syndrome.[165] He recommended muscle relaxants and cervical facet injections to treat the cervical facet syndrome and facet injections to treat the lumbosacral facet joint syndrome.[166] Dr. Rodriguez noted that if the cervical facet injections only provided Plaintiff with short-term pain relief, he would likely recommend proceeding with radiofrequency ablations ("RFAs").[167] Similarly, Dr. Rodriguez noted that if the lumbosacral facet injections only provided Plaintiff with short-term relief, he would discuss the option of lumbar RFAs with Plaintiff.[168]

On November 27, 2017, Dr. Voorhies sent a letter to Dr. Finney regarding the CT scan of Plaintiff's cervical spine.[169] He noted the report provides there is a focal area of increased metabolic activity in the anterior column at the C3-C4 endplates.[170] He also recommended referral to an interventionalist for consideration of a cervical epidural steroid injection as a reasonable treatment.[171]

---

[162] *Id.*
[163] Trial Exhibit 11 at 305-11.
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] *Id.*
[169] Trial Exhibit 10 at 193-94.
[170] *Id.*
[171] *Id.* at 194.

On December 26, 2017, Plaintiff returned to see Dr. Rodriguez.[172] She reported her neck pain and lower back pain were sometimes present.[173]

On March 8, 2018, Plaintiff saw Dr. Fred DeFrancesch at Interventional Spine Specialists.[174] She reported pain in her neck and lower back, with her predominant complaint being her lower neck.[175] She rated the pain in her neck a 68 on a scale of 53 to 100.[176] Upon physical examination, Plaintiff exhibited pain with extension and rotation in her cervical spine.[177] She also exhibited tenderness over the C4, C4-C5, and C5-C6 facets.[178] Dr. DeFrancesch reviewed the MRI of Plaintiff's cervical spine and opined it shows multilevel disc disorder without impingement of the cord or severe stenosis.[179] Dr. DeFrancesch administered facet injections with cortisone and Marcaine at the right C4-C5 and C5-C6.[180] He reported that post procedure, Plaintiff felt no pain in the cervical region.[181]

Roughly nine months later, on December 17, 2018, Plaintiff returned to see Dr. DeFrancesch.[182] She reported cervical pain of 60 out of 100 and lumbar pain of 50 out of 100.[183] Upon physical examination, Plaintiff exhibited tenderness over the right C4, C5,

---

[172] Trial Exhibit 11 at 302-04.
[173] *Id.*
[174] Trial Exhibit 13.
[175] *Id.* at 561-64.
[176] *Id.* Although the medical records reflect that Plaintiff rated her pain a 53 on a scale of 68 to 100, Dr. DeFrancesch testified at trial that this was a typo in his notes. His notes should have reflected that Plaintiff rated her neck pain a 68 on a scale of 53 to 100.
[177] *Id.*
[178] *Id.*
[179] *Id.*
[180] *Id.*
[181] *Id.*
[182] *Id.* at 558-60.
[183] *Id.*

and C6 regions.[184] Dr. DeFrancesch recommended a confirmatory medial branch blockade and a lumbar work up to follow completion of the cervical work up.[185]

On January 25, 2019, Plaintiff returned to see Dr. Rodriguez.[186] She reported her neck pain and lower back pain were only present once in a while.[187]

On May 9, 2019, Plaintiff returned to see Dr. DeFrancesch.[188] Plaintiff reported pain in her lumbar and cervical regions.[189] Dr. DeFrancesch performed the right-sided medial branch block at C4, C5, and C6 and then immediately administered an RFA at that level.[190] Plaintiff reported pain of 0 out of 100 post procedure.[191]

On June 18, 2019, Plaintiff returned to see Dr. Rodriguez.[192] She reported her neck pain was only present once in a while, her lower back pain was present sometimes, and she had no mid-back pain.[193] With respect to Plaintiff's cervical facet syndrome diagnosis, Dr. Rodriguez noted Plaintiff had done well with the RFA performed by Dr. DeFrancesch, and he explained to Plaintiff that she would likely need to repeat the procedure every 12-18 months.[194] With respect to Plaintiff's lumbosacral facet joint syndrome diagnosis, Dr. Rodriguez recommended L4-S1 facet injections, or RFAs if the injections only provide short-term relief.[195] He noted that, if the injections do not adequately treat Plaintiff's pain, surgical options could be considered.[196]

---

[184] *Id.*
[185] *Id.*
[186] Trial Exhibit 11 at 295-97.
[187] *Id.*
[188] Trial Exhibit 13 at 552-57.
[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] Trial Exhibit 11 at 289-91.
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*

On July 18, 2019, Plaintiff returned to see Dr. DeFrancesch.[197] She reported cervical pain, predominantly lower neck pain, as well as lumbar pain.[198] Dr. DeFrancesch noted Plaintiff had good relief from cervical facet disorder following the RFA.[199] He recommended a muscle relaxant and palpation of the lumbar facet joints under fluoroscopy.[200]

On July 18, 2019, Defendant's expert witness, Dr. Watson, examined Plaintiff.[201] Upon physical examination, Plaintiff presented with mild sensitivity in the cervical spine and exhibited full flexion and extension of the cervical spine.[202] She exhibited no pain but mild tenderness in the lumbar spine.[203] She was able to flex and touch the floor.[204] Dr. Watson noted Plaintiff did not present for immediate treatment after the accident and continued working that same day.[205] Further, in Plaintiff's initial visit with Dr. Irra following the accident, Plaintiff did not complain of neck or upper back pain and her cervical spine exam was normal.[206] Dr. Watson noted this would not be consistent with an acute, traumatic origin of radicular symptoms.[207] He further noted Plaintiff's diagnoses are cervical disc degeneration, cervical arthritis, and disc bulges/protrusions, which are not trauma-related and are found in the normal aging population.[208] Dr. Watson noted any cervical facet injections or RFAs would not be related to the accident, and there is no medical evidence supporting the efficacy of repeating RFAs beyond five to

---

[197] Trial Exhibit 13 at 546-50.
[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] Trial Exhibit 36.
[202] *Id.* at p. 2.
[203] *Id.*
[204] *Id.*
[205] *Id.* at p. 8.
[206] *Id.*
[207] *Id.*
[208] *Id.*

seven years.[209] With respect to Plaintiff's lumbar spine, Dr. Watson noted Plaintiff did not report lower back pain until three days after the accident, which would not be consistent with a traumatic origin of lower back pain.[210] A traumatic origin of lower back pain would result in symptoms immediately, or almost immediately, following the traumatic incident. He further noted the lumbar spine MRI shows degenerative findings including disc desiccation, facet arthritis, and disc protrusions, but no objective evidence of trauma to the lumbar spine.[211] Dr. Watson noted the scientific literature does not support RFAs and facet joint blocks to treat Plaintiff and noted Plaintiff reported her mid-back and lower back were back to normal after the accident.[212]

On August 5, 2019, Plaintiff returned to see Dr. DeFrancesch.[213]She complained of aching in her lower back and reported pain of 40 out of 100.[214] Dr. DeFrancesch administered the lumbar facet joint injection to L3-L4 and L4-L5 and the medial branch blocks.[215] Post procedure, Plaintiff reported pain of 0 out of 100.[216] Dr. DeFrancesch recommended proceeding with the lumbar confirmatory block and RFA,[217] which Plaintiff received on September 5, 2019.

At trial, Dr. Rodriguez, Dr. DeFrancesch, and Dr. Watson provided medical testimony regarding Plaintiff's cervical and lumbar spine injuries. Dr. Rodriguez testified the x-rays of Plaintiff's cervical and lumbar spine revealed long-term degeneration that pre-existed the accident.[218] Dr. Rodriguez testified the fact that degenerative findings

---

[209] *Id.* at p. 10.
[210] *Id.* at p. 12.
[211] *Id.*
[212] *Id.*
[213] Trial Exhibit 13 at 540-45.
[214] *Id.*
[215] *Id.*
[216] *Id.*
[217] *Id.*
[218] Testimony of Dr. Rodriguez.

were present in Plaintiff's cervical and lumbar x-rays does not mean that Plaintiff necessarily experienced pain before the accident, even though the condition pre-existed the accident.[219] He testified he believed it was more likely than not the accident caused Plaintiff's cervical and lumbar symptoms.[220]

Dr. Rodriguez further testified he initially recommended injections to treat Plaintiff's lower back for therapeutic and diagnostic purposes.[221] Once Plaintiff exhibited success from the cervical RFA, Dr. Rodriguez recommended repeating this procedure every 12-18 months. Dr. Rodriguez testified he would defer to Dr. DeFrancesch's opinion regarding the required length and frequency of RFAs for Plaintiff's cervical and lumbar spines.[222] He testified he believed Plaintiff's future need for RFAs was more probably than not a direct result of the accident.[223] Dr. Rodriguez testified he did not currently recommend spinal fusion surgery due to the successful treatment of Plaintiff through RFAs.[224]

Dr. DeFrancesch testified he believed it is more probable than not Plaintiff's cervical and lumbar injuries are related to the accident.[225] When asked whether Plaintiff's conditions were degenerative, Dr. DeFrancesch testified his physical examination of Plaintiff allowed him to determine her pain generators, which were not related to degenerative findings.[226] Dr. DeFrancesch further testified it is more probable than not that Plaintiff will require RFAs to treat her cervical and lumbar injuries as a result of the

---

[219] Id.
[220] Id.
[221] Id.
[222] Id.
[223] Id.
[224] Id.
[225] Testimony of Dr. DeFrancesch.
[226] Id.

accident.[227] He recommended 15 cervical RFAs and 15 lumbar RFAs, representing an average of 1-2 RFAs per year over the course of ten years.[228] Dr. DeFrancesch cited an unpublished study to support his recommendation of one to two RFAs per year,[229] but he cited no studies to support his recommendation of RFAs for ten years, nor did he testify from his own experience as to the effectiveness of RFAs for ten years.

Dr. Watson testified he does not think Plaintiff's cervical and lumbar conditions are more probably than not the result of the accident.[230] He pointed to the fact that Plaintiff did not seek any treatment until three days after her accident, and when she did so, she did not report any neck pain or upper back pain.[231] He testified this is inconsistent with injuries of traumatic origin, for which a patient would immediately suffer symptoms after the traumatic incident.[232] He testified Plaintiff's cervical and lumbar conditions are most likely degenerative conditions that pre-existed the accident, caused by the normal aging process.[233] Dr. Watson further testified the scientific literature does not support the efficacy of administering cervical or lumbar RFAs for ten years.[234] Referencing specific studies, Dr. Watson testified the literature does not support administering RFAs to the "vast majority" of patients beyond five years.[235]

The medical expert witnesses provided conflicting testimony regarding the origin of Plaintiff's cervical and lumbar injuries. With respect to Plaintiff's cervical injuries, Dr. Watson testified these injuries were degenerative and not caused by the accident. He

---

[227] *Id.*
[228] *Id.*
[229] *Id.*
[230] Testimony of Dr. Watson.
[231] *Id.*
[232] *Id.*
[233] *Id.*
[234] *Id.*
[235] *Id.*

explained a traumatic source of these injuries would manifest immediately; however, Plaintiff did not go to see a doctor until three days after the accident, and when she did, she did not complain of any neck or upper back pain. Plaintiff did not report any cervical spine pain until November 17, 2016, two and a half weeks after the accident. Dr. Rodriguez agreed the x-rays and MRIs of Plaintiff's cervical spine indicated degenerative findings that pre-existed the accident. However, he opined it was possible for Plaintiff not to experience any symptoms from this condition prior to the accident, and related Plaintiff's pain to the accident. Dr. DeFrancesch testified he related Plaintiff's cervical spine injuries to the accident and not the degenerative findings.

With respect to Plaintiff's lumbar spine injuries, both Dr. Rodriguez and Dr. DeFrancesch related Plaintiff's lumbar injuries to the accident. Dr. Watson related these injuries to degenerative findings and noted Plaintiff did not immediately seek treatment for these injuries. However, Plaintiff testified she immediately felt pain in her lower back after the accident and the objective evidence establishes Plaintiff reported pain in her lower back in her first examination just three days after the accident.

## **CONCLUSIONS OF LAW**

### I.    **Jurisdiction**

This case was filed against the United States under the Federal Tort Claims Act ("FTCA"). Before an action may be filed under the FTCA, an administrative claim must be presented to the federal agency employing the person whose act or omission caused the injury.[236] Presentation of an administrative claim to the appropriate agency is a jurisdictional prerequisite to suit.[237] After an administrative claim is presented to the

---

[236] 28 U.S.C. § 2675(a).
[237] *McNeil v. United States*, 508 U.S. 106, 111-13 (1993); 28 U.S.C. § 2675.

appropriate agency, the agency has six months to either admit or deny the claim. A complaint cannot be filed until the administrative claim has been denied or until six months has passed without the agency acting on the administrative claim.[238] In this case, it is undisputed that Plaintiff properly filed an administrative claim, and the agency failed to dispose of her claim within six months. Accordingly, Plaintiff properly exhausted her administrative remedies before filing this lawsuit, and this Court may properly exercise jurisdiction over the matter.

## II.    Federal Tort Claims Act

The FTCA constitutes a "limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment."[239] It is undisputed that Christine Watler, a USPS employee, was acting in the scope and course of her federal employment with USPS at the time of the accident. As a result, the United States is liable to Plaintiff to the same extent as Watler for injuries incurred as a result of the accident.

## III.    Negligence and Allocation of Fault

Under the FTCA, the United States' liability for tort claims is "in the same manner and to the same extent as a private individual under like circumstances" according to the law of the state where the alleged tortious action occurred.[240] Because the accident occurred in Louisiana, Louisiana substantive law applies in this case. Under Louisiana law, Plaintiff's negligence claim is governed by Louisiana Civil Code article 2315. Article 2315 provides: "Every act whatever of man that causes damage to another obliges him by

---

[238] *McNeil*, 508 U.S. at 107 n.1; 28 U.S.C. § 2675(a).
[239] *United States v. Orleans*, 425 U.S. 807, 813 (1976); 28 U.S.C. §§ 2674, 1346(b).
[240] 28 U.S.C. § 2674; *Owen v. United States*, 935 F.2d 734, 737 (5th Cir. 1991).

whose fault it happened to repair it."[241] "[T]he plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence."[242] "Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not."[243] Negligence cases are resolved under the duty/risk analysis which entails five separate elements:

> (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and (5) whether the plaintiff was damaged (the damages element).[244]

> Louisiana Civil Code article 2323 governs the allocation of comparative fault:

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.[245]

In cases in which there is a rear-end collision, Louisiana Revised Statute 32:81(A) provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic

---

[241] La. Civ. Code art. 2315(A).
[242] *Benjamin ex rel. Benjamin v. Housing Authority of New Orleans*, 2004-1058 (La. 12/1/04), 893 So.2d 1, 4.
[243] *Id.* at 4-5.
[244] *Id.* at 6 (citing *Perkins v. Entergy Corp.*, 00–1372 (La.3/23/01), 782 So.2d 606, 611).
[245] La. Civ. Code. art. 2323(A).

upon and the condition of the highway."[246] In such a case, a following motorist is presumed to have breached this statutory duty when a rear-end collision occurs.[247] Even so, "[i]f a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss."[248]

In this case, it is undisputed the vehicle operated by Watler collided with the rear of Plaintiff's vehicle. Plaintiff's vehicle was stationary, and Plaintiff was obeying all traffic laws when merging into traffic. Watler was following Plaintiff's vehicle too closely. As a result, Watler is 100% at fault for the accident, and no comparative fault is attributable to Plaintiff. The key issue is thus whether the October 31, 2016 accident caused Plaintiff's injuries.

Under Louisiana law, a plaintiff in a personal injury lawsuit must prove by a preponderance of the evidence the causal relationship between the injury sustained and the accident which caused the injury.[249] To demonstrate the causal relationship between the accident and the subsequent injury, a plaintiff must prove through medical testimony that it is more probable than not the subsequent injuries were caused by the accident.[250] "It is a settled principle of tort law that when a defendant's wrongful act causes injury, he is fully liable for the resulting damage even though the injured plaintiff had a preexisting condition that made the consequences of the wrongful act more severe than they would

---

[246] La. R.S. 32:81(A).
[247] *Garcia v. Stalsby*, 11-350 (La. App. 3 Cir. 12/14/11), 78 So.3d 873, 877, *writ denied*, 12-422 (La. 4/9/12), 85 So.3d 703.
[248] La. Civ. Code art. 2323(A).
[249] *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603 (La. 2/20/95), 650 So. 2d 757, 759 (citation omitted).
[250] *Id.* (citations omitted).

have been for a normal victim. The defendant takes the plaintiff as he finds him."[251] As the Supreme Court of Louisiana explained in *Housley v. Cerise*, in certain cases plaintiffs are entitled to a presumption of causation:

> '[A] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.'[252]

The application of the *Housley* presumption is a factual issue, which is reviewed by appellate courts under the manifest error standard of review.[253] Under the *Housley* presumption, the trier of fact is not precluded from making determinations regarding the credibility of witnesses, and, after weighing and evaluating the medical testimony, the trier of fact is free to accept or reject the opinion expressed by the medical expert.[254] If a plaintiff is entitled to the *Housley* presumption of causation, "the defendant must show some other particular incident could have caused the injury in question" to overcome the presumption.[255] To wit, the defendant must "present[] . . . proof of . . . [an]other cause for the onset of th[e] condition."[256]

"A plaintiff's recovery for damages caused by a defendant's wrongful act may not be proportionately reduced because of a preexisting weakness or susceptibility to injury

---

[251] *Koch v. United States*, 857 F.3d 267, 273 (5th Cir. 2017) (quoting *Maurer v. United States*, 668 F.2d 98, 99–100 (2d Cir. 1981)) (internal quotation marks and citations omitted).
[252] 579 So.2d 973, 980 (La. 1991) (quoting *Lukas v. Ins. Co. of North America*, 342 So.2d 591 (La. 1977)).
[253] *Harrington v. Wilson*, 08–544 (La. App. 5 Cir. 1/13/09), 8 So.3d 30, 39.
[254] *Id.*
[255] *Maranto v. Goodyear Tire & Rubber Co.*, 643 So.2d 167, 168 (La. App. 2 Cir. 1993) (citing *Davis v. Galilee Baptist Church*, 486 So.2d 1021 (La. App. 2d Cir. 1986)).
[256] *Breaux v. Maturin*, 619 So.2d 174, 177 (La. App. 3 Cir. 1993).

such as an osteoarthritic condition or a weakness caused by a previous injury."[257]

However, there are two exceptions to the general rule:

> First, when a plaintiff is incapacitated or disabled prior to an accident, the defendant is liable only for the additional harm or aggravation that he caused. Second, when a plaintiff has a preexisting condition that would inevitably worsen, a defendant causing subsequent injury is entitled to have the plaintiff's damages discounted to reflect the proportion of damages that would have been suffered even in the absence of the subsequent injury, but the burden of proof in such cases is upon the defendant to prove the extent of the damages that the preexisting condition would inevitably have caused.[258]

With respect to the aggravation of pre-existing conditions, the Louisiana courts

have explained:

> A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Although the victim's damages may be greater because a prior condition was aggravated by the tort, the tortfeasor is, nevertheless, responsible for the consequences of his tort. Nevertheless, before recovery can be granted for aggravation of a pre-existing condition, a causative link between the accident and the victim's current status must also be established.[259]

Thus, regarding the aggravation of a pre-existing condition:

> [T]he defendant is liable only for the 'natural and probable consequences' of that aggravation . . . the jury [or court] can properly reduce an award of future medical expenses to the extent they are necessitated by pre-existing conditions rather than the subject incident. A defendant is not liable for future medical expenses that would be incurred regardless of the aggravation.[260]

"[F]orce-of-impact evidence and testimony is a relevant factor in determining

causation or the extent of injuries."[261]

---

[257] *Koch*, 857 F.3d at 273 (quoting *Maurer*, 668 F.2d at 99–100) (internal quotation marks and citations omitted).

[258] *Id.* (quoting *Maurer*, 668 F.2d at 99–100) (internal quotation marks and citations omitted).

[259] *E.g., Smith v. Escalon*, 48,129 (La. App. 2 Cir. 6/26/13), 117 So. 3d 576, 581.

[260] *Perry v. Starr Indemnity & Liability Co.*, 52, 720 (La. App. 2 Cir. 9/25/19), 2019 WL 4658490, at *6.

[261] *Boudreaux v. Mid-Continent Cas.*, 2009-1379 (La. App. 1 Cir. 5/7/10), 2010 WL 1838560, at *4 (citing *Merrells v. State Farm Mut. Auto. Ins. Co.*, 33,404 (La. App. 2 Cir. 6/21/00), 764 So.2d 1182, 1185).

## IV.　Causation

The Court addresses the issue of causation as it relates to each of Plaintiff's alleged injuries.

### A.　Left and Right Knees

Plaintiff's knee problems, including osteoarthritis in both knees and the tear in her left knee meniscus, pre-existed the accident.[262] Because Plaintiff's knee condition existed prior to the accident, Plaintiff is not entitled to the *Housley* presumption of causation. Plaintiff has met her burden of proving, through medical testimony, that it is more likely than not the accident aggravated her pre-existing osteoarthritis, thereby accelerating her need for knee replacement surgery. However, Defendant has carried its burden of showing Plaintiff would have needed surgery even had the accident not occurred. The Court will reduce Plaintiff's damages related to her knees by eighty percent.

### B.　Right Shoulder

There is no evidence Plaintiff's partially torn rotator cuff existed prior to the accident, and at trial it was established that Plaintiff's right shoulder pain manifested after the accident. Accordingly, Plaintiff is entitled to the *Housley* presumption. Defendant did not point to any other incident causing or reason for the onset of Plaintiff's right shoulder injury. Plaintiff's right shoulder injury was caused by the accident, but Plaintiff has not shown it is more likely than not she will need shoulder surgery.

Plaintiff contends the accident caused, not aggravated, her right shoulder injury. At trial, it was established the MRI of Plaintiff's right shoulder revealed partial tearing of the rotator cuff. Plaintiff produced the medical testimony of two treating physicians who

---

[262] Testimony of Dr. Finney, Dr. Bostick, and Dr. Watson.

expressed the opinion her right shoulder injury more likely than not caused by the accident. These doctors believe Plaintiff needs injections administered to her right shoulder but did not testify she would more likely than not need shoulder surgery. As a result, the Court finds Plaintiff has met her burden of establishing her right shoulder injury was caused by the accident and that her past and future treatment are medically necessary. However, Plaintiff has not carried her burden of establishing it is more likely than not shoulder surgery will be medically necessary.

### C.    Cervical and Lumbar Spine

Because Plaintiff did not immediately report any cervical spine symptoms after the accident, the Court cannot say Plaintiff's cervical spine condition commenced with the accident, and, as a result, Plaintiff is not entitled to the *Housley* presumption of causation. The Court finds Plaintiff has not carried her burden of establishing her cervical spine injuries were caused by the accident. Other courts have arrived at similar conclusions where there is no objective evidence a plaintiff experienced pain immediately after an accident. For instance, in *Avant v. Illinois Nat. Ins. Co.*, the Louisiana Second Circuit Court of Appeals found the trial court committed no manifest error in finding the plaintiff failed to prove a causal relationship between her ankle injury and the accident at issue.[263] The court explained:

> The ankle pain did not manifest itself until several days after the accident. Prior to that time, Avant was able to walk and carry on her duties at work. While Avant had no other explanation for the cause of the ankle pain, her testimony does not suggest how the accident resulted in the ankle injury.[264]

The court further explained one of the plaintiff's physicians testified:

---

[263] 32, 680 (La. App. 2 Cir. 1/26/00), 750 So.2d 394, 396-97.
[264] *Id.* at 397.

[I]t would be 'very odd' if no symptoms appeared until seven to ten days after the accident and that one would 'almost always' expect to experience pain or see some swelling or bruising almost immediately after an accident which results in such an injury.[265]

As Plaintiff's own physician, Dr. Rodriguez, testified, Plaintiff had cervical spine degeneration predating the accident.[266] Plaintiff did not report any injuries or request medical treatment at the scene of the accident and was able to complete her volunteer job that evening. Plaintiff did not report any neck or upper back pain to a doctor until two and a half weeks after the accident. Since then, Plaintiff's neck complaints have been minor and intermittent. As Dr. Watson testified, not to experience pain immediately after the accident would be highly unusual if Plaintiff's cervical injuries were caused by the trauma of an accident.[267] There is no objective evidence of trauma to Plaintiff's cervical spine.[268] Further, the nine month gap in treatment extending from May 2018 to December 2018 "would not be consistent with significant, chronic, ongoing pain or disability."[269] Recently, on June 28, 2019, two and a half years after the accident, Plaintiff reported her neck pain was only present once in a while.[270] It is just as likely Plaintiff's cervical spine condition was caused by pre-existing degenerative changes as by the accident. The Court finds Plaintiff has not met her burden of establishing her cervical spine condition was more likely than not caused by the accident.

Plaintiff's lumbar spine injuries are a different story, however. Plaintiff testified she immediately felt pain in her back after the accident, and the objective evidence confirms Plaintiff reported pain in her lower back in her first examination three days after

---

[265] *Id.*
[266] Testimony of Dr. Rodriguez.
[267] Testimony of Dr. Watson; Trial Exhibit 36 at p. 10.
[268] Trial Exhibit 36 at p. 10.
[269] *Id.* at pp. 13-14.
[270] Trial Exhibit 11 at 289-91.

the accident. There is no evidence predating the accident documenting any issues with Plaintiff's lumber spine. Both Dr. Rodriguez and Dr. DeFrancesch related Plaintiff's lumbar injuries to the accident. As a result, Plaintiff has carried her burden in establishing her lumbar spine injuries were caused by the accident.

The Court turns to whether Plaintiff has proven it is more likely than not she will need 1.5 lumbar RFAs per year for ten years. In a previous case, *Brandner v. State Farm Mutual Automobile Insurance Company*, this Court prohibited Dr. DeFrancesch from testifying a plaintiff required annual RFAs for the remainder of his expected lifetime, thirty-six years.[271] Dr. DeFrancesch had not conducted any research into whether RFAs may be administered annually for thirty-six years and he did not have personal experience administering RFAs to patients for more than ten years.[272] This Court explained the personal experiences of Dr. DeFrancesch "[did] not provide a sufficient foundation to establish the reliability of [his] opinions regarding the medical necessity of annual administration of cervical and lumbar RFAs over the next thirty-six years."[273] Although *Brandner* involved a *Daubert* motion, the Court finds its reasoning instructive.

In this case, Dr. DeFrancesch recommended Plaintiff receive lumbar RFAs for ten years. However, he referenced no scientific literature to support his opinion. Further, he did not testify he has ever personally administered RFAs to any of his patients for a ten year period. Dr. Watson, citing specific studies, testified the scientific literature does not support the efficacy of providing RFAs beyond five to seven years, with the vast majority of patients receiving no more than five years of RFAs. Plaintiff has not carried her burden of showing it is more likely than not it will be medically necessary for her to receive an

---

[271] Civil Docket No. 18-982, 2019 WL 636423 (E.D. La. Feb. 14, 2019).
[272] *Id.* at *3.
[273] *Id.* at *4.

average of 1.5 lumbar RFAs per year for the next ten years. Plaintiff has proven it is more likely than not it will be medically necessary for her to receive one lumbar RFA a year for a total of five years.[274]

## V.    Damages

Plaintiff seeks an award of damages for past medical expenses; future medical expenses; future lost wages; and past and future physical and mental pain and suffering and loss of enjoyment of life.

### A.    Past Medical Expenses

Under Louisiana law, a tort victim may recover past (from injury to trial) and future (posttrial) medical expenses caused by tortious conduct.[275] "A plaintiff bears the burden of proving special damages by a preponderance of the evidence."[276]

At trial, the Defense stipulated to the amount of past medical expenses reflected in Trial Exhibit 27 but did not stipulate all those amounts were caused by the accident. Based on the Court's causation findings:

1. <u>Left and Right Knees</u>: Plaintiff is entitled to twenty percent of her past medical expenses related to her left and right knees.

2. <u>Right Shoulder</u>: Plaintiff is entitled to the full amount of past medical expenses related to her right shoulder.

3. <u>Cervical Spine</u>: Plaintiff is not entitled to any past medical expenses related to her cervical spine.

4. <u>Lumbar Spine</u>: Plaintiff is entitled to the full amount of past medical expenses related to her lumbar spine.

---

[274] Plaintiff has already received a lumbar RFA this year, 2019. She is thus entitled to receive four more RFAs over the next four years.
[275] *Menard v. Lafayette Ins. Co.*, 09–1869 (La. 03/16/10), 31 So.3d 996, 1006.
[276] *Caskey v. Merrick Const. Co., Inc.*, 46, 886 (La. App. 2 Cir. 3/14/12), 86 So.3d 186, 201.

## B.    Future Medical Expenses

Plaintiff bears the burden of proving her future medical expenses. In meeting her burden of proof on the issue of future medical expenses, the plaintiff must show it is more probable than not that these expenses will be incurred and must present medical testimony that the expenses are indicated and the probable cost of these expenses.[277] "Importantly, future medical expenses must be established with some degree of certainty."[278]

Based on the Court's causation findings:

1. <u>Left and Right Knees</u>: Plaintiff is entitled to twenty percent of her future medical expenses related to her left and right knee injuries.

2. <u>Right Shoulder</u>: Plaintiff is entitled to future medical expenses related to her right shoulder for ongoing conservative treatment. Plaintiff is not entitled to any amount of future medical expenses for shoulder surgery.

3. <u>Cervical Spine</u>: Plaintiff is not entitled to any future medical expenses related to her cervical spine.

4. <u>Lumbar Spine</u>: Plaintiff is entitled to future medical expenses relating to her lumbar spine, including the cost of one RFA per year for four years.[279]

## C.    Future Lost Wages

Lost wages, like medical expenses, are special damages.[280] Accordingly, Plaintiff bears the burden of proving her future lost wages by a preponderance of the evidence.[281]

The Court finds as follows:

1. <u>Left and Right Knees</u>: Dr. Bostick opined Plaintiff would be placed on no work status for three months post-op each knee replacement surgery.[282]

---

[277] *Daigle v. City of Shreveport*, 46,429 (La. App. 2 Cir. 10/05/11), 78 So.3d 753, 770, *writ denied*, 11–2472 (La. 02/03/12), 79 So.3d 1027.

[278] *Menard*, 31 So.3d at 1006 (citing *Highlands Ins. Co. v. Missouri Pacific R. Co.*, 532 So.2d 317, 324 (La. App. 3d Cir. 1988), *judgment affirmed sub nom. Lee v. Missouri Pacific R. Co.*, 540 So.2d 287 (La. 1989)).

[279] The Court awarded Plaintiff a total of five years of lumbar spine RFAs. Because Plaintiff has already had one RFA this year, 2019, four RFAs remain.

[280] *Kaiser v. Hardin*, 2006-2092, p. 11 (La. 4/11/07), 953 So.2d 802, 810.

[281] *Caskey*, 86 So.3d at 201.

[282] Trial Exhibit 16 at 715.

Plaintiff is entitled to recover twenty percent of her future lost wages related to her left and right knee replacements.

2. <u>Right Shoulder</u>: Plaintiff is not entitled to recover any future lost wages related to her right shoulder. Plaintiff is entitled to recover future medical expenses for conservative treatment of her right shoulder, for which she will not be required to miss work.

3. <u>Cervical Spine</u>: Because Plaintiff did not establish her cervical spine condition was caused by the accident, she is not entitled to recover any future lost wages related to her cervical spine.

4. <u>Lumbar Spine</u>: Dr. DeFrancesch opined Plaintiff will incur 1-2 weeks off of work after each lumbar RFA procedure.[283] Dr. Watson opined there was only a need for one day of recovery after each RFA procedure.[284] Plaintiff's own treatment history confirms Dr. Watson's opinion. At trial, Plaintiff testified she did not miss any work after the RFAs she has already received.[285] Rather, Plaintiff had these procedures performed during her lunch break and was able to return to work that same day.[286] A reasonable time for recovery after an RFA is three days. Accordingly, Plaintiff is entitled to future lost wages representing three days of recovery after each RFA. At one RFA per year for four years, this totals twelve days of future lost wages.

**D.     Past and Future Physical and Mental Pain and Suffering and Loss of Enjoyment of Life**

General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms.[287] Plaintiff bears the burden of proving general damages by a preponderance of evidence.[288] Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that

---

[283] *Id.* at 714.
[284] Trial Exhibit 36 at p. 12.
[285] Testimony of Pamela Brooks.
[286] *Id.*
[287] *Duncan v. Kansas City Southern Railway Co.*, 00–0066 (La. 10/30/00), 773 So.2d 670, 682, *cert. dismissed*, 532 U.S. 992, 121 S. Ct. 1651 (2001).
[288] *Schwartzberg v. Guillory*, 2016-0753 (La. App. 1 Cir. 2/17/17), 213 So.3d 1266, 1271.

accompany an injury.[289] Loss of enjoyment of life damages refer to the detrimental alterations of a person's ability to participate in the activities or pleasures of life that were formerly enjoyed.[290] The primary objective of general damages is to restore the plaintiff in as near a fashion as possible to the state she was in at the time immediately preceding injury.[291] Vast discretion is accorded to the trier of fact in fixing general damage awards.[292]

At trial, Plaintiff did not testify that she experienced depression or had sought any counseling related to the accident. Plaintiff has continued her full-time employment, as well as her volunteering with the Orleans Parish Sheriff and her church.

Plaintiff testified that prior to the accident, she was able to walk or stand for three to four hours without any pain.[293] After the accident, she is only able to walk or stand for 10 to 15 minutes before experiencing symptoms.[294] Plaintiff testified she is widowed, lives alone, and has no children.[295] She fears performing tasks around her home such as changing a lightbulb because, if she falls, she may not be able to get back up.[296] She fears becoming an invalid because she has no one to care for her.[297] Plaintiff further testified she fears losing her ability to perform her volunteer job at Orleans Parish Sheriff's Office.[298]

The Court finds Plaintiff is entitled to recover $25,000 in past and $25,000 in

---

[289] *McGee v. A C & S, Inc.*, 05–1036 (La. 07/10/06), 933 So.2d 770, 775.
[290] *Id.* at 773-74.
[291] *Daigle v. U.S. Fidelity and Guar. Ins. Co.*, 94-0304 (La. App. 1 Cir. 5/5/95), 655 So.2d 431, 437.
[292] *Cheramie v. Horst*, 93-1168 (La. App. 1st Cir. 5/20/94), 637 So.2d 720, 723.
[293] Testimony of Pamela Brooks.
[294] *Id.*
[295] *Id.*
[296] *Id.*
[297] *Id.*
[298] *Id.*

future general damages.[299]

## VI. Supplemental Expert Reports

**IT IS ORDERED** that Plaintiff and Defendant are to file supplemental expert reports from their respective life care planners and economists, based on the Court's rulings herein, on or before **Monday, December 9, 2019 at 5:00 p.m.** The supplemental lifecare plans must reference trial exhibits and medical testimony as the basis for each element of damages, including equipment and supplies. All damages must be attributed to specific bodily injuries and may not be grouped together. Further, the supplemental lifecare plans should include a discussion of past medical expenses and should specify which portions of the past medical expenses are attributable to each injury.

## <u>CONCLUSION</u>

Based on the above Findings of Fact and Conclusions of Law, the Court finds that Plaintiff Pamela Brooks is entitled to recover damages from Defendant United States of America. The Court defers its ruling on the amount of damages pending receipt of the supplemental expert reports and, if necessary, testimony of the experts.[300]

**New Orleans, Louisiana, this 14th day of November, 2019.**

_Susie Morgan_

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[299] This takes into account the pre-existing nature of Plaintiff's knee problems, which appear to be the major cause of Plaintiff's general damages.
[300] After review of the Plaintiff's and Defendant's supplemental expert reports, the Court will inform the parties whether live testimony will be necessary.